# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

|  |  |
|---|---|
| RightCHOICE Managed Care, Inc.; Blue Cross of California, Inc. d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield, <br><br>        Plaintiffs, | **COMPLAINT** <br><br> JURY TRIAL DEMANDED <br><br> CIVIL ACTION NO. _____ |

2269380.1

v.

Hospital Partners, Inc.; Hospital Laboratory
Partners, LLC; RAJ Enterprises of Central
Florida, LLC d/b/a Pinnacle Laboratory
Services; LifeBrite Laboratories, LLC;
Empower H.I.S. LLC; David Byrns; and Jorge
Perez,

             Defendants.

Plaintiffs RightCHOICE Managed Care, Inc. ("**RightCHOICE**"); Blue Cross of

California, Inc. d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health

Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc. d/b/a Anthem Blue

Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue

Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO

Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and

Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue

Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue

Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue

2

Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield (collectively, the "**BCBS Plans**"), by and through the undersigned counsel, hereby commence this action against Defendants Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services; LifeBrite Laboratories, LLC; Empower H.I.S. LLC; David Byrns; and Jorge Perez (collectively, "**Defendants**").

The BCBS Plans further state and allege as follows:

## NATURE OF THE ACTION

1. Since at least 2016, Defendants have engaged in an illegal and fraudulent scheme with Putnam County Memorial Hospital ("**Putnam**") to enrich themselves at the BCBS Plans' expense by billing for laboratory services that were not payable by the BCBS Plans, were fraudulent, were in violation of RightCHOICE's contract with Putnam, and were otherwise unlawful.

2. Plaintiffs are subsidiaries of Anthem, Inc., an independent licensee of the Blue Cross and Blue Shield Association.

3. Putnam is a 15-bed hospital located in Unionville, Missouri.

4. In late 2016, Putnam's Board of Trustees (the "**Putnam Board**") entered into a series of agreements with Hospital Partners, Inc. ("**Hospital Partners**") and its affiliates that allowed Hospital Partners, its affiliates, and other non-participating laboratories that it engaged (the "**Pass-Through Labs**"), to use Putnam to bill for testing

3

performed by the Pass-Through Labs, even though the patients receiving the testing were never present at Putnam, were never seen by healthcare providers credentialed at Putnam, and were located in areas outside of those serviced by Putnam.

5.     Because of those agreements, Defendants caused claims to be submitted to RightCHOICE under Putnam's name, National Provider Identifier ("**NPI**"), tax identifier, billing information and— most importantly— pursuant to Putnam's favorable contracted reimbursement rates and participating status with RightCHOICE.

6.     The claims at issue include, but are not limited to, substantial numbers of urine drug testing ("**UDT**") claims.

7.     To maximize their profits, Defendants leveraged nationwide networks of healthcare providers and laboratories, who provided their patients' urine specimens.

8.     Upon information and belief, some of the referring healthcare providers and laboratories provided their patients' specimens in exchange for a cut of the amount that Putnam was reimbursed by RightCHOICE.

9.     Defendants retained a substantial percentage of the amounts reimbursed by the BCBS Plans for these laboratory services.

10.     The patients were never present at Putnam, were never treated by Putnam-credentialed healthcare providers, and were located in areas not serviced by Putnam.  Instead, their only connection to Putnam was that their UDT was billed

4

through Putnam in order to take advantage of Putnam's participating status and favorable reimbursement rate with RightCHOICE.

11. Had the claims been billed directly by Defendants, most never would have been paid by RightCHOICE, and those that were paid would have been paid at substantially lower rates.

12. Defendants misrepresented the testing as being conducted at Putnam because they knew that RightCHOICE was more likely to pay for the tests if performed at a participating hospital (as opposed to by a non-participating Pass-Through Lab), and because Putnam's contract with RightCHOICE entitled it to substantially higher rates than the Pass-Through Labs would receive if they billed the claims directly.

13. Tellingly, Defendants began billing RightCHOICE through Putnam for testing immediately upon signing the agreements in late 2016, *even though Putnam's own laboratory was not yet operational*.

14. In spite of this fact, the claims submitted to RightCHOICE since the start of the scheme represented (falsely) that the testing was conducted at Putnam.

15. Since August 2016, the BCBS Plans have paid Putnam more than $60 million for testing that it was not entitled to, much of which was then distributed amongst the Defendants.

16. The increased volume of UDT claims billed to RightCHOICE because of this scheme is staggering. In the first six months of 2016, before the scheme was in

5

place, Putnam billed RightCHOICE only 85 total claims for UDT. On the other hand, in the first six months of 2017, after the scheme was in place, Putnam billed RightCHOICE more than 37,000 claims for UDT, an increase of more than 43,000%.

17. This was done in spite of the fact that Defendants knew that the claims they submitted to RightCHOICE were not payable by RightCHOICE, were fraudulent, were in violation of Putnam's contract with RightCHOICE, and were otherwise unlawful.

18. The purpose of the scheme was to increase the amount that Defendants received from RightCHOICE, without regard to the reasonableness or medical necessity of the underlying testing.

19. This arrangement has been investigated by the Office of the Missouri State Auditor (the "**State Auditor**").[1] The State Auditor described the Defendants' arrangement as "a billing scheme," where "the vast majority of billings were for patients who had never been to or received services from [Putnam]." Instead, it noted, Putnam "submits the bills for [the Pass-Through Labs'] services to the insurance companies, funneling millions of dollars through the hospital and reducing it to what is

---

[1] The State Auditor's report, which is incorporated herein, is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018). The State Auditor's press release announcing its findings is available via the following link: https://auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018).

6

essentially a shell organization for labs across the country." In exchange, the State Auditor continued, "the hospital gets a cut of the insurance payouts."

20. Through this civil action, the BCBS Plans seek compensation for the injuries they have incurred because of Defendants' conduct. In addition, the BCBS Plans seek punitive damages and injunctive relief prohibiting Defendants from further perpetrating the scheme.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question.

22. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

### PLAINTIFFS

24. Plaintiff RightCHOICE Managed Care, Inc. is a Delaware corporation headquartered in St. Louis, Missouri.

7

25.     Plaintiff Blue Cross of California d/b/a Anthem Blue Cross is incorporated and headquartered in California.

26.     Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

27.     Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Colorado.

28.     Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Connecticut.

29.     Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.

30.     Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.

31.     Plaintiff Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Indiana.

32.     Plaintiff Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Kentucky.

33.     Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Maine.

34.     Plaintiff Healthy Alliance Life Insurance Company is incorporated and headquartered in Missouri.

8

35.     Plaintiff HMO Missouri, Inc. is incorporated and headquartered in Missouri.

36.     Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in New Hampshire.

37.     Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

38.     Plaintiff Community Insurance Company d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Ohio.

39.     Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

40.     Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

41.     Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

42.     Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

## DEFENDANTS

43.     Defendant Hospital Partners, Inc. is a Florida corporation headquartered in Florida.  Hospital Partners took over management of Putnam in late 2016.[2]

---

[2]     On November 29, 2016, the Putnam Board agreed to begin transferring operational ownership of Putnam to Hospital Partners.  In a Registration of Fictitious Names filed by David Byrns and Jorge

9

44.     Hospital Laboratory Partners, LLC ("**Hospital Lab Partners**") is a Florida limited liability company.  Upon information and belief, the members of Hospital Lab Partners are residents of Florida or Georgia.  Hospital Lab Partners was contracted by Hospital Partners to, among other things, engage and coordinate the Pass-Through Labs.

45.     LifeBrite Laboratories, LLC ("**LifeBrite Labs**") is a Georgia limited liability company.  Upon information and belief, the members of LifeBrite Labs are residents of Florida or Georgia.  LifeBrite Labs is one of the Pass-Through Labs.

46.     RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services ("**Pinnacle Labs**") is a Florida limited liability company.  Upon information and belief, the members of Pinnacle Labs are residents of Florida.  Pinnacle Labs is one of the Pass-Through Labs.

47.     Empower H.I.S. LLC ("**Empower H.I.S.**") is a Florida limited liability company.  Upon information and belief, the members of Empower H.I.S. are Florida residents.  Empower H.I.S. was contracted to provide billing and other logistical support once Hospital Partners took over management of Putnam.  Upon information and belief, Empower H.I.S. facilitated the substantial financial transactions flowing between the various entities involved in this pass-through scheme.

_____

Perez with the Missouri Secretary of State on April 24, 2017, Byrns is listed as owning 51 percent of the business operating as Putnam County Memorial Hospital, with Jorge Perez owning the remaining 49 percent.  However, as of late 2017, the Missouri Department of Health and Senior Services had not received an official change of ownership request relating to Putnam.

10

48.     Defendant Jorge Perez is a Florida resident and the Vice President of Hospital Partners.  Upon information and belief, Jorge Perez has an ownership or pecuniary interest in Hospital Partners, Hospital Lab Partners, LifeBrite Labs, and Empower H.I.S.

49.     Defendant David Byrns is a Florida resident and was, during times relevant hereto, the President and Chief Executive Officer of Hospital Partners.

## THE BLUECARD PROGRAM

50.     Plaintiffs are subsidiaries of Anthem, Inc., an independent licensee of the Blue Cross and Blue Shield Association ("**BCBS Association**").

51.     Plaintiffs are participants in the BCBS Association's BlueCard program, which allows members of one BCBS Association licensee's health plans to obtain healthcare services in another BCBS Association licensee's service area (e.g., where a member is traveling or living outside of their home plan's service area).

52.     Because Putnam was a participating provider with RightCHOICE, and was located in RightCHOICE's service area, services billed by Putnam for any BCBS Association licensee's members were billed to RightCHOICE.

53.     RightCHOICE then reconciled the cost of the services billed by Putnam with the BCBS Association licensee responsible for each member.[3]

---

[3]   For example, if a BCBS Illinois member receives treatment in Missouri from a provider that is in-network with RightCHOICE, the BCBS Illinois member would be treated as in-network by the Missouri provider. Under the BlueCard program, the Missouri provider would submit its claim to RightCHOICE.  RightCHOICE would pay the provider for services rendered, and would then reconcile the cost of those services with BCBS Illinois.

11

54. As a result, each of the BCBS Plans was harmed by the fraudulent scheme alleged herein.

## MANAGED CARE AND THE BCBS PLANS

55. The BCBS Plans are insurers and third-party claims administrators for group health plans that provide benefits to their covered individuals and dependents.

56. The BCBS Plans may insure group health plans directly (the "**Fully-Insured Plans**"). For these plans, the BCBS Plans resolve claims and make benefit payments from their own assets.

57. The BCBS Plans also provide administrative services to self-funded group health plans (the "**Self-Funded Plans**"). The BCBS Plans deliver these services pursuant to Administrative Services Agreements between the BCBS Plans and the health plan's sponsor (usually an employer), which identify the rights and obligations of each party. Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 *et seq*. The BCBS Plans provide insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

58. The BCBS Plans paid claims to Putnam on behalf of a number of self-funded plans, and seeks redress in this lawsuit for those Self-Funded Plans.

59. The BCBS Plans' Administrative Service Agreements state:

12

> Pursuant to Section 405(c)(1) of ERISA, Employer delegates to Anthem fiduciary authority to determine claims for benefits under the Plan as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. Anthem shall administer complaints, appeals and requests for independent review according to Anthem's complaint and appeals policy, and any applicable law or regulation unless otherwise provided in the Benefits Booklet. In carrying out this authority, Anthem is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan.

60.     Accordingly, each of the Self-Funded Plans delegated to the BCBS Plans the discretionary authority to determine claims for benefits.

61.     In this capacity, the BCBS Plans has processed claims and administered appeals on behalf of all of the Self-Funded Plans.

62.     Similarly, all (or nearly all) of the impacted Self-Funded Plans have given the BCBS Plans the authority and discretion to recover overpayments. Specifically, the Administrative Service Agreements state:

> Employer grants Anthem the authority and discretion to . . . (1) determine and take steps reasonably necessary and cost-effective to effect recovery; (2) select and retain outside counsel; (3) reduce any recovery obtained on behalf of the Plan by its proportionate share of the outside counsel fees and costs incurred during litigation or settlement activities to obtain such recover; and (4) negotiate and effect any settlement of the Employer's and Plan's rights . . . .

63.     Accordingly, the BCBS Plans have authority to seek recovery on behalf of the impacted Self-Funded Plans and for payments made by the Fully-Insured Plans.

13

## THE BCBS PLANS' NETWORK OF PARTICIPATING PROVIDERS

64.  The enrollees of the BCBS Plans are considered the BCBS Plans' "members."

65.  The BCBS Plans rely upon networks of participating (also known as "in-network") healthcare providers.  Participating providers contract with BCBS Plans to accept a negotiated rate for their services, in exchange for, among other things, increased access to members of the BCBS Plans (due to the savings available to the BCBS Plans' members who receive treatment from participating providers) and increased certainty with respect to the amount that they will receive from the BCBS Plans for their services.

66.  On the other hand, non-participating (also known as "out-of-network") providers have not contracted with the BCBS Plans.  The reimbursement rates that the BCBS Plans are required to pay non-participating providers are often less than the rates the BCBS Plans are contractually obligated to pay participating providers, and BCBS Plan members are typically personally responsible for a larger share of the cost of those services.

67.  Putnam is one of RightCHOICE's participating providers.

68.  None of the other Defendants is a participating provider, nor do any of them have contracts with RightCHOICE or the other BCBS Plans.

14

## THE RIGHTCHOICE-PUTNAM CONTRACT

69.     Putnam County Memorial Hospital is a public corporation that operates a 15-bed hospital in Unionville, Missouri.

70.     Unionville is the county seat of Putnam County, which has fewer than 5,000 total residents.

71.     On June 10, 2008, RightCHOICE and Putnam entered into a Participating Hospital Agreement (the "**Contract**").  A true and correct copy of the Contract, filed under seal, is attached as Exhibit A hereto.

72.     The effective term of the Contract was one year, but it automatically renewed for another year upon the same terms and conditions unless terminated through the process set forth in the Contract.

73.     The Contract contains a number of provisions that make clear that RightCHOICE contracted to reimburse Putnam only for services *provided by Putnam*.

74.     For example, Putnam agreed to "*provide* Hospital Services to Covered Persons in accordance with and subject to the terms and conditions of [the Contract]."[4] (Ex. A at § 2.1 (emphasis added).)

75.     Putnam is explicitly prohibited from billing RightCHOICE for services not performed by Putnam.  The Contract states that Putnam "shall bill only for Hospital

---

[4]     The Contract defined "Hospital Services" as "those inpatient and outpatient services, products, and accommodations and care that are customarily provided or available at or available from [Putnam]."  (Ex. A at § 1.11.)

Services performed by, or under the direction and personal supervision of [Putnam]."
(Ex. A at § 4.1(b).)

76. Putnam is also "responsible for each claim submitted by, or on behalf of, [Putnam]." (Ex. A at § 4.1(b).)

77. Other provisions of the Contract relevant to this action include, but are not limited to, that:

    a. Putnam is obligated to "participate in, comply with, and provide Hospital Services in accordance with" RightCHOICE policies, programs, and procedures, including its provider manual. (Ex. A at § 2.6.)

    b. Putnam, its agents, and employees are required to "comply with and abide by all state, federal and local laws and regulations relating to the provision of Hospital Services to Covered Persons." (Ex. A at § 2.7.)

    c. Putnam certified that "all claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE] will be and are accurate, complete, and truthful." (Ex. A at § 4.1(d).)

    d. Putnam agreed to provide "valid and appropriate billing and diagnosis codes." (Ex. A at § 4.2.)

    e. Putnam agreed not to "pay, receive, or offer any incentive, or participate in any incentive program or arrangement, that provides or would provide [Putnam] or any other physician or provider with a direct or indirect

Case 5:18-cv-06037-DGK   Document 1   Filed 03/30/18   Page 16 of 58

inducement to provide less than Medically Necessary health care services, supplies, accommodations, treatments or care to Covered Persons." (Ex. A at § 4.4(c).)

f. Putnam may not "assign, delegate, or transfer [the Contract] or the rights or responsibilities provided for [therein] without the prior written consent of [RightCHOICE]." (Ex. A at § 6.1(a).)

g. The Contract is "governed by, and construed and enforced in accordance with, the laws of the State of Missouri." (Ex. A at § 6.8(a).)

h. Putnam agreed that only medically necessary services would be reimbursed by RightCHOICE, and medically necessary was defined as meaning Covered Services that were:

i. appropriate and necessary for the symptoms, diagnosis, or treatment of the medical condition;

ii. provided for the diagnosis, care and treatment of the medical condition;

iii. within standards of good medical practice within the medical community;

iv. not primarily for the convenience of the Covered Person, the attending physician, or another health care provider; and

17

v.       the type, supply or level of service or care which can safely

be provided and that is not more than what is necessary or appropriate.

(Ex. A at § 1.13 & § 1.18.)

78.     The Contract also sets the amount that Putnam receives from

RightCHOICE for the provision of Hospital Services.

79.     Specifically, the Contract sets the "allowed amount" as the lesser of the

Established Charge, which is set in the schedule of reasonable and customary charges

for services and supplies provided by Putnam; or the appropriate amount under the

applicable Prospective Payment Schedule, which is Attachment A to the Contract.[5]

## URINE DRUG TESTING AND PASS-THROUGH BILLING SCHEMES

### Urine Drug Testing

80.     Drug tests are laboratory analyses used to aid in the detection of

prescription, recreational, or illicit substances in human specimens.  Drug testing may

be used to meet state requirements, evaluate therapeutic compliance and drug aberrant

behavior (*e.g.*, abuse or diversion), or to evaluate for child and elder abuse.  It can

---

[5]     On March 15, 2017, RightCHOICE sent notice to Putnam that it was amending the rates at which it
would reimburse Putnam.  That change became effective on June 15, 2017.

include analysis for most drugs, chemicals, and/or plant products that are known to be misused, including for recreational use.

81. Although drug tests may be performed on a variety of specimen types, UDT is the most commonly used because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

82. This is consistent with Anthem's Clinical UM Guideline, entitled "Drug Testing or Screening in the Context of Substance Use Disorder and Chronic Pain" (the "**Anthem Drug Testing Policy**"), which is incorporated by reference into the Contract, and which states that "the use of blood samples as an alternative to urine for drug testing is considered medically necessary when the use of urine is not feasible[.]"

83. UDT typically falls into two categories of testing: presumptive and definitive.

84. Presumptive testing is used, when medically necessary, to determine the presence or absence of one or more drugs or drug classes. Presumptive testing is typically performed via immunoassay, and results are expressed as negative, positive, or numeric. Presumptive testing is also referred to as "screening" or "qualitative" testing.

85. Definitive testing is a follow-up test performed on a separate portion of the original specimen, when medically necessary, to validate the identity and quantity of a specific drug or metabolite. Definitive testing is typically performed using either

19

gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and results are expressed as a concentration of a particular metabolite or analyte (*e.g.*, nanograms per milliliter (ng/mL)). Definitive testing is also referred to as "confirmation" or "quantitative" testing.

86. Definitive testing is typically reasonable and necessary only in certain circumstances.

87. The Anthem Drug Testing Policy states that definitive testing is medically necessary when <u>all</u> of the following criteria are met:

 a. the presumptive UDT was done for a medically necessary reason;

 b. the presumptive test was negative for prescribed medications, positive for a prescription drug with abuse potential which was not prescribed, or positive for an illegal drug (for example, but not limited to, methamphetamine or cocaine);

  i. the specific definitive test(s) ordered are supported by documentation specifying the rationale for each [definitive] test ordered; and

  ii. clinical documentation reflects how the results of the test(s) will be used to guide clinical care.

20

## The Toxicology Laboratory Industry

88.     In recent years, government enforcement efforts, private lawsuits, and investigative journalism have helped to identify widespread fraud within the toxicology laboratory industry.

89.     For example, in a November 2014 article about the massive increases in the amount of UDT being reimbursed by Medicare, the Wall Street Journal summarized the then-recent history of the industry:

> Spending on the [urine drug] tests took off after Medicare cracked down on what appeared to be abusive billing for simple urine tests.  Some doctors moved on to high-tech testing methods, for which billing wasn't limited.
>
> They started testing for a host of different drugs—including illegal ones that few seniors ever use—and billing the federal health program for the elderly and disabled separately for each substance.
>
> Medicare's spending on 22 high-tech tests for drugs of abuse hit $445 million in 2012, up 1,423% in five years.[6]

90.     In another example, in October 2015, the former Millennium Laboratories agreed to pay $256 million to the U.S. Department of Justice to resolve allegations that it billed Medicare "many millions of dollars' worth" of UDT claims that were "not reasonable and necessary or that were furnished pursuant to prohibited referrals" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and other statutes.

---

[6]     Christopher Weaver and Anna Wilde Mathews, *Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill*, THE WALL STREET JOURNAL, Nov. 10, 2014 (available at: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

21

91.     As a result of concerns about the frequency, cost, and manner with which toxicology laboratories were billing government and commercial payors, a number of changes were put into place as to how laboratories test and bill for UDT.

92.     For example, the Centers for Medicare and Medicaid Services ("**CMS**") changed the way that UDT is billed, in part because of a "concern about the potential for overpayment when billing for each individual drug test rather than a single code that pays the same amount regardless of the number of drugs that are being tested."

93.     Because these changes have decreased both the frequency and rate at which toxicology laboratories are reimbursed for UDT, toxicology laboratories looked for other ways to gain access to more favorable reimbursement rates, including—as here—passing their UDT claims through hospitals to take advantage of the hospitals' participating status and favorable reimbursement rates from payors.

94.     Indeed, the website of one entity that recruited toxicology laboratories to pass their UDT claims through a network of pass-through hospitals makes clear the motives of the arrangement:

> ## Why Hospital Out-Patient Diagnostic Billing?
>
> The Government is continuing to restrict independent clinical labs due to recurring compliance and quality issues. Payers are strategically making moves to block all but a chosen few clinical labs by restricting in-network access. This forces out-of-network labs to strategically align themselves with health systems in order to have a seat at the table. Additionally, patients, clinics, rehab groups, and MDs prefer working with higher quality lab system than their current choices dictate; That's where you come in...
>
> ## Benefits of being a Preferred Partner
>
>   
>
> - 90% adjudication rate
> - 50% of claims within 30 days
> - Get paid a minimum of $500/specimen
>
> - Work with the top health systems in the country
> - Above average reimbursement
>
> - Free state-of-the-art specimen tracking system
> - In-Network status for 90+% of claims

95.     In other words, because of "recurring compliance and quality issues," CMS and commercial payors restricted certain toxicology laboratories from their networks.  This led the remaining laboratories—including those who were restricted from payors' networks for compliance and quality issues—to rely on health systems like Putnam to hide the true identity of the laboratory performing the UDT, and take advantage of the hospitals' participating status and favorable reimbursement agreements with payors.

23

## THE DEFENDANTS' PASS-THROUGH SCHEME

### Overview

96.     As described herein, Hospital Partners took over the management of Putnam in order to allow Defendants to use the hospital as a pass-through (i.e., to camouflage laboratory claims from the Pass-Through Labs so that RightCHOICE would be more likely to pay them, and would pay them at higher rates, than if the Pass-Through Labs billed them directly).

97.     Defendants then split the proceeds, which were substantially greater than what each party would have received if they billed RightCHOICE only for the tests that they actually performed, and at the rates to which they were entitled.

98.     To increase the revenues that they could generate from the pass-through scheme, Defendants relied upon networks of referring healthcare providers who ordered large volumes of laboratory testing (including pain clinics and drug detoxification or rehabilitation facilities).

99.     Upon information and belief, to ensure that they received the specimens referred by these healthcare providers and laboratories, Defendants and other co-conspirators paid them kickbacks by, for example, promising them a portion of the reimbursement that Putnam received for each test, including from RightCHOICE.

100.    Once ordered by a referring healthcare provider, the testing was conducted by the Pass-Through Labs.

24

101.     After testing, the Pass-Through Lab that performed the testing submitted information about the testing to Hospital Partners, Hospital Lab Partners, or Empower H.I.S.

102.     After receiving the claim information from the Pass-Through Lab, Hospital Partners, Hospital Lab Partners, or Empower H.I.S. prepared the claim, and submitted the claim to RightCHOICE as if the testing was performed at and by Putnam and was reimbursable under Putnam's Contract with RightCHOICE.

103.     These claims contained numerous material misrepresentations intended to hide the fact that the testing was being performed at the Pass-Through Labs, and not at Putnam, by Putnam-credentialed providers, or for BCBS Plan members in Putnam's service area.

104.     RightCHOICE reasonably relied on the representations that Defendants made, or caused to be made, on the claims, and paid the claims.

105.     Once Putnam received payment from RightCHOICE, Putnam, Hospital Partners, Hospital Lab Partners, and Empower H.I.S. divided the proceeds of the fraudulent claim between themselves and, upon information and belief, the referring healthcare providers.

**Putnam Agrees to Serve as a Pass-Through**

106.     In mid-2016, Putnam was in extremely poor financial condition. A news article published at the end of 2015 described Putnam as a "house of cards."

25

107.     As a result, the Putnam Board contacted at least three companies to discuss taking over management and/or ownership of Putnam.  Only Hospital Partners agreed to meet with the Putnam Board.

108.     The Putnam Board felt that, without coming to an agreement with Hospital Partners, Putnam was "within days of closing."

109.     As a result, in September 2016, it entered into a management services agreement with Hospital Partners, which was led by David Byrns and Jorge Perez.

110.     Under the management services agreement, Hospital Partners took over day-to-day management of Putnam.

111.     David Byrns, Hospital Partners' President and Chief Executive Officer, was named Chief Executive Officer of Putnam on September 13, 2016.

**Through Putnam, Defendants Engage Other Entities to Facilitate the Scheme**

112.     Shortly after David Byrns was made CEO of Putnam, Putnam engaged Empower H.I.S. to provide logistical support to Putnam, including with respect to billing and the implementation of electronic health records software.

113.     Jorge Perez is or was an officer of Empower H.I.S., and has a pecuniary interest in the company.

114.     Jorge Perez previously conspired to implement at least one other known pass-through billing scheme, at Campbellton-Graceville Hospital in Graceville, Florida.  There, Perez served as Campbellton-Graceville's CEO after it was acquired by The

People's Choice Hospital, LLC.[7]  In the case, laboratory tests performed at third party laboratories were improperly billed to insurers as if performed at and by Campbellton-Graceville Hospital, resulting in more than $50 million in improper reimbursement.

115.    According to public documents, on October 20, 2016, Putnam also contracted with Hospital Lab Partners, an affiliate of Hospital Partners, purportedly to operate a clinical laboratory on behalf of Putnam.

116.    The contract between Putnam and Hospital Lab Partners stated that Hospital Lab Partners was to "provide all personnel, equipment, supplies, and management support necessary for the comprehensive operation of the hospital's clinical laboratory."

117.    Hospital Lab Partners has a network of non-participating toxicology laboratories that it uses to perform testing (referred to herein as the Pass-Through Labs).

118.    Putnam's contract with Hospital Lab Partners made explicit that Putnam would bill payors, including RightCHOICE, for all testing under the hospital's name, regardless of where the testing was performed.

119.    This was done to hide the identity of the Pass-Through Labs from RightCHOICE, and to take advantage of RightCHOICE's agreement to reimburse

---

[7]    People's Choice is itself the defendant in separate actions arising from yet more fraudulent billing schemes. One arose due to its relationship with the Campbellton-Graceville Hospital.  *See Campbellton-Graceville Hosp. Corp. v. Peoples Choice Hosp.*, No. 5:16-cv-00222 (N.D. Fla. filed Aug. 3, 2016).  Another scheme was perpetrated in Oklahoma.  *See Aetna Inc. v. The People's Choice Hosp., LLC*, No. 2:17-cv-04354 (E.D. Pa. filed Sept. 29, 2017) (recently transferred to the Western District of Texas).

27

Putnam at higher rates than the Pass-Through Labs were entitled to if they billed RightCHOICE directly.

### The Pass-Through Conspirators Divide the Proceeds of the Scheme

120.    When RightCHOICE relied on the above misrepresentations and paid the claims, Putnam—under the control of Byrns, Perez, and Hospital Partners—distributed the proceeds of the scheme to the other Defendants in accordance with their respective contracts.

121.    Under its contract with Hospital Lab Partners, Putnam was obligated to pay Hospital Lab Partners 80 percent of any reimbursement it received from payors, with an additional six percent going to one or more billing companies (including Empower H.I.S.).

### The Pass-Through Conspirators Billed RightCHOICE before Putnam's Laboratory was Operational

122.    As soon as the contract between Putnam and Hospital Lab Partners was signed, Putnam began billing RightCHOICE for testing that it did not perform (and could not have performed).

123.    This is consistent with the findings reported by the State Auditor, which noted that Putnam paid Hospital Lab Partners and its subcontracted laboratories $30.4 million in the four-month period from November 2016 to February 2017, in spite of the fact that Putnam's laboratory was not yet operational.

28

124.     This suggests that the scheme generated in excess of $36 million from payors, including RightCHOICE, during those four months.

**Putnam Hires Phlebotomists at Healthcare Providers' Offices**

125.     Shortly after Hospital Partners took over management of Putnam, Putnam began paying approximately $68,000 per month for 33 phlebotomists to facilitate the scheme.

126.     The phlebotomists were apparently hired by Putnam (which was controlled by Byrns, Perez, and Hospital Partners) to provide "pre-laboratory services."

127.     Upon information and belief, Putnam hired the phlebotomists to process specimens that were tested by the Pass-Through Labs, and classified the phlebotomists as Putnam hires to make Putnam appear more involved than it actually was.

128.     The phlebotomists were located in medical practices throughout the country, including Alabama (one), Arizona (one), Arkansas (three), California (two), Georgia (four), Kentucky (three), Louisiana (three), Missouri (two), Oklahoma (two), Tennessee (five), and Texas (seven).

129.     After being questioned by the State Auditor as to the propriety of Putnam paying for the phlebotomists, David Byrns stated that Hospital Partners had reimbursed Putnam for the costs associated with the hiring of these phlebotomists. However, he was unable or unwilling to provide the State Auditor proof of payment.

130.     Upon information and belief, the placement of these phlebotomists in medical practices was, and was intended to be, a kickback to these medical practices in order to induce them to refer their patients' specimens to the scheme.

**The Pass-Through Scheme's Reliance on Over-Testing and Over-Billing**

131.     To maximize the revenue that they could extract from the BCBS Plans, Defendants billed the testing using codes that would maximize the amount likely to be paid, without regard to whether those codes reflected services that were actually appropriate or medically necessary, and without regard to appropriate billing practices.

132.     When using the HCPCS codes[8] in effect in 2016, a laboratory should have billed one presumptive code and one definitive code per date of service.

133.     Instead, Defendants often improperly unbundled and billed RightCHOICE for 15 or more drug testing codes *in addition to* the HCPCS codes for both presumptive and definitive testing.

134.     For example, Putnam billed RightCHOICE for UDT purportedly performed for a BCBS Plan member on December 1, 2016, even though Putnam's laboratory was not yet operational.

135.     Nevertheless, for that member, Putnam billed RightCHOICE 23 different codes, in spite of the fact that two of them—G0479 and G0480—explicitly covered *all* presumptive *and* definitive testing performed for that member on that date of service.

---

[8]     "HCPCS" stands for "Healthcare Common Procedure Coding System" and is a code set used by Medicare and health insurance providers to standardize billing.

30

136.     Of the remaining 21 codes billed to RightCHOICE for this member, a substantial percentage were codes for definitive testing that Putnam misrepresented as being for presumptive testing.

137.     The total amount billed for the UDT purportedly provided to this member was in excess of $4,000.

138.     By comparison, the Medicare Clinical Laboratory Fee Schedule for 2016 was less than $100 each for G0479 and G0480.

**The Pass-Through Conspirators' Efforts to Hide the Scheme**

139.     In early 2017, RightCHOICE sought to investigate the claims being submitted to it by Putnam.

140.     Around the same time, RightCHOICE and Putnam exchanged correspondence as to the substantial increase in claims for UDT being billed to RightCHOICE by Putnam.

141.     For example, on March 15, 2017, RightCHOICE notified David Byrns, as Chief Executive Officer of Putnam, that it was implementing new reimbursement rates for Putnam, which would go into effect on June 15, 2017.

142.     In a letter dated May 18, 2017, David Byrns wrote that Putnam "works diligently to provide the valuable medical services necessary for Anthem-insured patients at Putnam's clinical laboratory[,]" but, "[o]n occasion, Putnam may experience operational issues regarding laboratory capabilities, malfunctioning equipment, or

31

other issues that are common amongst medical providers who perform services with complex instrumentation." In those cases, he continued, Putnam "must work with associates intermittently in order to provide services ordered by physicians."

143. When Byrns made this statement, he knew that it was false, and made with the intent to further the fraudulent pass-through scheme.

144. In the same letter, Byrns described Hospital Lab Partners' role as "provid[ing] consultation, guidance, and expertise to Putnam in regards to the laboratory services and operations performed at Putnam's laboratory facilities."

145. He otherwise refused to divulge the nature of Hospital Lab Partners' relationship with Putnam, other than to say that it "assist[ed] Putnam in providing Anthem-insured patients with sound laboratory services."

146. Byrns stated that he could not provide additional information about the nature of Hospital Lab Partners' relationship with Putnam because he did "not want to disclose [Hospital Lab Partners'] trade secrets, confidential information, or other business know-how[.]"

147. When Byrns made these statements, he knew that they were false and/or omitted material facts. Specifically, Byrns knew that Hospital Lab Partners was conspiring with Hospital Partners, Empower H.I.S., David Byrns, Jorge Perez, and the Pass-Through Labs to bill payors (including RightCHOICE) for testing performed by the Pass-Through Labs as if performed at and by Putnam.

32

**Sample Claims**

148.     In early 2017, as part of its investigation into Putnam's claims, RightCHOICE requested that Putnam provide all records relating to ten sample claims.

149.     On July 3, 2017, RightCHOICE received a letter from Ricardo J. Perez, on Empower H.I.S. letterhead, and with an address in Miami, Florida, but signed on behalf of Putnam County Memorial Hospital.

150.     In his letter, Ricardo Perez said that he was enclosing "all Medical Records information that we have on file."

151.     Enclosed with Perez's letter were documents relating to nine of the ten sample claims identified by RightCHOICE.

152.     However, the only documents provided for the nine sample claims were the UDT results (*i.e.*, no office visit notes, treatment plans, or other records were provided for these patients).

153.     RightCHOICE has identified the following sample claims as illustrative of Defendants' scheme.

*Sample Claim No. 1*

154.     On November 4, 2016, a urine specimen was collected from a BCBS Plan member by a pain management practice in Ohio, hundreds of miles from Putnam.

155.     The test results provided by Empower H.I.S. have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the

33

"Account."

156.   None of the tests are identified as being completed by Putnam, which is consistent with the fact that Putnam's laboratory was not operational when the member's specimen was collected.

157.   Instead, underneath the header, a complete laboratory report from LifeBrite Labs is reprinted:



158.   The test results show that no drugs were detected in the member's specimen, except for Oxycodone, which was prescribed.

34

159.    Because the results of the presumptive test were as expected (*i.e.*, the only positive was for a prescribed medication), definitive testing was not medically necessary under the Anthem Drug Testing Policy.

160.    However, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $3,808.

161.    In reliance on the misrepresentations contained on the claim form submitted by Putnam, RightCHOICE paid Putnam $2,703.68.

162.    This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area.

163.    But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid anything to Putnam for the service.

### *Sample Claim No. 2*

164.    On November 15, 2016, a urine specimen was collected from a BCBS Plan member by a substance abuse treatment facility in Virginia, hundreds of miles from Putnam.

165.    The test results provided by Empower H.I.S. have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the "Account."

35

166.     None of the tests are identified as being completed by Putnam, which is consistent with the fact that Putnam's laboratory was not operational when the member's specimen was collected.

167.     Instead, underneath the header, a laboratory report from LifeBrite Labs is reprinted:



168.     The test results from LifeBrite Labs show that, of the three drugs identified in the member's specimen, two were prescribed (Naloxone and Buprenorphine) and one was not (Gabapentin).

169.     Because of the unexpected positive, the Anthem Drug Testing Policy would have permitted definitive testing to confirm the positive for Gabapentin.

170.     Instead, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $4,138.

171.     In reliance on the misrepresentations contained on the claim submitted by Putnam, RightCHOICE paid Putnam $2,937.98

172.     This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area.

173.     But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid anything to Putnam for the service.

## CAUSES OF ACTION

### COUNT I
### FRAUD AND FRAUDULENT CONCEALMENT
### (Against all Defendants)

174.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

175.     As alleged herein, each of the Defendants, individually and in furtherance of the fraudulent scheme alleged herein, made, or caused to be made, intentional misrepresentations of material fact relating to the insurance claims that Putnam submitted, or caused to be submitted, to the BCBS Plans for reimbursement.

37

176.    When Defendants made these intentional misrepresentations, or caused them to be made, they did so with the intent to induce the BCBS Plans to rely on those misrepresentations and pay the insurance claims.

177.    Each Defendant's participation in the fraudulent scheme includes, but is not limited to, the following:

    a.    *Hospital Partners*:  Hospital Partners was responsible for targeting and taking over the management of Putnam, which was fundamentally essential to the scheme, as Putnam's Contract with RightCHOICE needed to be accessible to the scheme's participants.  Hospital Partners then engaged the other entity Defendants, including the Pass-Through Labs and Empower H.I.S., which Hospital Partners caused to submit the claims to RightCHOICE.  When RightCHOICE relied on Defendants' material misrepresentations and paid the claims, Hospital Partners withdrew funds from Putnam's accounts to pay itself and the other Defendants for their participation in the scheme.  Hospital Partners was controlled by David Byrns and Jorge Perez, both of whom have or had pecuniary interests in the company.

    b.    *Hospital Lab Partners*:  Hospital Lab Partners, which appears to be affiliated with or controlled by Hospital Partners, was engaged by Hospital Partners to contract with and manage the Pass-Through Labs in furtherance of the scheme, which it did.  Upon information and belief, Hospital Lab Partners

38

was also controlled by David Byrns and Jorge Perez, both of whom have or had pecuniary interests in the company.

c.    *Empower H.I.S.*:  Empower H.I.S. was engaged by Hospital Partners to perform billing functions and prepare electronic health records necessary for the success of the scheme.  Specifically, because of the thousands of claims being passed through Putnam by Defendants, Empower H.I.S. managed and submitted the resulting claims to RightCHOICE, in addition to managing and responding to RightCHOICE's requests for records documenting the nature of the testing performed by the Pass-Through Labs.  Empower H.I.S. was controlled by Jorge Perez and his family, and he has or had a pecuniary interest in the company.

d.    *LifeBrite Labs*:  LifeBrite Labs was engaged by Hospital Lab Partners to act as a Pass-Through Lab.  Specifically, LifeBrite Labs agreed to conduct testing on BCBS Plan members' specimens, and to provide the necessary information to other Defendants (including Empower H.I.S.), where they would be billed to RightCHOICE as if performed at and by Putnam.  Upon information and belief, LifeBrite Labs is controlled by Jorge Perez and at least one other individual.  Upon information and belief, Jorge Perez has or had a pecuniary interest in LifeBrite Labs.

e.    *Pinnacle Labs*:  Pinnacle Labs was engaged by Hospital Lab Partners to act as a Pass-Through Lab.  Specifically, Pinnacle Labs agreed to conduct

39

testing on BCBS Plan members' specimens, and to provide the necessary information to other Defendants (including Empower H.I.S.), where they would be billed to RightCHOICE as if performed by Putnam.

f. *Jorge Perez*: Jorge Perez designed and implemented this scheme, including through the various entity Defendants described herein that he controlled. Jorge Perez designed and implemented this scheme in such a way that entities that he controlled each received a cut of any reimbursement paid by RightCHOICE as a result of the fraudulent scheme (including Hospital Partners, Hospital Lab Partners, and Empower H.I.S.). Upon information and belief, Perez owns or controls a network of hospitals, substance abuse facilities, and ancillary service providers (*e.g.*, Empower H.I.S.), all of which are leveraged to perpetrate schemes such as the one described herein.

g. *David Byrns*: David Byrns worked with Jorge Perez to design and implement this scheme, including through his dual roles at Hospital Partners (President) and Putnam (Chief Executive Officer). When installed as Chief Executive Officer of Putnam, David Byrns signed the contracts with the other entity Defendants on Putnam's behalf, which were essential to the success of the scheme. Upon information and belief, David Byrns was responsible for the day-to-day management of Putnam throughout the pendency of this scheme, including responding to requests for information from RightCHOICE during its

40

investigation of the scheme. In addition to being responsible for designing and implementing the scheme, Byrns made material misrepresentations to RightCHOICE during the course of RightCHOICE's investigation of the scheme.

178. Collectively, Defendants concealed information regarding the structure and role of the entity Defendants in furtherance of the conspiracy, and used the entity Defendants to hide the existence of this scheme from the BCBS Plans.

179. The claims submitted by Defendants, or that Defendants caused to be submitted, included the following material misrepresentations:

    a.    provider name (misrepresented as Putnam);

    b.    provider address, Tax ID, and NPI (misrepresented as Putnam);

    c.    type of bill (misrepresented as "141," which indicates a specimen submitted for analysis to a hospital);

    d.    admission type (misrepresented as "3," which indicates an elective admission, when there was no admission);

    e.    source of admission (misrepresented as "1," which indicates a physician referral, when there was no admission);

    f.    patient discharge status (misrepresented as "01," which indicates a discharge to home or self-care, when there was no admission or discharge);

    g.    attending physician's name and NPI (misrepresented as the name and NPI of the referring healthcare provider);

41

h. the medical necessity of the testing performed; and

i. that the information shown on the face of each claim submitted to RightCHOICE was "true, accurate and complete."

180. Defendants also failed to disclose, or caused Putnam to fail to disclose, material facts relating to the insurance claims that Defendants submitted, or caused to be submitted, including that:

a. Putnam was participating in a pass-through scheme designed to misuse the Contract;

b. Upon information and belief, that participants in the pass-through scheme were paying kickbacks to healthcare providers and laboratories in exchange for referring their patients' specimens to the Pass-Through Labs, which in turn were billed to RightCHOICE under the Contract;

c. Upon information and belief, that participants in the pass-through scheme waived BCBS Plan members' copayment and coinsurance obligations, in violation of the BCBS Plans' policy, in order to prevent the scheme from being detected by the BCBS Plans in response to member complaints about owing large coinsurance or copayment amounts.

181. Defendants understood that, under the circumstances, and given the volume of claims received by RightCHOICE from healthcare providers of all types, Putnam had a special relationship of trust and confidence toward RightCHOICE that

42

gave rise to a duty to speak and disclose material information regarding the claims submitted.

182.    Defendants' scheme relied upon this relationship, and the volume of claims received by RightCHOICE, to hide their fraudulent claims.

183.    Defendants had a duty to disclose to RightCHOICE and the BCBS Plans information material to the claims that Putnam submitted, or caused to be submitted, so as not to mislead RightCHOICE and the BCBS Plans.

184.    Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that the claim was not "knowingly or recklessly disregard[ing] or misrepresent[ing] or conceal[ing] material facts."

185.    At the time that Defendants submitted the claims, or caused the claims to be submitted, they knew that the representations described above were false, and that the claims contained the above-described omissions.

186.    These misrepresentations and omissions were material to RightCHOICE's determination of whether the claims were payable.

187.    Defendants intended for RightCHOICE and the BCBS Plans to rely on their material misrepresentations and omissions, such that RightCHOICE would pay Putnam for the claims arising from this pass-through scheme.

188.    Defendants knew, or should have known, that this scheme should have been disclosed to RightCHOICE and the BCBS Plans.  Yet, they failed to disclose the

43

scheme.

189.     In failing to disclose the aforementioned material information, Defendants and Putnam acted in bad faith.

190.     RightCHOICE and the BCBS Plans reasonably relied on the claims submitted by Defendants, including the misrepresentations and omissions, when determining whether to pay each claim.

191.     Had RightCHOICE been aware that the claims contained material misrepresentations, or omitted material information, it would not have made the payments it did.

192.     Similarly, had Defendants disclosed the aforementioned material omissions, RightCHOICE would not have made payment on the claims.

193.     Defendants had superior and special knowledge of the pass-through scheme, as set forth herein, and took steps to prevent RightCHOICE from identifying the scheme.

194.     As a result, when RightCHOICE received the claims, it was unaware of the pass-through scheme, which was not reasonably discoverable by RightCHOICE.

195.     In reliance on the misrepresentations and omissions, RightCHOICE made payment on the claims. The BCBS Plans subsequently reconciled some of those payments with RightCHOICE.

44

196.     Defendants' conduct was specifically designed to injure the BCBS Plans, and was done willfully, maliciously, and in disregard of the BCBS Plans' rights.

197.     As a direct and proximate result of Defendants' material misrepresentations and omissions, the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT II
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

198.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

199.     The claims submitted by Defendants, or caused to be submitted by Defendants, contained material misrepresentations, including but not limited to those described in paragraphs 179 and 180, above.

200.     These representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, made without reasonable care, or made under circumstances in which Defendants ought to have known their falsity.

201.     Defendants' misrepresentations were made to RightCHOICE and the BCBS Plans in the course of Defendants' business and because of a pecuniary interest.

45

202.     Defendants had a duty to disclose to RightCHOICE and the BCBS Plans information material to the claims that Defendants submitted, or caused to be submitted, to RightCHOICE, to avoid misleading RightCHOICE and the BCBS Plans.

203.     Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that they were not "knowingly or recklessly disregardin[ing] or mispresentin[g] or conceal[ing] material facts."

204.     Defendants failed to exercise reasonable care when making these representations.

205.     It was foreseeable that RightCHOICE and the BCBS Plans would rely on Defendants' representations, given the nature of the claims payment process, and the fact that they were submitted to RightCHOICE by Putnam.

206.     RightCHOICE reasonably relied on Defendants' misrepresentations, and paid the claims.

207.     If RightCHOICE had been aware of the material misrepresentations, RightCHOICE would not have paid the claims.

208.     As a direct and proximate result of Defendants' misrepresentations, the BCBS Plans have been damaged in an amount to be determined at trial.

46

## COUNT III
## RESTITUTION UNDER ERISA § 502(a)(3)
### (Against all Defendants)

209.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

210.    Many of the impacted group health plans are employer-sponsored group health plans covered by ERISA (the "**ERISA Plans**").

211.    The BCBS Plans have been delegated by the plan administrator of each of the ERISA Plans the discretionary authority to review and decide on claims for benefits under the ERISA Plans.

212.    The ERISA Plans also delegated to the BCBS Plans the authority to recover overpayments made by the BCBS Plans on the ERISA Plans' behalf.

213.    Because of the fraudulent scheme identified herein, the BCBS Plans have paid millions of dollars in benefits to Putnam, and through Putnam, to Defendants.

214.    The BCBS Plans have standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

215.    As alleged herein, Defendants have submitted, or caused to be submitted, misleading and fraudulent claims to RightCHOICE for payment of benefits for charges related to laboratory services that Defendants represented, or caused to be represented, were performed by Putnam.

47

216. RightCHOICE relied on the claim information supplied by Defendants, or that Defendants caused to be supplied, in determining whether to pay the claims.

217. Had RightCHOICE been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

218. Based upon the fraudulent claims Defendants submitted, or caused to be submitted, to RightCHOICE, Defendants received payments in excess of the amounts that they were actually entitled to receive for those services.

219. Further, even if Defendants did not knowingly and intentionally submit misleading and fraudulent claims to RightCHOICE, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans, and recover overpayments made to Defendants.

220. This is particularly true where Defendants submitted claims, or caused claims to be submitted, for members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from ERISA Plan members. In these instances, Defendants accepted the terms of the ERISA Plans and submitted claims, or caused claims to be submitted, that were subject to those terms.

221. Further, by knowingly accepting payments from the ERISA Plans, Defendants became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

48

222. The ERISA Plans, by their terms, require the return of overpayments and amounts that were erroneously paid.

223. Thus, even to the extent that Defendants did not intentionally overcharge the BCBS Plans, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans and recover these overpayments.

224. Because of Defendants' wrongful behavior, the BCBS Plans have paid millions of dollars in benefits to Putnam, and, through Putnam, to Defendants, that were not owed under the terms of the ERISA Plans.

225. The BCBS Plans seek equitable restitution to cover the assets that Defendants unlawfully obtained because of the conduct described herein.

226. Specifically, the BCBS Plans seek an Order imposing a constructive trust on the assets that Defendants received in the form of overpayments, as well as on any profits or income made by Defendants on those amounts.

227. The BCBS Plans also seek an Order restoring to the BCBS Plans—individually and on behalf of the ERISA Plans—the sums held in constructive trust by Defendants.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF
### UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202
#### (Against all Defendants)

228. The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

49

229. The BCBS Plans act as a claims fiduciary for the ERISA Plans.

230. Therefore, the BCBS Plans have standing under ERISA § 502(a)(3) to enjoin any acts or practices that violate any provisions of the ERISA Plans, and to obtain other appropriate relief to redress such violations or enforce plan provisions.

231. Defendants have engaged in a scheme to defraud RightCHOICE into paying amounts to Defendants in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

232. There is an actual case and controversy between the BCBS Plans and Defendants as to the claims Defendants submitted, and continue to submit, to RightCHOICE, all of which arise from the fraudulent scheme described herein.

233. Defendants' fraudulent scheme is deceptive, unfair, and unlawful.

234. No payment is due to Defendants on any claims that are pending, or may be submitted in the future, where such claims arise from Defendants' fraudulent scheme.

235. There is a *bona fide*, present, and practical need for a declaration as to the lawfulness of Defendants' actions, including whether RightCHOICE has the right to deny the claims implicated by Defendants' actions and scheme.

236. The BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, and that any claims for payment of benefits

50

submitted by Defendants to RightCHOICE because of this scheme are non-payable and void.

237.     The BCBS Plans also seek recovery of their reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1).

238.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent scheme, and that any claims for payment of benefits submitted by Defendants as a result of their fraudulent scheme are non-payable and void.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against all Defendants)**

239.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

240.     RightCHOICE had a valid and enforceable contract with Putnam (referred to throughout this document as the "Contract").

241.     Defendants were aware of the Contract.

242.     Defendants improperly, wrongfully, willfully, and intentionally engaged in the scheme described in this Complaint.  Defendants' scheme was predicated upon the repeated breach of the Contract.

51

243.     By orchestrating and participating in the fraudulent scheme described herein, Defendants caused Putnam to breach its contract with RightCHOICE by, among other things:

a.     Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, for services not performed by, or performed under the direction and personal supervision of, Putnam.  (*See* Ex. A at §§ 1.11, 2.1, and 4.1(b); *see also* Anthem Blue Cross and Blue Shield Provider and Facility Manual at 32 (requiring that providers of laboratory services bill only for the components of the services that they perform).)

b.     Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not accurate, complete, and truthful, including but not limited to claims containing the following misrepresentations:

i.       Provider name;

ii.      Provider address

iii.     Provider Tax ID and NPI;

iv.      Type of bill;

v.       Admission type;

vi.      Source of admission;

vii.     Patient discharge status;

52

viii.     Attending physician's name and NPI;

ix.     Medical necessity of the testing performed; and

x.     That the information provided on the claim was "true, accurate and complete."

c.     Failing to provide "valid and appropriate billing and diagnosis codes."  (*See* Ex. A at § 4.2.)

d.     Failing to participate in, comply with, and provide hospital services in accordance with Anthem policies, programs, and procedures, including the Anthem Provider Manual and Anthem Drug Testing Policy.  (*See* Ex. A at § 2.6.) This includes, but is not limited to, billing for components of laboratory testing not performed by Putnam in violation of the Anthem Blue Cross and Blue Shield Provider Manual.

e.     Assigning, delegating, or transferring the Contract or Putnam's rights and responsibilities under the Contract without the prior written consent of RightCHOICE.  (*See* Ex. A at § 6.1(a).)

f.     Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not reasonable and medically necessary, as defined by the Contract.  (*See* Ex. A at §§ 1.13 & 1.18.)

g.     Paying, receiving, offering an incentive, or participating in an incentive program or arrangement that provides another physician or provider

53

with a direct or indirect inducement to provide less than medically necessary health care services, supplies, accommodations, treatments or care to BCBS Plan members. (*See* Ex. A at § 4.4(c).)

h.　　Failing to refund RightCHIOCE for any overpayment or erroneous payment no later than 30 days after Putnam became aware of the overpayment or erroneous payment. (*See* Ex. A at § 4.4(b).)

244.　Defendants' interference with RightCHOICE's contract with Putnam was without justification.

245.　The BCBS Plans have been damaged by Defendants' acts of interference in an amount to be determined in this litigation.

## COUNT VI
## CIVIL CONSPIRACY
### (Against all Defendants)

246.　The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

247.　Defendants and others known and unknown, including Putnam and other Pass-Through Labs, committed torts against the BCBS Plans by fraudulently and negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

248.　Defendants formed agreements amongst themselves and the above-named parties, and others unknown, directly or indirectly, to commit the unlawful acts

54

described in this Complaint.

249.    The above-named parties committed wrongful acts in furtherance of their common scheme.

250.    The BCBS Plans have been injured by the wrongful scheme in a significant amount to be determined in this litigation.

## COUNT VII
## AIDING AND ABETTING A TORT
### (Against all Defendants)

251.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

252.    Defendants committed torts against the BCBS Plans by fraudulently and negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

253.    Each Defendant knew that the conduct described in this Complaint was occurring and was a breach of duty.

254.    Each Defendant actively participated in various aspects of the scheme described in this Complaint.  Each Defendant also gave substantial assistance or encouragement to other participants in the scheme.

255.    The BCBS Plans have been damaged by the scheme in an amount to be determined in this litigation.

55

256.     Because each Defendant knew of the scheme and gave substantial assistance to further the scheme, each Defendant is subject to liability for the torts committed in furtherance of the scheme.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against all Defendants)

257.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

258.     Defendants fraudulently submitted, or caused the submission of, claims to RightCHOICE for services that were not performed at or by Putnam, or on behalf of Putnam patients.

259.     RightCHOICE, relying on Defendants' misrepresentations, issued reimbursements to Putnam, which were shared with the other Defendants.

260.     Each Defendant, therefore, received a benefit from the BCBS Plans in the form of a share of reimbursements for services that should not have been reimbursed.

261.     The BCBS Plans conferred those benefits in reliance on the reasonable belief that the reimbursements were properly owed.

262.     Each Defendant appreciated the benefit conferred by the BCBS Plans.

263.     Each Defendant has unjustly accepted and retained those benefits.

264.     Each Defendant should be required to make restitution for the benefits it received, retained, and appropriated because justice and equity require such restitution.

56

265.    Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous providers at the expense of insurance companies and patients.

266.    The BCBS Plans are entitled to restitution in an amount to be determined at trial, including but not limited to all amounts Defendants received from RightCHOICE because of Defendants' scheme.

## PRAYER FOR RELIEF

WHEREFORE, the BCBS Plans respectfully request judgment in their favor granting the following relief:

a)    Actual and consequential damages in an amount to be determined at trial, plus interest;

b)    An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

c)    An injunction prohibiting Defendants from continuing their scheme;

d)    An award of the BCBS Plans' costs, including reasonable attorney's fees, in accordance with contractual provisions and ERISA § 502(g)(1);

e)    Punitive damages;

f)    Equitable relief, as described herein; and

g)    Any other relief deemed just, proper, and/or equitable.

57

DATED: March 30, 2018    By:   /s/ Neal F. Perryman

**LEWIS RICE LLC**
Neal F. Perryman, #43057MO
Michael L. Jente, #62980MO
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
T: (314) 444-7600
nperryman@lewisrice.com
mjente@lewisrice.com

-and-

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (*pro hac vice* motion forthcoming)
Randall Tietjen (*pro hac vice* motion forthcoming)
Jamie R. Kurtz (*pro hac vice* motion forthcoming)
Nathaniel J. Moore (*pro hac vice* motion forthcoming)
800 LaSalle Avenue
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
rtietjen@robinskaplan.com
jkurtz@robinskaplan.com
nmoore@robinskaplan.com

***Attorneys for Plaintiffs***

58