**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

RightCHOICE Managed Care, Inc., Blue Cross
of California, Inc. d/b/a Anthem Blue Cross;
Anthem Blue Cross Life and Health Insurance
Company; Rocky Mountain Hospital and
Medical Service, Inc. d/b/a Anthem Blue
Cross and Blue Shield; Anthem Health Plans,
Inc. d/b/a Anthem Blue Cross and Blue
Shield; Blue Cross and Blue Shield of Georgia,
Inc.; Blue Cross Blue Shield Healthcare Plan of
Georgia, Inc.; Anthem Insurance Companies,
Inc. d/b/a Anthem Blue Cross and Blue
Shield; Anthem Health Plans of Kentucky, Inc.
d/b/a Anthem Blue Cross and Blue Shield;
Anthem Health Plans of Maine, Inc. d/b/a
Anthem Blue Cross and Blue Shield; Healthy
Alliance Life Insurance Company; HMO
Missouri, Inc.; Anthem Health Plans of New
Hampshire, Inc. d/b/a Anthem Blue Cross
and Blue Shield; Empire HealthChoice
Assurance, Inc. d/b/a Empire Blue Cross and
Blue Shield; Community Insurance Company
d/b/a Anthem Blue Cross and Blue Shield;
Anthem Health Plans of Virginia, Inc. d/b/a
Anthem Blue Cross and Blue Shield; HMO
Healthkeepers, Inc. d/b/a Anthem Blue Cross
and Blue Shield; Blue Cross Blue Shield of
Wisconsin d/b/a Anthem Blue Cross and Blue
Shield; Compcare Health Services Insurance
Corporation d/b/a Anthem Blue Cross and
Blue Shield; Blue Cross Blue Shield of
Michigan Mutual Insurance Company;
BCBSM, Inc. d/b/a BlueCross BlueShield of
Minnesota; Regence BlueCross BlueShield of
Oregon; Regence BlueCross BlueShield of
Utah; Regence BlueShield; and Regence
BlueShield of Idaho,

**THIRD AMENDED COMPLAINT**

JURY TRIAL DEMANDED

CIVIL ACTION NO.
5:18-CV-06037-DGK

- 1 -

Plaintiffs,

v.

Hospital Partners, Inc.; Hospital Laboratory
Partners, LLC; Empower H.I.S. LLC; LifeBrite
Laboratories, LLC; RAJ Enterprises of Central
Florida, LLC d/b/a Pinnacle Laboratory
Services; Labmed Services, LLC;
SeroDynamics, LLC; Lucenta Labs, LLC;
David Byrns; Jorge Perez; Christian Fletcher;
James F. Porter, Jr.; Beau Gertz; and Mark
Blake.

                    Defendants.

Plaintiffs RightCHOICE Managed Care, Inc. ("RightCHOICE"); Blue Cross of

California, Inc. d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health

Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc. d/b/a Anthem Blue

Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue

Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a

Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO

Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and

- 2 -

Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Michigan Mutual Insurance Company; BCBSM, Inc. d/b/a BlueCross BlueShield of Minnesota; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield; and Regence BlueShield of Idaho (collectively, "Plaintiffs"), by and through the undersigned counsel, hereby commence this action against Defendants Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; Empower H.I.S., LLC; RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services; LifeBrite Laboratories, LLC; Labmed Services, LLC; SeroDynamics, LLC; Lucenta Labs, LLC; David Byrns; Jorge Perez; Christian Fletcher; James F. Porter, Jr.; Beau Gertz; and Mark Blake (collectively, "Defendants").

Plaintiffs further state and allege as follows:

### NATURE OF THE ACTION

1.     Since at least 2016, Defendants have engaged in an illegal and fraudulent scheme using Putnam County Memorial Hospital ("Putnam") to enrich themselves at Plaintiffs' expense by billing for laboratory services that were not payable by Plaintiffs, were fraudulent, were in violation of RightCHOICE's contract with Putnam, and were

- 3 -

otherwise unlawful.

2. Putnam is a 15-bed hospital located in Unionville, Missouri.

3. In late 2016, Putnam's Board of Trustees (the "Putnam Board") entered into a series of agreements with Hospital Partners, Inc. ("Hospital Partners") and its affiliates that allowed Hospital Partners, its affiliates, and other non-participating laboratories that it engaged (the "Pass-Through Labs"), to use Putnam to bill for testing performed by the Pass-Through Labs, even though the patients receiving the testing were never present at Putnam, were never seen by healthcare providers credentialed at Putnam, and were located in areas outside of those serviced by Putnam.

4. Because of the agreements, Defendants caused claims to be submitted to RightCHOICE under Putnam's name, National Provider Identifier ("NPI"), tax identifier, billing information and— most importantly— pursuant to Putnam's favorable contracted reimbursement rates and participating status with RightCHOICE.

5. The claims at issue include, but are not limited to, substantial numbers of urine drug testing ("UDT") claims.

6. When referring providers ordered the tests, they ordered them from laboratories (the Pass-Through Labs), typically with the assistance of the laboratories' sales personnel. They did not order the tests from Putnam.

7. To maximize their profits, Defendants leveraged nationwide networks of providers and laboratories, who provided their patients' specimens.

- 4 -

8.     Upon information and belief, some of the referring providers and laboratories provided their patients' specimens in exchange for a cut of the amount that Putnam was reimbursed by RightCHOICE.

9.     Defendants retained a substantial percentage of the amounts reimbursed by Plaintiffs for these laboratory tests.

10.     The patients were never present at Putnam, were never treated by Putnam-credentialed healthcare providers, and were located in areas not serviced by Putnam.  Instead, their only connection to Putnam was that their tests were billed through Putnam to take advantage of Putnam's participating status and favorable reimbursement rate with RightCHOICE.

11.     Had the claims been billed directly by Defendants, most never would have been paid by RightCHOICE, and those that were paid would have been paid at substantially lower rates.

12.     Defendants misrepresented the tests as being conducted at Putnam because Putnam's contract with RightCHOICE entitled it to substantially higher rates than the Pass-Through Labs would receive if they billed the claims to RightCHOICE directly.

13.     Defendants began billing tests to RightCHOICE through Putnam immediately upon signing the agreements in late 2016, *even though Putnam's own*

- 5 -

*laboratory was not yet operational.*  Yet, the claims submitted to RightCHOICE since the start of the scheme represented that the tests were conducted at and by Putnam.

14.    Since August 2016, Defendants billed Plaintiffs more than $225 million for laboratory tests purportedly performed at Putnam, causing Plaintiffs to reimburse Putnam more than $73 million for tests that it was not entitled to.

15.    The majority of the $73 million paid by Plaintiffs to Putnam was then distributed to Defendants.

16.    In the year before Defendants implemented the scheme described herein, Putnam generated only $7.5 million in total revenue.

17.    The increase in UDT claims billed to RightCHOICE because of this scheme is staggering.  In the first six months of 2016, before the scheme was in place, Putnam billed RightCHOICE for 85 total UDT claims.  However, in the first six months of 2017, after the scheme was in place, Putnam billed RightCHOICE more than 37,000 UDT claims, an increase of more than 43,000%.

18.    This was done in spite of the fact that Defendants knew the claims they submitted to RightCHOICE were not payable by RightCHOICE, were fraudulent, were in violation of Putnam's contract with RightCHOICE, and were otherwise unlawful.

19.    The purpose of the scheme was to increase the amount that Defendants received from RightCHOICE, without regard to the reasonableness or medical necessity of the underlying testing.

- 6 -

20.     This arrangement has already been investigated by the Office of the Missouri State Auditor (the "State Auditor").[1]

21.     The State Auditor described the arrangement as "a billing scheme," where "the vast majority of billings were for patients who had never been to or received services from [Putnam]." It explained that Putnam "submits the bills for [the Pass-Through Labs'] services to the insurance companies, funneling millions of dollars through the hospital and reducing it to what is essentially a shell organization for labs across the country." In exchange, "the hospital gets a cut of the insurance payouts."

22.     Through this civil action, Plaintiffs seek compensation for the injuries they incurred because of Defendants' conduct. Similarly, Plaintiffs seek the imposition of punitive damages, equitable relief, and injunctive relief prohibiting Defendants from further perpetrating the scheme.

---

[1]    The State Auditor's report, which is incorporated herein, is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited July 13, 2018). The State Auditor's press release announcing its findings is available via the following link: https://auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited July 13, 2018). A follow-up review by the State Auditor was published on July 11, 2018, and is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloways-follow-review-putnam-county-memorial-hospital-reveals-end-questionable-lab.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question.

24.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

### PLAINTIFFS

26.     Plaintiff RightCHOICE Managed Care, Inc. is a Delaware corporation headquartered in Missouri.

27.     Plaintiff Blue Cross of California d/b/a Anthem Blue Cross is incorporated and headquartered in California.

28.     Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

29.     Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Colorado.

- 8 -

30.     Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Connecticut.

31.     Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.

32.     Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.

33.     Plaintiff Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Indiana.

34.     Plaintiff Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Kentucky.

35.     Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Maine.

36.     Plaintiff Healthy Alliance Life Insurance Company is incorporated and headquartered in Missouri.

37.     Plaintiff HMO Missouri, Inc. is incorporated and headquartered in Missouri.

38.     Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in New Hampshire.

39.     Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

40.     Plaintiff Community Insurance Company d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Ohio.

41.     Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

42.     Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

43.     Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

44.     Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

45.     Plaintiff Blue Cross Blue Shield of Michigan Mutual Insurance Company is incorporated and headquartered in Michigan.

46.     Plaintiff BCBSM, Inc. d/b/a BlueCross BlueShield of Minnesota is incorporated and headquartered in Minnesota.

47.     Plaintiff Regence BlueCross BlueShield of Oregon is incorporated and headquartered in Oregon.

48.     Plaintiff Regence BlueCross BlueShield of Utah is incorporated and headquartered in Utah.

49.     Plaintiff Regence BlueShield is incorporated and headquartered in Washington.

50.     Plaintiff Regence BlueShield of Idaho is incorporated and headquartered in Idaho.

**DEFENDANTS**

51.     Defendant Hospital Partners, Inc. is a Florida corporation headquartered in Florida.  Hospital Partners took over management of Putnam in late 2016.[2]

52.     Hospital Laboratory Partners, LLC ("Hospital Lab Partners") is a Florida limited liability company.  Upon information and belief, the members of Hospital Lab Partners are Florida residents.  Hospital Lab Partners was contracted by Hospital Partners to, among other things, engage and coordinate the Pass-Through Labs. Hospital Lab Partners was voluntarily dissolved on April 5, 2018, the same day it was served with the Complaint and Summons in this case.

53.     Empower H.I.S. LLC ("Empower H.I.S.") is a Florida limited liability company.  Upon information and belief, the members of Empower H.I.S. are Florida

---

[2]     On November 29, 2016, the Putnam Board agreed to begin transferring operational ownership of Putnam to Hospital Partners.  In a Registration of Fictitious Names filed by David Byrns and Jorge Perez with the Missouri Secretary of State on April 24, 2017, Byrns is listed as owning 51 percent of the business operating as Putnam County Memorial Hospital, with Jorge Perez owning the remaining 49 percent.  However, on March 28, 2018, Hospital Partners filed a Complaint against the Putnam Board and State Auditor seeking a wide variety of declaratory relief, including a declaration that Hospital Partners "is in control of [Putnam] and shall have full access thereto without interference from any Defendants or other third-parties."  *See Hospital Partners, Inc. v. Putnam County Memorial Hospital Board of Trustees and Nicole Galloway (as the Office of Missouri State Auditor)*, Case No. 18AK-CC00009 (Putnam Cty. Circ. Ct.).  The case is ongoing.

- 11 -

residents. Empower H.I.S. was contracted to provide billing and other logistical support once Hospital Partners took over management of Putnam. Upon information and belief, Empower H.I.S. facilitated the substantial financial transactions flowing between the various entities involved in this pass-through scheme.

54.     RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services ("Pinnacle Labs") is a Florida limited liability company. Upon information and belief, the members of Pinnacle Labs are residents of Florida. Pinnacle Labs is one of the Pass-Through Labs.

55.     LifeBrite Laboratories, LLC ("LifeBrite Labs") is a Georgia limited liability company. Upon information and belief, the sole member of LifeBrite Labs is a Georgia resident. LifeBrite Labs is one of the Pass-Through Labs.

56.     LabMed Services, LLC ("LabMed") is a Nevada limited liability company. Upon information and belief, the members of LabMed are residents of Colorado and Florida. LabMed is one of the Pass-Through Labs.

57.     Serodynamics, LLC ("Serodynamics") is a Colorado limited liability company. Upon information and belief, the members of Serodynamics are residents of Colorado and Florida. Serodynamics is one of the Pass-Through Labs.

58.     Lucenta Labs, LLC ("Lucenta Labs") is a Texas limited liability company. Upon information and belief, the members of Lucenta Labs are residents of Texas. Lucenta Labs is one of the Pass-Through Labs.

- 12 -

59.     Defendant Jorge Perez is a Florida resident and the Vice President of Hospital Partners.  Upon information and belief, Jorge Perez has a management role, ownership interest, or pecuniary interest in Hospital Partners, Hospital Lab Partners, and Empower H.I.S.

60.     Defendant David Byrns is a Florida resident and was, during times relevant hereto, the President and Chief Executive Officer of Hospital Partners.  Once Hospital Partners took over the management of Putnam, Byrns became Putnam's Chief Executive Officer.

61.     Defendant Christian Fletcher is a Georgia resident and was, during times relevant hereto, the sole member, manager, and Chief Executive Officer of LifeBrite Labs.

62.     Defendant James F. Porter, Jr. is a Florida resident and was, during times relevant hereto, the Manager of both Hospital Lab Partners and Pinnacle Labs.

63.     Defendant Beau Gertz is a Colorado resident and was, during times relevant hereto, responsible for the management of LabMed and Serodynamics.

64.     Defendants Mark Blake is a Florida resident and was, during times relevant hereto, a principal of LabMed.  Upon information and belief, Blake also assisted with the management of Serodynamics.

- 13 -

## THE BCBS PLANS

## THE BLUECARD PROGRAM

65.     Plaintiffs are independent licensees (or subsidiaries of independent

licensees) of the Blue Cross and Blue Shield Association ("BCBS Association").

66.     Each of the Plaintiffs is a participant in the BCBS Association's BlueCard

program, which allows members of one BCBS Association licensee's health plans to

obtain healthcare in another BCBS Association licensee's service area (e.g., where a

member is traveling or living outside of their home plan's service area).

67.     The laboratory services at issue in this matter were billed by Putnam to

RightCHOICE.

68.     RightCHOICE then reconciled the cost of the services billed by Putnam

with the BCBS Association licensee responsible for each member.

69.     As a result, each of the impacted licensees of the BCBS Association was

harmed by the scheme alleged herein.

## ASSIGNMENT OF LEGAL CLAIMS FOR MONEY OWED BY OTHER LICENSEES OF THE BCBS ASSOCIATION

70.     Other independent licensees of the BCBS Association (who similarly

participate in the BlueCard program) have been injured by this pass-through scheme in

the same way as Plaintiffs.

71.     As a result, the following licensees of the BCBS Association have assigned

to BCBS Georgia their legal claims for money owed as a result of Defendants' pass-

- 14 -

through billing scheme alleged herein (collectively, the "Assignor BCBS Plans"):

    a.      Blue Cross and Blue Shield of Alabama;

    b.      USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield; HMO Partners, Inc. d/b/a Health Advantage;

    c.      Blue Shield of California;

    d.      CareFirst of Maryland, Inc., CareFirst BlueChoice, Inc., CFA, LLC; Group Hospitalization and Medical Services, Inc.;

    e.      Blue Cross and Blue Shield of Florida, Inc.;

    f.      Health Care Service Corporation;

    g.      Hawaii Medical Service Association;

    h.      Highmark, Inc., Highmark West Virginia Inc., Highmark BCBSD Inc., and Highmark Choice Company;

    i.      Horizon Blue Cross Blue Shield of New Jersey;

    j.      Blue Cross and Blue Shield of Kansas, Inc.;

    k.      Blue Cross of Idaho Health Service, Inc.;

    l.      Independence Blue Cross, LLC;

    m.      Blue Cross and Blue Shield of Kansas City;

    n.      Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana;

    o.      Blue Cross and Blue Shield of Massachusetts, Inc.;

- 15 -

p.      Blue Cross & Blue Shield of Mississippi, Inc.;

q.      Blue Cross and Blue Shield of Nebraska;

r.      Blue Cross and Blue Shield of North Carolina;

s.      Noridian Mutual Insurance Company d/b/a Blue Cross Blue

Shield of North Dakota;

t.      Premera Blue Cross;

u.      Blue Cross & Blue Shield of Rhode Island;

v.      Blue Cross and Blue Shield of South Carolina;

w.      BlueCross BlueShield of Tennessee;

x.      Blue Cross Blue Shield of Wyoming;

y.      Blue Cross and Blue Shield of Arizona, Inc.; and

z.      Wellmark, Inc.

72.      The assignments completed by the Assignor BCBS Plans state that each Assignor BCBS Plan "assigns and transfers to [RightCHOICE] the rights, title and interest to legal claims for money owed, to the extent permitted by applicable law, that [the Assignor BCBS Plans] may assert against any individual or entity, known or unknown, because of their participation in the Putnam County Pass-Through Scheme."[3]

73.      Collectively, Plaintiffs and the Assignor BCBS Plans are referred to herein as the "BCBS Plans."

---

[3]      BCBS Assignor Plan Wellmark, Inc. restricted its assignment to fully-insured plans.

- 16 -

## MANAGED CARE AND THE BCBS PLANS

74.    The BCBS Plans are insurers and third party claims administrators for group health plans that provide benefits to their covered individuals and dependents.

75.    The BCBS Plans may insure group health plans directly (the "Fully-Insured Plans").  For these plans, the BCBS Plans resolve claims and make benefit payments from their own assets.

76.    The BCBS Plans also provide administrative services to self-funded group health plans (the "Self-Funded Plans").  The BCBS Plans deliver these services pursuant to Administrative Services Agreements between the BCBS Plans and the health plan's sponsor (usually an employer), which identify the rights and obligations of each party. Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 *et seq*.  The BCBS Plans provide insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

77.    The BCBS Plans paid claims to Putnam on behalf of a number of Self-Funded Plans, and seek redress in this lawsuit for those Self-Funded Plans.

78.    The BCBS Plans have prepared an exhibit listing the impacted Self-Funded Plans, and will be prepared to file the document once a protective order is in

- 17 -

effect, given the confidential and sensitive nature of a document listing many of the BCBS Plans' customers.

79.     The BCBS Plans' agreements with their Self-Funded Plans expressly provide the BCBS Plans with the authority and discretion to recover overpayments on behalf of their customers.

80.     Accordingly, the BCBS Plans have authority and standing to seek recovery on behalf of the impacted Self-Funded Plans and for payments made by the Fully-Insured Plans.

### THE BCBS PLANS' NETWORK OF PARTICIPATING PROVIDERS

81.     Enrollees of the BCBS Plans are considered the BCBS Plans' "members."

82.     The BCBS Plans rely upon networks of participating (also known as "in-network") providers.  Participating providers contract with BCBS Plans to accept a negotiated rate for their services, in exchange for, among other things, increased access to members of the BCBS Plans (due to the savings available to the BCBS Plans' members who receive treatment from participating providers) and increased certainty with respect to the amount that they will receive from the BCBS Plans for their services.

83.     On the other hand, non-participating (also known as "out-of-network") providers have not contracted with the BCBS Plans.  The reimbursement rates that the BCBS Plans are required to pay non-participating providers are often less than the rates the BCBS Plans are contractually obligated to pay participating providers, and BCBS

- 18 -

Plan members are often personally responsible for a larger share of the cost of those services.

84.     Putnam is one of RightCHOICE's participating providers.

85.     None of the other Defendants is a participating provider, nor do any of them have contracts with RightCHOICE or the other BCBS Plans.

<u>**THE RIGHTCHOICE-PUTNAM CONTRACT**</u>

86.     Putnam County Memorial Hospital is a public corporation that operates a 15-bed hospital in Unionville, Missouri.

87.     Unionville is the county seat of Putnam County, which has fewer than 5,000 total residents.

88.     On June 10, 2008, RightCHOICE and Putnam entered into a Participating Hospital Agreement (the "Contract").  A redacted, but otherwise true and correct copy of the Contract, is attached as Exhibit A hereto.

89.     The effective term of the Contract was one year, but it automatically renewed for another year upon the same terms and conditions unless terminated through the process set forth in the Contract.

90.     The Contract contains a number of provisions that make clear that RightCHOICE contracted to reimburse Putnam only for services *provided by Putnam*.

91.     For example, Putnam agreed to "*provide* Hospital Services to Covered

- 19 -

Persons in accordance with and subject to the terms and conditions of [the Contract]."[4] (Ex. A at § 2.1 (emphasis added).)

92. The Contract also explicitly prohibited Putnam from billing RightCHOICE for services not performed by Putnam. The Contract states that Putnam "shall bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]." (Ex. A at § 4.1(b).)

93. The Contract also limited the services that Putnam would provide and bill for under the Contract to "inpatient and outpatient services, products, accommodations and care that are customarily provided or available at or available from [Putnam]." (Ex. A at §§ 1.11 (defining Hospital Services), § 2.1 (defining the treatment Putnam was to provide to the BCBS Plans' members).

94. Putnam is also "responsible for each claim submitted by, or on behalf of, [Putnam]." (Ex. A at § 4.1(b).)

95. Other provisions of the Contract relevant to this action include that:

a. Putnam is obligated to "participate in, comply with, and provide Hospital Services in accordance with" RightCHOICE policies, programs, and procedures, including its provider manual. (Ex. A at § 2.6.)

---

[4] The Contract defined "Hospital Services" as "those inpatient and outpatient services, products, and accommodations and care that are customarily provided or available at or available from [Putnam]." (Ex. A at § 1.11.)

- 20 -

b.     Putnam, its agents, and employees are required to "comply with and abide by all state, federal and local laws and regulations relating to the provision of Hospital Services to Covered Persons."  (Ex. A at § 2.7.)

c.     Putnam certified that "all claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE] will be and are *accurate, complete, and truthful*."  (Ex. A at § 4.1(d) (emphasis added).)

d.     Putnam agreed to provide "valid and appropriate billing and diagnosis codes."  (Ex. A at § 4.2.)

e.     Putnam agreed not to "pay, receive, or offer any incentive, or participate in any incentive program or arrangement, that provides or would provide [Putnam] or any other physician or provider with a direct or indirect inducement to provide less than Medically Necessary health care services, supplies, accommodations, treatments or care to Covered Persons."  (Ex. A at § 4.4(c).)

f.     Putnam may not "assign, delegate, or transfer [the Contract] or the rights or responsibilities provided for [therein] without the prior written consent of [RightCHOICE]."  (Ex. A at § 6.1(a).)

g.     Putnam agreed that only medically necessary services would be reimbursed by RightCHOICE, and medically necessary was defined as meaning Covered Services that were:

- 21 -

i. appropriate and necessary for the symptoms, diagnosis, or treatment of the medical condition;

ii. provided for the diagnosis, care and treatment of the medical condition;

iii. within standards of good medical practice within the medical community;

iv. not primarily for the convenience of the Covered Person, the attending physician, or another health care provider; and

v. the type, supply or level of service or care which can safely be provided and that is not more than what is necessary or appropriate. (Ex. A at § 1.13 & § 1.18.)

h. The Contract is "governed by, and construed and enforced in accordance with, the laws of the State of Missouri." (Ex. A at § 6.8(a).)

96. The Contract also sets the amount that Putnam receives from RightCHOICE for the provision of Hospital Services.

97. Specifically, the Contract sets the "allowed amount" as the lesser of the Established Charge, which is set in the schedule of reasonable and customary charges

- 22 -

for services and supplies provided by Putnam; or the appropriate amount under the applicable Prospective Payment Schedule, which is Attachment A to the Contract.[5]

98.     The BCBS Plans are third-party beneficiaries of the Contract.

99.     Specifically, the Contract states that Putnam was to "provide Hospital Services to Covered Persons in accordance with and subject to the terms and conditions of [the Contract]."  (Ex. A at § 2.1.)

100.    Covered Services was defined to mean, in pertinent part, "those health services, products, accommodations and care for which a Company determines that benefits are available under the applicable Coverage Agreement."  (Ex. A at § 1.7.)

101.    Coverage Agreement was defined to mean

> any agreement, contract, program or certificate entered into, issued or agreed to by a Company, a plan sponsor, or a group, under which a Company furnishes administrative services or other services in support of a health care program, and which may include access to one or more of the Company's provider networks or vendor arrangements, except those excluded by RightCHOICE.  *Coverage Agreement also includes any agreement between a Company or any other Blue Cross or Blue Shield plan, or the Blue Cross and Blue Shield Association entitling a Covered Person to receive benefits for Covered Services*.

(Ex. A at § 1.6.)

102.    Therefore, the Contract's plain language demonstrates the parties' intent that members of *any* BCBS Plan would be treated by Putnam under the Contract.

---

[5]    On March 15, 2017, RightCHOICE sent notice to Putnam that it was amending Putnam's reimbursement rates.  The change became effective on June 15, 2017.

- 23 -

## LABORATORY TESTING AND PASS-THROUGH BILLING SCHEMES

103.    The vast majority of the claims at issue in this matter are for UDT.  The other claims are for a variety of tests, including blood and general health panels.

### Urine Drug Testing

104.    Drug tests are laboratory analyses used to aid in the detection of prescription, recreational, or illicit substances in human specimens.  Drug testing may be used to meet state requirements, evaluate therapeutic compliance and drug aberrant behavior (*e.g.*, abuse or diversion), or to evaluate for child and elder abuse.  It can include analysis for most drugs, chemicals, and/or plant products that are known to be misused, including for recreational use.

105.    Although drug tests may be performed on a variety of specimen types, UDT is the most commonly used because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

106.    This is consistent with Anthem's Clinical UM Guideline, entitled "Drug Testing or Screening in the Context of Substance Use Disorder and Chronic Pain" (the "Anthem Drug Testing Policy"), which is incorporated by reference into the Contract, and which states that "the use of blood samples as an alternative to urine for drug testing is considered medically necessary when the use of urine is not feasible[.]"

107.    UDT typically falls into two categories of testing: presumptive and definitive.

- 24 -

108.    Presumptive testing is used, when medically necessary, to determine the presence or absence of one or more drugs or drug classes.  Presumptive testing is typically performed via immunoassay, and results are expressed as negative, positive, or numeric.  Presumptive testing is also referred to as "screening" or "qualitative" testing.

109.    Definitive testing is a follow-up test performed on a separate portion of the original specimen, when medically necessary, to validate the identity and quantity of a specific drug or metabolite.  Definitive testing is typically performed using either gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and results are expressed as a concentration of a particular metabolite or analyte (*e.g.*, nanograms per milliliter (ng/mL)).  Definitive testing is also referred to as "confirmation" or "quantitative" testing.

110.    Definitive testing is typically reasonable and necessary only in certain circumstances.

111.    The Anthem Drug Testing Policy states that definitive testing is medically necessary when all of the following criteria are met:

    a.    the presumptive UDT was done for a medically necessary reason;

    b.    the presumptive test was negative for prescribed medications, positive for a prescription drug with abuse potential which was not prescribed,

- 25 -

or positive for an illegal drug (for example, but not limited to, methamphetamine or cocaine);

> i. the specific definitive test(s) ordered are supported by documentation specifying the rationale for each [definitive] test ordered; and

> ii. clinical documentation reflects how the results of the test(s) will be used to guide clinical care.

### The Toxicology Laboratory Industry

112. In recent years, government enforcement efforts, private lawsuits, and investigative journalism have helped to identify widespread fraud within the toxicology laboratory industry.

113. For example, in a November 2014 article about increases in the amount of UDT being reimbursed by Medicare, the Wall Street Journal summarized the then-recent history of the industry:

> Spending on the [urine-drug] tests took off after Medicare cracked down on what appeared to be abusive billing for simple urine tests. Some doctors moved on to high-tech testing methods, for which billing wasn't limited.

> They started testing for a host of different drugs—including illegal ones that few seniors ever use—and billing the federal health program for the elderly and disabled separately for each substance.

Medicare's spending on 22 high-tech tests for drugs of abuse hit $445 million in 2012, up 1,423% in five years.[6]

114.    In another example, in October 2015, the former Millennium Laboratories agreed to pay $256 million to the U.S. Department of Justice to resolve allegations that it billed Medicare "many millions of dollars' worth" of UDT claims that were "not reasonable and necessary or that were furnished pursuant to prohibited referrals" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and other statutes.

115.    As a result of concerns about the frequency, cost, and manner with which toxicology laboratories were billing government and commercial payors, a number of changes were put into place as to how laboratories test and bill for UDT.

116.    For example, the Centers for Medicare and Medicaid Services ("CMS") changed the way that UDT is billed, in part because of a "concern about the potential for overpayment when billing for each individual drug test rather than a single code that pays the same amount regardless of the number of drugs that are being tested."

117.    Because these changes have decreased both the frequency and rate at which toxicology laboratories are reimbursed for UDT, toxicology laboratories looked for other ways to gain access to more favorable reimbursement rates, including—as

---

[6]    Christopher Weaver and Anna Wilde Mathews, *Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill*, THE WALL STREET JOURNAL, Nov. 10, 2014 (available at: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

- 27 -

here—passing their UDT claims through hospitals to take advantage of the hospitals' participating status and favorable reimbursement rates from payors.

118.    Indeed, the website of one entity that recruited toxicology laboratories to pass their UDT claims through a network of hospitals makes clear the motives:

## Why Hospital Out-Patient Diagnostic Billing?

The Government is continuing to restrict independent clinical labs due to recurring compliance and quality issues. Payers are strategically making moves to block all but a chosen few clinical labs by restricting in-network access. This forces out-of-network labs to strategically align themselves with health systems in order to have a seat at the table. Additionally, patients, clinics, rehab groups, and MDs prefer working with higher quality lab system than their current choices dictate. That's where you come in...

## Benefits of being a Preferred Partner

  

- 90% adjudication rate
- 50% of claims within 30 days
- Get paid a minimum of $500/specimen

- Work with the top health systems in the country
- Above average reimbursement

- Free state-of-the-art specimen tracking system
- In-Network status for 90+% of claims

119.    In other words, because of "recurring compliance and quality issues," commercial payors restricted toxicology laboratories from their networks.  This led some laboratories—including those with compliance and quality issues—to rely on

- 28 -

health systems like Putnam to hide the identity of the laboratory performing the tests, and take advantage of the hospitals' favorable reimbursement agreements with payors.

## THE DEFENDANTS' PASS-THROUGH SCHEME

### Overview

120.     As described herein, Hospital Partners took over the management of Putnam to allow Defendants to use the hospital as a pass-through (i.e., to camouflage claims from the Pass-Through Labs so that RightCHOICE would pay them, and would pay them at higher rates than if the Pass-Through Labs billed them directly).

121.     The tests were ordered by providers from the Pass-Through Labs.

122.     Some or all of the Pass-Through Labs had sales personnel responsible for causing the tests to be ordered from them.

123.     The tests were not ordered from Putnam, and would have had no connection to Putnam but for the pass-through scheme.

124.     Defendants split the proceeds, which were substantially greater than what each party would have received if the Pass-Through Labs billed the BCBS Plans for only the tests they performed, and at the rates that they were individually entitled to.

125.     Defendants relied on networks of referring providers who ordered large volumes of laboratory tests (including drug- and alcohol-treatment programs).

126.     Upon information and belief, to ensure they received the specimens referred by these providers and laboratories, Defendants or other co-conspirators paid

- 29 -

them kickbacks by, for example, promising them a portion of the reimbursement that Putnam received from RightCHOICE.

127.    Once ordered by a referring provider, the tests were conducted by the Pass-Through Labs.

128.    The Pass-Through Labs then provided information about the tests to Hospital Partners, Hospital Lab Partners, or Empower H.I.S.

129.    Hospital Partners, Hospital Lab Partners, or Empower H.I.S. prepared and submitted the claim to RightCHOICE as if the tests were performed at and by Putnam and were reimbursable under the Contract.

130.    The claims contained numerous material misrepresentations intended to hide the fact that the tests were performed at and by the Pass-Through Labs, that the tests were not performed at or by Putnam, that Putnam-credentialed providers played no role in the tests or patient care, and that the tests were for the BCBS Plans' members in areas well outside of Putnam's service area.

131.    RightCHOICE reasonably relied on the representations that Defendants made or caused to be made on the claims.  As a result, it paid many of the claims.

132.    When RightCHOICE paid Putnam for the claims, Defendants divided the proceeds of the fraudulent claim between themselves and, upon information and belief, the referring healthcare providers.

- 30 -

**Putnam Agrees to Serve as a Pass-Through**

133.    In mid-2016, Putnam was in extremely poor financial condition.  A news article published at the end of 2015 described Putnam as a "house of cards."

134.    As a result, the Putnam Board contacted at least three companies to discuss taking over management and/or ownership of Putnam.

135.    Only Hospital Partners agreed to meet with the Putnam Board.

136.    The Putnam Board felt that, absent an agreement with Hospital Partners, Putnam was "within days of closing."

137.    In September 2016, the Putnam Board entered into a management services agreement with Hospital Partners, led by David Byrns and Jorge Perez.[7]

138.    Under the management services agreement, Hospital Partners took over day-to-day management of Putnam.

---

[7] Jorge Perez previously implemented another pass-through billing scheme at Campbellton-Graceville Hospital ("CGH") in Graceville, Florida.  Perez served as CGH's CEO after it was acquired by The People's Choice Hospital, LLC.  Tests performed at third party laboratories were billed to insurers as if performed at and by CGH, resulting in more than $50 million in improper reimbursement.  LifeBrite Labs was one of the laboratories that Perez conspired with to bill through CGH.  People's Choice is itself the defendant in separate actions arising from yet more fraudulent billing schemes.  One arose due to its relationship with the CGH.  *See Campbellton-Graceville Hosp. Corp. v. Peoples Choice Hosp.*, No. 5:16-cv-00222 (N.D. Fla. filed Aug. 3, 2016).  Another scheme was perpetrated in Oklahoma.  *See Aetna Inc. v. The People's Choice Hosp., LLC*, No. 2:17-cv-04354 (E.D. Pa. filed Sept. 29, 2017) (recently transferred to the Western District of Texas).

- 31 -

139.     David Byrns, Hospital Partners' President and Chief Executive Officer, was named Chief Executive Officer of Putnam on September 13, 2016.

**Through Putnam, Defendants Engage Other Entities to Facilitate the Scheme**

140.     Shortly after David Byrns became Putnam's CEO, Putnam engaged Empower H.I.S. to provide logistical support to Putnam, including with respect to billing and the implementation of electronic health records software.

141.     Jorge Perez is or was an officer of Empower H.I.S., and has a pecuniary interest in the company.

142.     On October 20, 2016, Putnam—at the direction of Jorge Perez and David Byrns—contracted with Hospital Lab Partners, purportedly to operate a clinical laboratory on behalf of Putnam.

143.     Upon information and belief, Hospital Lab Partners was created and managed jointly by Jorge Perez and James F. Porter, Jr. in order to facilitate the pass-through scheme alleged herein.[8]

144.     The contract between Putnam and Hospital Lab Partners stated that Hospital Lab Partners would "provide all personnel, equipment, supplies, and management support necessary for the comprehensive operation of the hospital's clinical laboratory."

---

[8]     Hospital Lab Partners voluntary dissolved on April 5, 2018, the same day that it was served with the original Summons and Complaint in this matter.

145.     Hospital Partners, Hospital Lab Partners, Byrns, Perez, and Porter engaged a network of Pass-Through Labs.

146.     Pinnacle Labs was one such Pass-Through Lab.

147.     As the manager of both Hospital Lab Partners and Pinnacle Labs, James F. Porter, Jr. ensured that Pinnacle Labs served as one of the Pass-Through Labs.

148.     LifeBrite Labs was another Pass-Through Lab.

149.     Christian Fletcher is the sole member and CEO of LifeBrite Labs, and conspired with Jorge Perez to bill tests performed by LifeBrite Labs through Putnam, just as the two had done previously at Campbellton-Graceville Hospital.

150.     LabMed was another Pass-Through Lab.

151.     Beau Gertz and Mark Blake are principals of LabMed.

152.     Serodynamics was another Pass-Through Lab.

153.     Serodynamics was managed by Beau Gertz. Upon information and belief, Mark Blake also managed or was otherwise involved in the operation of Serodynamics.

154.     Beau Gertz recently made comments in a public forum held in furtherance of his efforts to take over another struggling hospital. During that meeting, he described his involvement in previous schemes—including Putnam—and Jorge Perez's role in those schemes.

155.     A reporter in attendance recorded Beau Gertz's comments, during which Gertz stated the following:

- 33 -

a.     Beau Gertz worked with Jorge Perez for one-and-a-half years.

b.     Beau Gertz was "one of Jorge Perez's reference laboratories" and "his sales and marketing arm."

c.      "The way we did it with Empower, we had . . . let's call it 'Lab A.' Let's say Lab A is me.  Lab A would do the processing, reporting, and at the end of the day, it's called 'work.'  I would do all the work.  I would then, through an electronic file—it's called an HL7—but we'll just say 'submission,' would be billed.  It would be billed through one of fourteen hospitals."

d.     The management contracts entered into by the hospitals with Empower "took away basically all the duties, all the taxes, took away all the burdens and it put it all on Empower.  But yet Empower could do whatever they wanted in return.  That's what he has done at all these hospitals.  What you guys saw on CBS was that same exact management contract at a hospital called Campbellton-Graceville Hospital."[9]

---

[9] In March 2018, shortly before Beau Gertz made his presentation, CBS News aired a sequence of reports regarding pass-through billing schemes of the sort alleged herein: (1) *Some Rural Hospitals Used for Big Insurance Reimbursements – and Profit,* CBS NEWS (March 26, 2018), https://www.cbsnews.com/news/rural-hospitals-big-insurance-reimbursements-chestatee-regional; (2) *How Some Rural Hospitals Were Used to Score Huge Paydays*, CBS NEWS (March 26, 2018), https://www.cbsnews.com/news/how-some-rural-hospitals-were-used-to-score-huge-paydays; (3) *Exploiting Small Hospitals?*, CBS NEWS (March 27, 2018), https://www.youtube.com/watch?v=n5G_ZOylCds; (4) *Auditor "Shocked" by Massive Billing Schemes at Rural Hospitals*, CBS NEWS (MAY 16, 2018), https://www.cbsnews.com/news/questionable-billing-schemes-rural-hospitals-costing-health-insurance-companies-millions/?ftag=CNM-00-10aac3a.

- 34 -

e. "I followed Jorge.  I thought Jorge was a good guy.  Once I started finding out that this issue was not the way it should be done is when I went to Dentons, which is the largest law firm in the world.  I said, 'Okay, there's obviously a way to do this.  Rural hospitals need a way to survive.'"

f. "The hospital can't simply take a specimen, have somebody else run it, and then submit it through with nobody in that hospital's ever even seen the patient, heard of the patient, done anything for that patient.  Never handled the patient.  Basically, what was going on is the bills were going through, but there was no work done by the hospital.  All's it was was a billing mechanism at the end of the day.  Jorge owns a billing company and I'm sure he made his decisions for whatever reasons he made his decisions."

g. "I, myself, am distancing myself.  I've sent demand letters—thirteen total—to the hospitals that utilized my services, and I didn't ask for any money back.  I actually told them, 'Reverse the money, given it back to the insurance carriers.'  Because that raises the premiums if it's not done correctly."

h. With laboratory outreach programs, you have to do them "100-percent by-the-books or it's considered fraudulent."

i. Jorge Perez owed Beau Gertz "$14.4 million in the span of a year.  I know it works.  But he didn't do it the correct way."

156. Mark Blake is on the Board of Directors of the National Alliance of Rural

- 35 -

Hospitals, an organization created and run by Jorge Perez that purportedly advocates, educates, and promotes on behalf of rural hospitals. Upon information and belief, the National Alliance for Rural Hospitals is a vehicle through which Jorge Perez and others attract struggling hospitals so that they can use them for pass-through billing schemes.

157. In March 2018, Mark Blake sent letters to a number of hospitals affiliated with Jorge Perez and Empower H.I.S. Upon information and belief, these are the "demand letters" referenced by Beau Gertz during his presentation.

158. In the letters, Mark Blake said that the hospitals "have a very interesting outreach program overseen by Jorge Perez . . . ." The letters also alleged that the hospitals had done little, if any, of the laboratory work that was billed to insurers.

159. Lucenta Labs was another Pass-Through Lab.

160. Putnam's contract with Hospital Lab Partners stated that Putnam would bill payors, including RightCHOICE, for all tests under the hospital's name, *regardless of where the testing was performed*.

161. This was done to hide the identity of the Pass-Through Labs from RightCHOICE, and to take advantage of RightCHOICE's agreement to reimburse Putnam at higher rates than the Pass-Through Labs were entitled to if they billed RightCHOICE directly (to the extent the Pass-Through Labs' claims would have been paid by RightCHOICE at all).

- 36 -

162.    RightCHOICE relied on the above misrepresentations and paid many of the claims billed by Defendants.

163.    When RightCHOICE paid Putnam for these claims, Putnam was being managed by Hospital Partners, Jorge Perez, and David Byrns.

164.    When payments were received by Putnam from RightCHOICE, Hospital Partners, Jorge Perez, and David Byrns distributed those funds to the other Defendants in accordance with their respective agreements.

165.    Personnel with accounting duties at Putnam were repeatedly instructed by Byrns and his colleagues to follow instructions and directives of management and billing companies and not to ask any questions about the laboratory billings.

166.    Empower H.I.S. received more than $14 million because of its participation in the fraudulent scheme alleged herein.

167.    Hospital Lab Partners received more than $62.5 million because of its participation in the fraudulent scheme alleged herein.

168.    LifeBrite Labs received more than $11.5 million because of its participation in the fraudulent scheme alleged herein.

169.    LabMed received more than $20 million because of its participation in the fraudulent scheme alleged herein.

170.    Serodynamics received more than $6 million because of its participation in the fraudulent scheme alleged herein.

- 37 -

171.     Lucenta Labs received more than $450,000 because of its participation in the fraudulent scheme alleged herein.

172.     Putnam kept a small portion of the funds paid by RightCHOICE.

**Tests Billed Before Putnam's Laboratory was Operational**

173.     As soon as the contract between Putnam and Hospital Lab Partners was signed, Putnam began billing RightCHOICE for tests that it did not perform.

174.     Putnam could not have performed the tests.

175.     According to the State Auditor, Putnam paid Hospital Lab Partners (and, in turn, the Pass-Through Labs) $30.4 million between November 2016 and February 2017, in spite of the fact that Putnam's laboratory was not yet operational.

176.     This suggests that the scheme generated in excess of $36 million from payors, including RightCHOICE, during those four months.

**Putnam Hires Phlebotomists at Healthcare Providers' Offices**

177.     Shortly after Hospital Partners took over management of Putnam, Putnam hired 33 phlebotomists (at a cost of $68,000 per month) to facilitate the scheme.

178.     The phlebotomists were apparently hired by Putnam (then controlled by Hospital Partners, Jorge Perez, and David Byrns) to provide "pre-laboratory services."

179.     Upon information and belief, Putnam hired the phlebotomists to process specimens that were tested by the Pass-Through Labs, and classified the phlebotomists as Putnam hires to make Putnam appear more involved than it actually was.

- 38 -

180.    The phlebotomists were located in medical practices throughout the country, including Alabama (one), Arizona (one), Arkansas (three), California (two), Georgia (four), Kentucky (three), Louisiana (three), Missouri (two), Oklahoma (two), Tennessee (five), and Texas (seven).

181.    After being questioned by the State Auditor as to the propriety of Putnam paying for the phlebotomists, David Byrns stated that Hospital Partners had reimbursed Putnam for the costs associated with the hiring of these phlebotomists. However, he was unable or unwilling to provide the State Auditor proof of payment.

182.    Upon information and belief, the placement of these phlebotomists in medical practices was, and was intended to be, a kickback to these medical practices in order to induce them to refer their patients' specimens to the scheme.

### The Scheme's Reliance on Over-Testing and Over-Billing

183.    To maximize the revenue that they could extract from the BCBS Plans, Defendants billed the tests using codes that would maximize the amount likely to be paid, without regard to whether those codes reflected appropriate or medically necessary services, and without regard to appropriate billing practices.

184.    When using the Healthcare Common Procedure Coding System ("HCPCS") codes in effect in 2016, a laboratory should have billed one presumptive code and one definitive code per date of service.

- 39 -

185.     Instead, Defendants often unbundled and billed RightCHOICE for 15 or more drug testing codes *in addition to* the HCPCS codes for both presumptive and definitive testing.

186.     For example, Putnam billed RightCHOICE for UDT purportedly performed for a BCBS Plan member on December 1, 2016, even though Putnam's laboratory was not yet operational.

187.     Nevertheless, for that member, Putnam billed RightCHOICE 23 different codes, in spite of the fact that two of them—G0479 and G0480—explicitly covered *all* presumptive *and* definitive testing performed for that member on that date of service.

188.     Of the remaining 21 codes billed to RightCHOICE for this member, a substantial percentage were codes for definitive testing that was misrepresented as presumptive testing.

189.     The total amount billed for the UDT purportedly provided to this member was in excess of $4,000.

190.     By comparison, the Medicare Clinical Laboratory Fee Schedule for 2016 was less than $100 each for G0479 and G0480.

- 40 -

**Defendants' Efforts to Hide the Scheme**

191.     In early 2017, RightCHOICE sought to investigate the claims being submitted to it by Putnam.

192.     RightCHOICE and Putnam exchanged correspondence as to the substantial increase in claims being billed to RightCHOICE by Putnam.

193.     On March 15, 2017, RightCHOICE notified David Byrns, Putnam's CEO, that it was implementing new reimbursement rates for Putnam, which would go into effect on June 15, 2017.

194.     On May 18, 2017, David Byrns wrote that Putnam "works diligently to provide the valuable medical services necessary for Anthem-insured patients at Putnam's clinical laboratory[,]" but, "[o]n occasion, Putnam may experience operational issues regarding laboratory capabilities, malfunctioning equipment, or other issues that are common amongst medical providers who perform services with complex instrumentation."  In those cases, he continued, Putnam "must work with associates intermittently in order to provide services ordered by physicians."

195.     When Byrns made this statement, he knew that it was false, and made with the intent to further the fraudulent pass-through scheme.

196.     In the same letter, Byrns described Hospital Lab Partners' role as "provid[ing] consultation, guidance, and expertise to Putnam in regards to the laboratory services and operations performed at Putnam's laboratory facilities."

- 41 -

197.    He otherwise refused to divulge the nature of Hospital Lab Partners'

relationship with Putnam, other than to say that it "assist[ed] Putnam in providing

Anthem-insured patients with sound laboratory services."

198.    Byrns stated that he could not provide additional information about the

nature of Hospital Lab Partners' relationship with Putnam because he did "not want to

disclose [Hospital Lab Partners'] trade secrets, confidential information, or other

business know-how[.]"

199.    When Byrns made these statements, he knew that they were false and/or

omitted material facts.

200.    Specifically, Byrns knew that Hospital Lab Partners was controlled by his

co-conspirators Jorge Perez and James F. Porter, Jr., and was conspiring with the other

Defendants to bill payors (including RightCHOICE) for testing performed by the Pass-

Through Labs as if performed at and by Putnam.

**Sample Claims**

201.    In early 2017, while investigating Putnam's laboratory claims,

RightCHOICE requested that Putnam provide all records relating to ten sample claims.

202.    On July 3, 2017, RightCHOICE received a letter from Ricardo J. Perez,

Jorge Perez's brother, on Empower H.I.S. letterhead, and with an address in Miami,

Florida, but signed on behalf of Putnam County Memorial Hospital.

- 42 -

203. In his letter, Ricardo Perez said that he was enclosing "all Medical Records information that we have on file."

204. Enclosed with Ricardo Perez's letter were documents relating to nine of the ten sample claims identified by RightCHOICE.

205. However, the only documents provided for the nine sample claims were the UDT results (*i.e.*, no order forms, office visit notes, treatment plans, or other records were provided for these patients).

206. RightCHOICE has identified the following sample claims as illustrative of Defendants' scheme.

207. At the time that RightCHOICE paid the claims described below, it based its payment determinations on the information provided in the claims from Putnam (*i.e.*, it did not have test results or other medical records).

*Sample Claim No. 1*

208. On November 4, 2016, a urine specimen was collected from a BCBS Plan member by a pain management practice in Ohio, hundreds of miles from Putnam.

209. The test results provided by Empower H.I.S. have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the "Account."

210. None of the tests shown on the test results are identified as being performed at or by Putnam.

- 43 -

211. This is consistent with the fact that Putnam's laboratory was not operational when the member's specimen was collected.

212. Instead, underneath the header, a complete laboratory report from LifeBrite Labs is reprinted:



213. The test results show that no drugs were detected in the member's specimen, except for Oxycodone, which was prescribed.

214. Because the results of the presumptive test were as expected (*i.e.*, the only positive was for a prescribed medication), definitive testing was not medically necessary under the Anthem Drug Testing Policy.

- 44 -

215.    However, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $3,808.

216.    In reliance on the misrepresentations contained on the claim form submitted by Putnam, RightCHOICE paid Putnam $2,703.68.

217.    This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area.

218.    But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid anything to Putnam for the service.

*Sample Claim No. 2*

219.    On November 15, 2016, a urine specimen was collected from a BCBS Plan member by a substance abuse treatment facility in Virginia, hundreds of miles from Putnam.

220.    The test results provided by Empower H.I.S. have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the "Account."

221.    None of the tests shown on the test results are identified as being completed by Putnam.

- 45 -

222. This is consistent with the fact that Putnam's laboratory was not operational when the member's specimen was collected.

223. Instead, underneath the header, a laboratory report from LifeBrite Labs is reprinted:



224. The test results from LifeBrite Labs show that, of the three drugs identified in the member's specimen, two were prescribed (Naloxone and Buprenorphine) and one was not (Gabapentin).

225. Because of the unexpected positive, the Anthem Drug Testing Policy would have permitted definitive testing to confirm the positive for Gabapentin.

- 46 -

226. Instead, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $4,138.

227. In reliance on the misrepresentations contained on the claim submitted by Putnam, RightCHOICE paid Putnam $2,937.98

228. This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area.

229. But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid anything to Putnam for the service.

## CAUSES OF ACTION

### COUNT I
### FRAUD AND FRAUDULENT CONCEALMENT
### (Against all Defendants)

230. The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

231. As alleged herein, each of the Defendants, individually and in furtherance of the fraudulent scheme alleged herein, made, or caused to be made, intentional misrepresentations of material fact relating to the insurance claims that Putnam submitted, or caused to be submitted, to the BCBS Plans for reimbursement.

232. Defendants agreed and conspired with one another to make or cause these

- 47 -

intentional misrepresentations to be made.

233.    When Defendants made these intentional misrepresentations, or caused them to be made, they did so with the intent to induce the BCBS Plans to rely on those misrepresentations and pay the insurance claims.

234.    Each Defendant's participation in the fraudulent scheme includes, but is not limited to, the following:

a.    *Hospital Partners*:  Hospital Partners was responsible for targeting and taking over the management of Putnam, which was fundamentally essential to the scheme, as Putnam's contract with RightCHOICE needed to be accessible to the scheme's participants.  Hospital Partners then engaged the other entity Defendants, including Hospital Lab Partners, Empower H.I.S., and the Pass-Through Labs.  When RightCHOICE relied on Defendants' material misrepresentations and paid the claims, Hospital Partners withdrew funds from Putnam's accounts to pay itself and the other Defendants for their participation in the scheme.  At the time Hospital Partners took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the relevant period, Hospital Partners was controlled and directed by David Byrns and Jorge Perez, both of whom have or had pecuniary interests in the company.

- 48 -

b. *Hospital Lab Partners*:  Hospital Lab Partners was engaged by Hospital Partners to contract with and manage the Pass-Through Labs in furtherance of the scheme, which it did.  In addition, Hospital Lab Partners served as a conduit for the flow of funds to the Pass-Through Labs, as Hospital Partners paid Hospital Lab Partners 80 percent of any funds paid by RightCHOICE, which it then passed on to the Pass-Through Labs.  At the time Hospital Lab Partners took each of these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Upon information and belief, Hospital Lab Partners was controlled and directed by James F. Porter, Jr. and Jorge Perez, both of whom had pecuniary interests in the company.  Hospital Lab Partners received more than $62.5 million because of its participation in the scheme alleged herein.

c. *Empower H.I.S.*:  Empower H.I.S. was engaged by Hospital Partners to perform billing functions and prepare electronic health records necessary for the success of the scheme, which it did.  Specifically, Empower H.I.S. managed and submitted the thousands of laboratory claims billed through Putnam for tests performed by the Pass-Through Labs.  Empower H.I.S. also responded to RightCHOICE's requests for records, and provided the administrative support

- 49 -

necessary for the success of the pass-through scheme alleged herein. In exchange for its knowing participation in the pass-through scheme, Empower H.I.S. received 6 percent of any amounts paid by RightCHOICE to Putnam. At the time Empower H.I.S. took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Empower H.I.S. was controlled and directed by Jorge Perez and his family members, and he has or had a pecuniary interest in the company. Empower H.I.S. received more than $14 million because of its participation in the scheme alleged herein.

        d.    *LifeBrite Labs*: LifeBrite Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, or James F. Porter, Jr. LifeBrite Labs generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the tests to its co-conspirators so that they could be billed to RightCHOICE under the Contract as if performed at and by Putnam. LifeBrite Labs knowingly agreed to participate in this pass-through scheme because of the success it had participating in a similar scheme based at Campbellton-Graceville Hospital in Florida. At the time LifeBrite Labs took these acts, it knew and intended that they would cause the submission of

- 50 -

fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Throughout the period relevant hereto, LifeBrite Labs was controlled and directed by its sole member and CEO, Christian Fletcher, who has or had a pecuniary interest in the company. LifeBrite Labs received more than $11.5 million because if its participation in the scheme alleged herein.

e.    *Pinnacle Labs*: Pinnacle Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, or James F. Porter, Jr. Pinnacle Labs generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the tests to its co-conspirators so that they could be billed to RightCHOICE under the Contract as if performed at and by Putnam. In exchange for its participation in the pass-through scheme, Pinnacle Labs was paid a substantial amount by Hospital Lab Partners. At the time Pinnacle Labs took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Throughout the period relevant hereto, Pinnacle Labs was controlled and directed by James F. Porter, Jr., who has or had a pecuniary interest in the company.

- 51 -

f.  *LabMed*:  LabMed was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, or James F. Porter, Jr.  LabMed generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the tests to its co-conspirators so that they could be billed to RightCHOICE under the Contract as if performed at and by Putnam.  At the time LabMed took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the period relevant hereto, LabMed was directed Beau Gertz and Mark Blake.  LabMed received more than $20 million because of its participation in the scheme alleged herein.

g.  *Serodynamics*:  Serodynamics was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, or James F. Porter, Jr.  Serodynamics generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the tests to its co-conspirators so that they could be billed to RightCHOICE under the Contract as if performed at and by Putnam.  At the time Serodynamics took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to

- 52 -

RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Throughout the period relevant hereto, Serodynamics was directed Beau Gertz. Upon information and belief, Mark Blake also helped manage Serodynamics. Serodynamics received more than $6 million because of its participation in the scheme alleged herein.

h.     *Lucenta Labs*:  Lucenta Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, or James F. Porter, Jr.  Lucenta Labs generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the tests to its co-conspirators so that they could be billed to RightCHOICE under the Contract as if performed at and by Putnam.  At the time Lucenta Labs took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Lucenta Labs received more than $450,000 because of its participation in the scheme alleged herein.

i.     *Jorge Perez*:  Jorge Perez designed and implemented this pass-through scheme, including the creation and structuring of the various entities used to perpetrate the scheme.  Jorge Perez was responsible for convincing the Putnam Board that Hospital Partners should take over management of the

hospital. Jorge Perez created Hospital Partners (with David Byrns), created Hospital Lab Partners (with James F. Porter, Jr.), created and managed Empower H.I.S. (with his family members), engaged LifeBrite Labs (through Christian Fletcher, who he knew from the Campbellton-Graceville pass-through scheme),[10] and brought in James F. Porter, Jr., who in turn agreed to bring Pinnacle Labs into the conspiracy. Jorge Perez designed and implemented this scheme in such a way that the entities that he controlled and directed each received a cut of any reimbursement paid by RightCHOICE as a result of the fraudulent scheme. At the time Jorge Perez took these acts, he knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Upon information and belief, Perez owns or controls a network of hospitals, substance abuse facilities, and other service providers (*e.g.*, Empower H.I.S.), all of which are leveraged to perpetrate schemes such as the one described herein.

j.      *David Byrns*:  David Byrns conspired with Jorge Perez to design and implement this scheme, including through his dual roles at Hospital Partners (President) and Putnam (CEO). As Putnam's CEO, David Byrns signed the

---

[10]  Jorge Perez has also held himself out as a Director of LifeBrite Hospital Group, LLC. News reports identify Christian Fletcher as the Chief Executive Officer of that entity, which owns or manages a number of small hospitals.

- 54 -

contracts with Empower H.I.S. and Hospital Lab Partners that were essential to the operation and success of the pass-through scheme. In addition, upon information and belief, David Byrns was responsible for the day-to-day management of Putnam throughout the scheme, including responding to requests for information from RightCHOICE during its investigation of the scheme. As set forth herein, in that capacity, Byrns made misrepresentations intended to avoid the detection of the pass-through scheme by RightCHOICE. At the time David Byrns took these acts, he knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.

k. *Christian Fletcher*: Christian Fletcher conspired with the other Defendants to bill for testing performed by LifeBrite Labs through Putnam, which he knew and intended would cause the submission of fraudulent claims for payment to RightCHOICE. Christian Fletcher committed LifeBrite Labs to participate in the pass-through scheme and conspired with the other Defendants to do so, in part because of his experience with a similar scheme involving Jorge Perez at Campbellton-Graceville Hospital. Christian Fletcher committed LifeBrite Labs to participate in the pass-through scheme in exchange for a percentage of any amounts paid (including RightCHOICE) for tests performed

by LifeBrite Labs. When he agreed to use LifeBrite Labs in furtherance of the pass-through scheme, Christian Fletcher intended that RightCHOICE would reasonably rely on the fraudulent claims and pay Putnam. When RightCHOICE paid the resulting claims, LifeBrite Labs received a portion of the reimbursement paid for testing performed at LifeBrite Labs. As the sole member of LifeBrite Labs, Christian Fletcher directed all of the above acts. Christian Fletcher also undertook these acts in his individual capacity. Upon information and belief, as the sole member of LifeBrite Labs, when Christian Fletcher received distributions from the company, he necessarily received funds paid by RightCHOICE in reasonable reliance on the fraudulent claims submitted because of the pass-through scheme.

l.     *James F. Porter, Jr.*:  James F. Porter, Jr. served in a dual role in furtherance of the pass-through scheme alleged herein. First, after agreeing to participate in the conspiracy, James F. Porter, Jr. created Hospital Lab Partners, which he used as an intermediary entity to engage the Pass-Through Labs. Second, he conspired with the other Defendants to bill for testing performed by Pinnacle Labs through Putnam, which he knew and intended would cause the submission of fraudulent claims for payment to RightCHOICE. James F. Porter, Jr. committed LifeBrite Labs to participate in the pass-through scheme in exchange for a percentage of any amounts paid (including RightCHOICE) for

- 56 -

tests performed by Pinnacle Labs. When he agreed to use Pinnacle Labs in furtherance of the pass-through scheme, James F. Porter, Jr. intended that RightCHOICE would reasonably rely on the fraudulent claims and pay Putnam. When RightCHOICE paid the resulting claims, Pinnacle Labs received a portion of the reimbursement paid for testing that it had performed.

m. *Beau Gertz*: Beau Gertz conspired with the other Defendants to bill for tests performed by LabMed and Serodynamics through Putnam, which he knew and intended would cause the submission of fraudulent claims for payment to RightCHOICE. Beau Gertz committed LabMed and Serodynamics to participate in the pass-through scheme and conspired with the other Defendants to do so. When RightCHOICE paid the resulting claims, LabMed and Serodynamics received a portion of the reimbursement paid for testing performed at their facilities. Beau Gertz directed these acts. Beau Gertz also undertook these acts in his individual capacity. Upon information and belief, Beau Gertz received distributions from LabMed and Serodynamics that necessarily included funds paid by RightCHOICE in reasonable reliance on the fraudulent claims submitted because of the pass-through scheme.

n. *Mark Blake*: Mark Blake conspired with the other Defendants to bill for tests performed by LabMed (and, upon information and belief, Serodynamics) through Putnam, which he knew and intended would cause the

- 57 -

submission of fraudulent claims for payment to RightCHOICE. Mark Blake committed LabMed (and, upon information and belief, Serodynamics) to participate in the pass-through scheme and conspired with the other Defendants to do so. When RightCHOICE paid the resulting claims, LabMed and Serodynamics received a portion of the reimbursement paid for testing performed at their facilities. Mark Blake directed these acts. Mark Blake also undertook these acts in his individual capacity. Upon information and belief, Mark Blake received distributions from LabMed (and, upon information and belief, Serodynamics) that necessarily included funds paid by RightCHOICE in reasonable reliance on the fraudulent claims submitted because of the pass-through scheme.

235. Collectively, Defendants concealed information regarding the structure and role of the entity Defendants in furtherance of the conspiracy, and used the entity Defendants to hide the existence of this scheme from the BCBS Plans.

236. The claims submitted by Defendants, or that Defendants caused to be submitted, included the following material misrepresentations:

       a.     provider name (misrepresented as Putnam);

       b.     provider address, Tax ID, and NPI (misrepresented as Putnam);

       c.     type of bill (misrepresented as "141," which indicates a specimen submitted for analysis to a hospital);

- 58 -

d.      place of service code;

e.      admission type (misrepresented as "3," which indicates an elective admission, when there was no admission);

f.      source of admission (misrepresented as "1," which indicates a physician referral, when there was no admission);

g.      patient discharge status (misrepresented as "01," which indicates a discharge to home or self-care, when there was no admission or discharge);

h.      attending physician's name and NPI (misrepresented as the name and NPI of the referring healthcare provider);

i.      the medical necessity of the testing performed; and

j.      that the information shown on the face of each claim submitted to RightCHOICE was "true, accurate and complete."

237.      Defendants also failed to disclose, or caused Putnam to fail to disclose, material facts relating to the insurance claims that Defendants submitted, or caused to be submitted, including that:

a.      Putnam was participating in a pass-through scheme designed to misuse the Contract;

b.      That the laboratory testing billed for by Putnam was never ordered from Putnam;

c.      Upon information and belief, that participants in the pass-through

- 59 -

scheme were paying kickbacks to healthcare providers and laboratories in exchange for referring their patients' specimens to the Pass-Through Labs, which in turn were billed to RightCHOICE under the Contract;

d.     Upon information and belief, that participants in the pass-through scheme waived BCBS Plan members' copayment and coinsurance obligations, in violation of the BCBS Plans' policy, in order to prevent the scheme from being detected by the BCBS Plans in response to member complaints about owing large coinsurance or copayment amounts.

238.    Defendants understood that, under the circumstances, and given the volume of claims received by RightCHOICE from providers of all types, Putnam had a special relationship of trust and confidence toward RightCHOICE that gave rise to a duty to speak and disclose material information regarding the claims submitted.

239.    Defendants' scheme relied upon this relationship, and the volume of claims received by RightCHOICE, to hide their fraudulent claims.

240.    Defendants had a duty to disclose to RightCHOICE and the BCBS Plans information material to the claims that Putnam submitted, or caused to be submitted, so as not to mislead RightCHOICE and the BCBS Plans.

241.    Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that each claim was not "knowingly or recklessly disregard[ing] or misrepresent[ing] or conceal[ing] material facts."

- 60 -

242.     Defendants also knew that the claims resulting from the pass-through scheme would be submitted to RightCHOICE pursuant to the Contract, which required, among other things, that:

     a.     "[A]ll claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE] will be and are *accurate, complete, and truthful*."  (Ex. A at § 4.1(d) (emphasis added).)

     b.     Putnam "shall bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]."  (Ex. A at § 4.1(b).)

243.     At the time that Defendants submitted the claims, or caused the claims to be submitted, they knew that the representations described above were false, and that the claims contained the above-described omissions.

244.     These misrepresentations and omissions were material to RightCHOICE's determination of whether the claims were payable.

245.     Defendants intended for RightCHOICE and the BCBS Plans to rely on their material misrepresentations and omissions, such that RightCHOICE would pay Putnam for the claims arising from this pass-through scheme.

246.     Defendants knew, or should have known, that this scheme should have been disclosed to RightCHOICE and the BCBS Plans.  Yet, they failed to disclose the scheme.

247.     In failing to disclose the aforementioned material information, Defendants

and Putnam acted in bad faith.

248.    RightCHOICE and the BCBS Plans reasonably relied on the claims submitted by Defendants, including the misrepresentations and omissions, when determining whether to pay each claim.

249.    Had RightCHOICE been aware that the claims contained material misrepresentations, or omitted material information, it would not have paid them.

250.    Similarly, had Defendants disclosed the aforementioned material omissions, RightCHOICE would not have paid the claims.

251.    Defendants had superior and special knowledge of the pass-through scheme, and took steps to prevent RightCHOICE from identifying it.

252.    As a result, when RightCHOICE received the claims, it was unaware of the pass-through scheme, which was not reasonably discoverable by RightCHOICE.

253.    In reliance on the misrepresentations and omissions, RightCHOICE paid the claims.

254.    The BCBS Plans reconciled some of those payments with RightCHOICE.

255.    Defendants' conduct was specifically designed to injure the BCBS Plans, and was done willfully, maliciously, and in disregard of the BCBS Plans' rights.

256.    As a direct and proximate result of Defendants' material misrepresentations and omissions, the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT II
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

257.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

258.     The claims submitted by Defendants, or caused to be submitted by Defendants, contained material misrepresentations, including but not limited to those described in paragraphs 236 and 237, above.

259.     These representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, made without reasonable care, or made under circumstances in which Defendants ought to have known their falsity.

260.     Defendants' misrepresentations were made to RightCHOICE and the BCBS Plans in the course of Defendants' business and because of a pecuniary interest.

261.     Defendants had a duty to disclose to RightCHOICE and the BCBS Plans information material to the claims that Defendants submitted, or caused to be submitted, to RightCHOICE, to avoid misleading RightCHOICE and the BCBS Plans.

262.     Defendants took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that they were not "knowingly or recklessly disregardin[ing] or mispresentin[g] or conceal[ing] material facts."

- 63 -

263. Defendants also took on this obligation because they knowingly caused the misrepresentations to be made pursuant to the Contract, which required "all claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE to be] *accurate, complete, and truthful*." (Ex. A at § 4.1(d) (emphasis added).)

264. Defendants failed to exercise reasonable care when making these representations.

265. It was foreseeable that RightCHOICE and the BCBS Plans would rely on Defendants' representations, given the nature of the claims payment process, and the fact that they were submitted to RightCHOICE by Putnam.

266. RightCHOICE reasonably relied on Defendants' misrepresentations and paid the claims.

267. If RightCHOICE had been aware of the material misrepresentations, RightCHOICE would not have paid the claims.

268. As a direct and proximate result of Defendants' misrepresentations, the BCBS Plans have been damaged in an amount to be determined at trial.

## COUNT III
## RESTITUTION UNDER ERISA § 502(a)(3)
### (Against all Defendants)

269. The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

- 64 -

270.     Many of the impacted group health plans are employer-sponsored group health plans covered by ERISA (the "**ERISA Plans**").

271.     The BCBS Plans have been delegated by the plan administrator of each of the ERISA Plans the discretionary authority to review and decide on claims for benefits under the ERISA Plans.

272.     The ERISA Plans also delegated to the BCBS Plans the authority to recover overpayments made by the BCBS Plans on the ERISA Plans' behalf.

273.     Because of the fraudulent scheme identified herein, the BCBS Plans have paid millions of dollars in benefits to Putnam, and through Putnam, to Defendants.

274.     The BCBS Plans have standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

275.     As alleged herein, Defendants have submitted, or caused to be submitted, misleading and fraudulent claims to RightCHOICE for payment of benefits for charges related to laboratory services that Defendants represented, or caused to be represented, were performed by Putnam.

276.     RightCHOICE relied on the claim information supplied by Defendants, or that Defendants caused to be supplied, in determining whether to pay the claims.

- 65 -

277.    Had RightCHOICE been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

278.    Based upon the fraudulent claims Defendants submitted, or caused to be submitted, to RightCHOICE, Defendants received payments in excess of the amounts that they were actually entitled to receive for those services.

279.    Further, even if Defendants did not knowingly and intentionally submit misleading and fraudulent claims to RightCHOICE, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans, and recover overpayments made to Defendants.

280.    This is particularly true where Defendants submitted claims, or caused claims to be submitted, for members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from ERISA Plan members.  In these instances, Defendants accepted the terms of the ERISA Plans and submitted claims, or caused claims to be submitted, that were subject to those terms.

281.    Further, by knowingly accepting payments from the ERISA Plans, Defendants became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

282.    The ERISA Plans, by their terms, cover only medically necessary services and require the return of overpayments and amounts that were erroneously paid.

- 66 -

283.     Thus, even to the extent that Defendants did not intentionally overcharge the BCBS Plans, the BCBS Plans are entitled to equitable relief to enforce the terms of the ERISA Plans and recover these overpayments.

284.     The ERISA Plans state that fraudulent statements on electronic submissions will invalidate any payment or claims for services.

285.     The BCBS Plans have paid millions of dollars in benefits to Defendants that were not owed under the terms of the ERISA Plans.

286.     The BCBS Plans seek equitable restitution to cover the assets that Defendants unlawfully obtained because of the conduct described herein.

287.     Specifically, the BCBS Plans seek an Order imposing a constructive trust on the assets that Defendants received in the form of overpayments.

288.     The BCBS Plans also seek an Order restoring to the BCBS Plans—individually and on behalf of the ERISA Plans—the sums held in constructive trust by Defendants.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF
## UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202
## (Against all Defendants)

289.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

290.     The BCBS Plans act as a claims fiduciary for the ERISA Plans.

- 67 -

291. Therefore, the BCBS Plans have standing under ERISA § 502(a)(3) to enjoin any acts or practices that violate any provisions of the ERISA Plans, and to obtain other appropriate relief to redress such violations or enforce plan provisions.

292. Defendants have engaged in a scheme to defraud RightCHOICE into paying amounts to Defendants in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

293. There is an actual case and controversy between the BCBS Plans and Defendants as to the claims Defendants submitted, and continue to submit, to RightCHOICE, all of which arise from the fraudulent scheme described herein.

294. Defendants' fraudulent scheme is deceptive, unfair, and unlawful.

295. No payment is due to Defendants on any claims that are pending, or may be submitted in the future, where such claims arise from Defendants' fraudulent scheme.

296. There is a *bona fide*, present, and practical need for a declaration as to the lawfulness of Defendants' actions, including whether RightCHOICE has the right to deny the claims implicated by Defendants' actions and scheme.

297. The BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, and that any claims for payment of benefits

- 68 -

submitted by Defendants to RightCHOICE because of this scheme are non-payable and void.

298.    The BCBS Plans also seek recovery of their reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1).

299.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the BCBS Plans are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent scheme, and that any claims for payment of benefits submitted by Defendants as a result of their fraudulent scheme are non-payable and void.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against all Defendants)

300.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

301.    RightCHOICE had a valid and enforceable contract with Putnam (referred to throughout this document as the "Contract").

302.    Defendants were aware of the Contract.

303.    Defendants improperly, wrongfully, willfully, and intentionally engaged in the scheme described in this Complaint.

304.    Defendants' scheme was predicated upon the repeated breach of the Contract.

- 69 -

305. By orchestrating and participating in the fraudulent scheme described herein, Defendants caused Putnam to breach its contract with RightCHOICE by, among other things:

a. Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, for services not performed by, or performed under the direction and personal supervision of, Putnam. (*See* Ex. A at §§ 1.11, 2.1, and 4.1(b); *see also* Anthem Blue Cross and Blue Shield Provider and Facility Manual at 32 (requiring that providers of laboratory services bill only for the components of the services that they perform).)

b. Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, for services other than for inpatients or outpatients. (*See* Ex. A at §§ 1.11 & 2.1.)

c. Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not accurate, complete, and truthful, including but not limited to claims containing the following misrepresentations:

    i. Provider name;

    ii. Provider address;

    iii. Provider Tax ID and NPI;

    iv. Type of bill;

- 70 -

<div style="margin-left: 2em;">

v.        Admission type;

vi.        Source of admission;

vii.        Patient discharge status;

viii.        Attending physician's name and NPI;

ix.        Medical necessity of the testing performed; and

x.        That the information provided on the claim was "true,
</div>

accurate and complete."

d.      Failing to provide "valid and appropriate billing and diagnosis codes." (*See* Ex. A at § 4.2.)

e.      Failing to participate in, comply with, and provide hospital services in accordance with Anthem policies, programs, and procedures, including the Anthem Provider Manual and Anthem Drug Testing Policy. (*See* Ex. A at § 2.6.) This includes, but is not limited to, billing for components of laboratory testing not performed by Putnam in violation of the Anthem Blue Cross and Blue Shield Provider Manual.

f.      Assigning, delegating, or transferring the Contract or Putnam's rights and responsibilities under the Contract without the prior written consent of RightCHOICE. (*See* Ex. A at § 6.1(a).)

g.      Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not reasonable and

medically necessary, as defined by the Contract. (*See* Ex. A at §§ 1.13 & 1.18.)

h.    Paying, receiving, offering an incentive, or participating in an incentive program or arrangement that provides another physician or provider with a direct or indirect inducement to provide less than medically necessary health care services, supplies, accommodations, treatments or care to BCBS Plan members. (*See* Ex. A at § 4.4(c).)

i.    Failing to refund RightCHOICE for any overpayment or erroneous payment no later than 30 days after Putnam became aware of the overpayment or erroneous payment. (*See* Ex. A at § 4.4(b).)

306.    Defendants' interference with RightCHOICE's contract with Putnam was without justification.

307.    The BCBS Plans have been damaged by Defendants' acts of interference in an amount to be determined in this litigation.

## COUNT VI
## CIVIL CONSPIRACY
## (Against all Defendants)

308.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

309.    Defendants and others known and unknown, including Putnam and other Pass-Through Labs, committed torts against the BCBS Plans by fraudulently and

- 72 -

negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

310.    Defendants formed agreements amongst themselves and the above-named parties, and others unknown, directly or indirectly, to commit the unlawful acts described in this Complaint.

311.    The above-named parties committed wrongful acts in furtherance of their common scheme.

312.    The BCBS Plans have been injured by the wrongful scheme in a significant amount to be determined in this litigation.

<div align="center">

**COUNT VII**
**AIDING AND ABETTING A TORT**
**(Against all Defendants)**

</div>

313.    The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

314.    Defendants committed torts against the BCBS Plans by fraudulently and negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

315.    Each Defendant knew that the conduct described in this Complaint was occurring and was a breach of duty.

316. Each Defendant actively participated in various aspects of the scheme described in this Complaint. Each Defendant also gave substantial assistance or encouragement to other participants in the scheme.

317. The BCBS Plans have been damaged by the scheme in an amount to be determined in this litigation.

318. Because each Defendant knew of the scheme and gave substantial assistance to further the scheme, each Defendant is subject to liability for the torts committed in furtherance of the scheme.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against all Defendants)

319. The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

320. Defendants fraudulently submitted or caused the submission of claims to RightCHOICE for services that were not performed at or by Putnam.

321. RightCHOICE, relying on Defendants' misrepresentations, issued reimbursements to Putnam, which were shared with the other Defendants.

322. Each Defendant, therefore, received a benefit from the BCBS Plans in the form of a share of reimbursements that should not have been reimbursed.

323. The BCBS Plans conferred those benefits in reliance on the reasonable belief that the reimbursements were properly owed.

324.     Each Defendant appreciated the benefit conferred by the BCBS Plans.

325.     Each Defendant has unjustly accepted and retained those benefits.

326.     Each Defendant should be required to make restitution for the benefits it received, retained, and appropriated because justice and equity require such restitution.

327.     Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous providers at the expense of insurance companies and patients.

328.     The BCBS Plans are entitled to restitution in an amount to be determined at trial, including but not limited to all amounts Defendants received from RightCHOICE because of Defendants' scheme.

**COUNT IX**
**MONEY HAD AND RECEIVED**
**(Against All Defendants)**

329.     The BCBS Plans incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

330.      As set forth herein, each of the Defendants received or obtained possession of the BCBS Plans' money.

331.     Defendants thereby appreciated a benefit.

332.     Defendants' acceptance and retention of the BCBS Plans' money is unjust.

## PRAYER FOR RELIEF

WHEREFORE, the BCBS Plans respectfully request judgment in their favor granting the following relief:

a) Actual and consequential damages in an amount to be determined at trial, plus interest;

b) An order obligating Defendants to disgorge the proceeds of the scheme;

c) Equitable relief, as described herein;

d) An injunction prohibiting Defendants from continuing their scheme;

e) An award of the BCBS Plans' costs, including reasonable attorney's fees, in accordance with contractual provisions and ERISA § 502(g)(1);

f) Punitive damages; and

g) Any other relief deemed just, proper, and/or equitable.

DATED: July 17, 2018                    By: ___/s/ Neal F. Perryman

**LEWIS RICE LLC**
Neal F. Perryman, MO Bar #43057
Michael L. Jente, MO Bar #62980
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
T: (314) 444-7600
nperryman@lewisrice.com
mjente@lewisrice.com

-and-

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (admitted *pro hac vice*)
Randall Tietjen (admitted *pro hac vice*)
Jamie R. Kurtz (admitted *pro hac vice*)
Nathaniel J. Moore (admitted *pro hac vice*)
800 LaSalle Avenue
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
rtietjen@robinskaplan.com
jkurtz@robinskaplan.com
nmoore@robinskaplan.com

Timothy Billion (admitted *pro hac vice*)
140 N. Phillips Ave, Suite 307
Sioux Falls, South Dakota 57104
T: (612) 349-8475
tbillion@robinskaplan.com

*Attorneys for Plaintiffs*

- 77 -