| | |
|---|---|
| RightCHOICE Managed Care, Inc., Blue Cross of California, Inc. d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Michigan Mutual Insurance Company; BCBSM, Inc. d/b/a BlueCross BlueShield of Minnesota; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield; and Regence BlueShield of Idaho,<br><br>       Plaintiffs, | **FOURTH AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>CIVIL ACTION NO.<br>5:18-CV-06037-DGK |

- 1 -

v.

Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; Empower H.I.S. LLC; RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services; Labmed Services, LLC; Serodynamics, LLC; David Byrns; Jorge Perez; James F. Porter, Jr.; Beau Gertz; and Mark Blake.

Defendants.

Plaintiffs RightCHOICE Managed Care, Inc. ("RightCHOICE"); Blue Cross of California, Inc. d/b/a Anthem Blue Cross; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield; Healthy Alliance Life Insurance Company; HMO Missouri, Inc.; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue

- 2 -

Shield; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield; Blue Cross Blue Shield of Michigan Mutual Insurance Company; BCBSM, Inc. d/b/a BlueCross BlueShield of Minnesota; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield; and Regence BlueShield of Idaho (collectively, "Plaintiffs"), by and through the undersigned counsel, hereby commence this action against Defendants Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; Empower H.I.S., LLC; RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services; Labmed Services, LLC; SeroDynamics, LLC; David Byrns; Jorge Perez; James F. Porter, Jr.; Beau Gertz; and Mark Blake (collectively, "Defendants").

Plaintiffs further state and allege as follows:

## NATURE OF THE ACTION

1. From 2016 to 2018, the Defendants and their co-conspirators engaged in an illegal and fraudulent scheme using Putnam County Memorial Hospital ("Putnam"), a struggling 15-bed hospital located in Unionville, Missouri, to enrich themselves at Plaintiffs' expense by billing for laboratory services that were not payable by Plaintiffs, were fraudulent, were in violation of RightCHOICE's contract with Putnam, and were otherwise unlawful.

2. Specifically, the Defendants and their co-conspirators used Putnam to bill

- 3 -

Plaintiffs for more than $170 million in laboratory tests, even though the tests were not ordered from Putnam, were not tested at or by Putnam, the patients were never present at Putnam or treated by Putnam-credentialed providers, and Putnam did not report the test results to the ordering providers. Instead, the Defendants and their co-conspirators performed the tests at their laboratories and used Putnam *simply as a billing entity*. In order to take advantage of Putnam's in-network status and favorable reimbursement rates with Plaintiffs, when the Defendants and their co-conspirators billed Plaintiffs for the laboratory tests, they misrepresented (among other things) that the tests were performed at and by Putnam. Because of their scheme, the Defendants and their co-conspirators caused Plaintiffs to reimburse Putnam approximately $89 million for laboratory tests that never should have been paid. The Defendants and their co-conspirators then distributed the vast majority of the proceeds of the fraudulent scheme amongst themselves.

3. In 2015 and 2016, Defendants David Byrns, Jorge Perez, James F. Porter, Jr., Beau Gertz, and Make Blake (collectively, the "Individual Defendants"), and co-conspirator Christian Fletcher, were involved in a similar scheme at Campbellton-Graceville Hospital in Graceville, Florida. When their access to Campbellton-Graceville Hospital was shut off in mid-2016, they desperately needed a new hospital to bill through.

4. On September 12, 2016, Defendant Hospital Partners, Inc. ("Hospital

- 4 -

Partners"), owned by Jorge Perez and David Byrns, contracted with Putnam to take over management of the hospital. Byrns became Putnam's Chief Executive Officer. Thereafter, Byrns signed agreements (on behalf of Putnam) with the other Defendants.

5.      The tests at issue were actually performed by Defendant Serodynamics, LLC ("Serodynamics"), Defendant RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services ("Pinnacle Labs"), and LifeBrite Laboratories, LLC[1] ("LifeBrite") (collectively, the "Pass-Through Labs") at their laboratories in Colorado, Florida, and Georgia, respectively.[2] Serodynamics was principally owned and operated by Defendants Beau Gertz and Make Blake. Pinnacle Labs was principally owned and operated by Defendant James F. Porter, Jr.

6.      Defendant Labmed Services, LLC ("Labmed") was the marketing arm of Serodynamics. It had relationships with independent marketers who drove test orders to Serodynamics, which the Defendants caused to be billed through Putnam. Labmed was substantially owned and operated by Defendants Beau Gertz and Make Blake.

7.      Defendant Hospital Laboratory Partners, LLC ("Hospital Lab Partners") was ostensibly engaged to set up an on-site laboratory at Putnam, but instead served as

---

[1] Plaintiffs' claims against LifeBrite Labs and Christian Fletcher were dismissed with prejudice on January 17, 2019. (*See* Dkt. 156.)

[2] Lucenta Labs, LLC also performed laboratory tests that were billed to Plaintiffs through Putnam, but halted its participation in the scheme and returned its share of the proceeds to Jorge Perez prior to the filing of this lawsuit. Plaintiffs' claims against Lucenta Labs were dismissed without prejudice on January 30, 2019. (*See* Dkt 170.)

an intermediary between Putnam and Pinnacle Labs and LifeBrite Labs. Hospital Lab Partners was owned by Defendants Jorge Perez and James F. Porter, Jr.

8. Defendant Empower H.I.S., LLC ("Empower") billed the claims to Plaintiffs as if the tests had been performed at and by Putnam, instead of where they were actually tested—at the Pass-Through Labs. Empower prepared and submitted the claims at issue to Plaintiffs using, in part, information provided to it by the other Defendants and co-conspirators. Empower was principally owned and operated by Defendant Jorge Perez and his family members.

9. The laboratory tests at issue are predominantly urine-drug tests and blood tests.

10. One subset of the claims at issue is particularly telling of the Defendants' greed: In the fall of 2016, Serodynamics, Labmed, Gertz, and Blake had hundreds of tests that Serodynamics had already performed and reported to the ordering providers *months earlier*. They had intended to bill the claims through Campbellton-Graceville Hospital, but lost the ability to bill through the hospital in mid-2016. Rather than taking a loss on those claims or causing Serodynamics to bill insurers directly, Serodynamics and Labmed had their employees alter the order forms by replacing Campbellton-Graceville Hospital's logo with Putnam's logo, verified that the patients still had active insurance, and caused the claims to be billed to Plaintiffs through Putnam.

11. Putnam's contract with Plaintiffs (the "Contract") stated that Putnam

- 6 -

"shall bill only for Hospital Services performed by, or under the direction and personal supervision of Hospital." (*See* Ex. A at § 4.1(b).) The Contract defined Hospital Services to mean "those inpatient and outpatient services, products, accommodations, and care that are customarily provided or available at or available from" Putnam. (*Id.*, § 1.11.) None of the tests at issue were performed by or under the direction and personal supervision of Putnam. Nor were the tests inpatient or outpatient services. Instead, Plaintiffs' members had no relationship with Putnam except that their tests were billed through the hospital.

12. Some of the Defendants (through their contracted marketing personnel) paid a portion of what Plaintiffs reimbursed for the claims to the providers who ordered the tests.

13. In addition, the Defendants systematically waived or made no effort to collect Plaintiffs' members' cost-sharing obligations (including co-pays, deductible, and co-insurance) in an attempt to conceal the pass-through scheme. Because the Defendants and their co-conspirators billed such high rates for the tests at issue (*e.g.*, $5,268.75 for a panel of blood tests), the cost-sharing obligations owed by Plaintiffs' members were substantial. Had the Defendants and their co-conspirators attempted to collect Plaintiffs' members' cost-sharing obligations, Plaintiffs' members likely would have either (i) complained to their providers about the amounts due, which could cause the provider to stop ordering tests from the Defendants and their co-conspirators, or

(ii) complained to Plaintiffs, which would have raised attention to the scheme.

14. Since August 2016, the Defendants and their co-conspirators billed Plaintiffs more than $170 million for laboratory tests purportedly performed at or by Putnam, causing Plaintiffs to reimburse Putnam more than $89 million that it should not have been paid.

15. Upon information and belief, of the $89 million paid by Plaintiffs for the tests at issue, more than $47 million was paid for tests performed by LifeBrite Labs, more than $21 million was paid for tests performed by Pinnacle Labs, and more than $18 million was paid for tests performed by Serodynamics.

16. The majority of the $89 million paid by Plaintiffs was distributed amongst the Defendants and their co-conspirators.

17. In the year before Defendants and their co-conspirators implemented the scheme described herein, Putnam generated only $7.5 million in *total* revenue.

18. This arrangement has already been investigated by the Office of the Missouri State Auditor (the "State Auditor").[3]

---

[3] The State Auditor's report, which is incorporated herein, is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited July 13, 2018). The State Auditor's press release announcing its findings is available via the following link: https://auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited July 13, 2018). A follow-up review by the State Auditor was published on July 11, 2018, and is accessible via the following link: https://www.auditor.mo.gov/content/auditor-galloways-follow-review-putnam-county-memorial-hospital-reveals-end-questionable-lab.

19. The State Auditor described the arrangement as "a billing scheme," where "the vast majority of billings were for patients who had never been to or received services from [Putnam]." She explained that Putnam "submits the bills for [the Pass-Through Labs'] services to the insurance companies, funneling millions of dollars through the hospital and reducing it to what is essentially a shell organization for labs across the country." In exchange, "the hospital gets a cut of the insurance payouts."

20. According to the State Auditor, the scheme is also the subject of a federal criminal investigation.[4]

21. Through this civil action, Plaintiffs seek compensation for the injuries they incurred because of Defendants' conduct. Similarly, Plaintiffs seek the imposition of punitive damages, equitable relief, and injunctive relief prohibiting Defendants from further perpetrating the scheme.

**JURISDICTION AND VENUE**

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question.

23. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the claims

---

[4] *See* Rudi Keller, *Galloway makes governor bid official*, THE BOONVILLE DAILY NEWS, Aug. 12, 2019, available at: https://www.boonvilledailynews.com/news/20190812/galloway-makes-governor-bid-official

within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

### PLAINTIFFS

25. Plaintiff RightCHOICE Managed Care, Inc. is a Delaware corporation headquartered in Missouri.

26. Plaintiff Blue Cross of California d/b/a Anthem Blue Cross is incorporated and headquartered in California.

27. Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

28. Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Colorado.

29. Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Connecticut.

30. Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.

- 10 -

31. Plaintiff Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.

32. Plaintiff Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Indiana.

33. Plaintiff Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Kentucky.

34. Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Maine.

35. Plaintiff Healthy Alliance Life Insurance Company is incorporated and headquartered in Missouri.

36. Plaintiff HMO Missouri, Inc. is incorporated and headquartered in Missouri.

37. Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in New Hampshire.

38. Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

39. Plaintiff Community Insurance Company d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Ohio.

40. Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a/ Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

41. Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Virginia.

42. Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

43. Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield is incorporated and headquartered in Wisconsin.

44. Plaintiff Blue Cross Blue Shield of Michigan Mutual Insurance Company is incorporated and headquartered in Michigan.

45. Plaintiff BCBSM, Inc. d/b/a BlueCross BlueShield of Minnesota is incorporated and headquartered in Minnesota.

46. Plaintiff Regence BlueCross BlueShield of Oregon is incorporated and headquartered in Oregon.

47. Plaintiff Regence BlueCross BlueShield of Utah is incorporated and headquartered in Utah.

48. Plaintiff Regence BlueShield is incorporated and headquartered in Washington.

49. Plaintiff Regence BlueShield of Idaho is incorporated and headquartered in Idaho.

- 12 -

## DEFENDANTS

50. Defendant Hospital Partners, Inc. is a Florida corporation headquartered in Florida. Hospital Partners took over management of Putnam in late 2016.[5]

51. Hospital Laboratory Partners, LLC is a Florida limited liability company. The members of Hospital Lab Partners are domiciled in Florida. Hospital Lab Partners was voluntarily dissolved on April 5, 2018, the same day it was served with the Complaint and Summons in this case.

52. Empower H.I.S. LLC is a Florida limited liability company. The members of Empower H.I.S. are domiciled in Florida.

53. RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services is a Florida limited liability company. The members of Pinnacle Labs are domiciled in Florida. Pinnacle Labs was voluntarily dissolved on July 12, 2018.

54. LabMed Services, LLC ("LabMed") is a Nevada limited liability company. The members of LabMed are domiciled in Colorado and Florida.

---

[5] On November 29, 2016, the Putnam Board agreed to begin transferring operational ownership of Putnam to Hospital Partners. In a Registration of Fictitious Names filed by David Byrns and Jorge Perez with the Missouri Secretary of State on April 24, 2017, Byrns is listed as owning 51 percent of the business operating as Putnam County Memorial Hospital, with Jorge Perez owning the remaining 49 percent. However, on March 28, 2018, Hospital Partners filed a Complaint against the Putnam Board and State Auditor seeking a wide variety of declaratory relief, including a declaration that Hospital Partners "is in control of [Putnam] and shall have full access thereto without interference from any Defendants or other third-parties." *See Hospital Partners, Inc. v. Putnam County Memorial Hospital Board of Trustees and Nicole Galloway (as the Office of Missouri State Auditor)*, Case No. 18AK-CC00009 (Putnam Cty. Circ. Ct.).

55. Serodynamics, LLC ("Serodynamics") is a Colorado limited liability company. The members of Serodynamics are domiciled in Colorado and Florida.

56. Defendant Jorge Perez is domiciled in Florida.

57. Defendant David Byrns is domiciled in Florida.

58. Defendant James F. Porter, Jr. is domiciled in Florida.

59. Defendant Beau Gertz is domiciled in Colorado.

60. Defendant Mark Blake is domiciled in Florida.

## THE PLAINTIFFS

### THE BLUECARD PROGRAM

61. Plaintiffs are independent licensees (or subsidiaries of independent licensees) of the Blue Cross and Blue Shield Association ("BCBS Association").

62. Each of the Plaintiffs is a participant in the BCBS Association's BlueCard program, which allows members of one BCBS Association licensee's health plans to obtain healthcare in another BCBS Association licensee's service area (e.g., where a member is traveling or living outside of their home plan's service area).

63. The laboratory tests at issue were billed by the Defendants and their co-conspirators to RightCHOICE.

64. RightCHOICE reconciled the cost of the services billed by Putnam with the BCBS Association licensee responsible for each member.

65. As a result, each of the impacted licensees of the BCBS Association was

- 14 -

harmed by the scheme alleged herein.

## ASSIGNMENT OF LEGAL CLAIMS FOR MONEY OWED BY OTHER LICENSEES OF THE BCBS ASSOCIATION

66. Other independent licensees of the BCBS Association (who similarly participate in the BlueCard program) have been injured by this pass-through scheme in the same way as Plaintiffs.

67. As a result, the following licensees of the BCBS Association have assigned to RightCHOICE their legal claims for money owed as a result of Defendants' pass-through billing scheme alleged herein (collectively, the "Assignor BCBS Plans"):

     a.    Blue Cross and Blue Shield of Alabama;

     b.    USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield;

     c.    HMO Partners, Inc. d/b/a Health Advantage;

     d.    Blue Shield of California;

     e.    CareFirst of Maryland, Inc., CareFirst BlueChoice, Inc., CFA, LLC;

     f.    Group Hospitalization and Medical Services, Inc.;

     g.    Blue Cross and Blue Shield of Florida, Inc.;

     h.    Health Care Service Corporation;

     i.    Hawaii Medical Service Association;

     j.    Highmark, Inc., Highmark West Virginia Inc., Highmark BCBSD Inc., and Highmark Choice Company;

k.      Horizon Blue Cross Blue Shield of New Jersey;

l.      Blue Cross and Blue Shield of Kansas, Inc.;

m.      Blue Cross of Idaho Health Service, Inc.;

n.      Independence Blue Cross, LLC;

o.      Blue Cross and Blue Shield of Kansas City;

p.      Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana;

q.      Blue Cross and Blue Shield of Massachusetts, Inc.;

r.      Blue Cross & Blue Shield of Mississippi, Inc.;

s.      Blue Cross and Blue Shield of Nebraska;

t.      Blue Cross and Blue Shield of North Carolina;

u.      Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota;

v.      Premera Blue Cross;

w.      Blue Cross & Blue Shield of Rhode Island;

x.      Blue Cross and Blue Shield of South Carolina;

y.      BlueCross BlueShield of Tennessee;

z.      Blue Cross Blue Shield of Wyoming;

aa.     Blue Cross and Blue Shield of Arizona, Inc.; and

bb.     Wellmark, Inc.

- 16 -

68.     The assignments completed by the Assignor BCBS Plans state that each Assignor BCBS Plan "assigns and transfers to [RightCHOICE] the rights, title and interest to legal claims for money owed, to the extent permitted by applicable law, that [the Assignor BCBS Plans] may assert against any individual or entity, known or unknown, because of their participation in the Putnam County Pass-Through Scheme."[6]

69.     Where used here, "Plaintiffs" includes the Assignor BCBS Plans.

### MANAGED CARE AND THE PLAINTIFFS

70.     Plaintiffs are insurers and third party claims administrators for group health plans that provide benefits to their covered individuals and dependents.

71.     The Plaintiffs may insure group health plans directly (the "Fully-Insured Plans").  For these plans, the Plaintiffs resolve claims and make benefit payments from their own assets.

72.     The Plaintiffs also provide administrative services to self-funded group health plans (the "Self-Funded Plans").  The Plaintiffs deliver these services pursuant to Administrative Services Agreements between the Plaintiffs and the health plan's sponsor (usually an employer), which identify the rights and obligations of each party. Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 *et seq.*  The Plaintiffs provide insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for

---

6     BCBS Assignor Plan Wellmark, Inc. restricted its assignment to fully-insured plans.

reimbursement of medical services provided to the individuals covered by these benefit plans.

73.     The Plaintiffs paid claims to Putnam on behalf of Self-Funded Plans, and seek redress in this lawsuit for those Self-Funded Plans.

74.     The Plaintiffs' agreements with their Self-Funded Plans expressly provide the Plaintiffs with the authority and discretion to recover overpayments on behalf of their customers.

75.     Accordingly, the Plaintiffs have authority and standing to seek recovery on behalf of the impacted Self-Funded Plans and for payments made by the Fully-Insured Plans.

**THE PLAINTIFFS' NETWORK OF PARTICIPATING PROVIDERS**

76.     Enrollees of the Plaintiffs are considered the BCBS Plans' "members."

77.     The Plaintiffs rely upon networks of participating (also known as "in-network") providers.  Participating providers contract with Plaintiffs to accept a negotiated rate for their services, in exchange for, among other things, increased access to members of the Plaintiffs (due to the savings available to the Plaintiffs' members who receive treatment from participating providers) and increased certainty with respect to the amount that they will receive from the Plaintiffs for their services.

78.     On the other hand, non-participating (also known as "out-of-network") providers have not contracted with the Plaintiffs.  The reimbursement rates that the

- 18 -

Plaintiffs are required to pay non-participating providers are often less than the rates the Plaintiffs are contractually obligated to pay participating providers, and Plaintiffs' members are often personally responsible for a larger share of the cost of those services.

79. Putnam is one of RightCHOICE's participating providers.

80. None of the other Defendants is a participating provider, nor do any of them have contracts with RightCHOICE or the other Plaintiffs.

### THE RIGHTCHOICE-PUTNAM CONTRACT

81. Putnam County Memorial Hospital is a public corporation that operates a 15-bed hospital in Unionville, Missouri.

82. Unionville is the county seat of Putnam County, which has fewer than 5,000 total residents.

83. On June 10, 2008, RightCHOICE and Putnam entered into a Participating Hospital Agreement (the "Contract"). A redacted, but otherwise true and correct copy of the Contract, is attached as Exhibit A hereto.

84. The effective term of the Contract was one year, but it automatically renewed for another year upon the same terms and conditions unless terminated through the process set forth in the Contract.

85. The Contract contains a number of provisions that make clear that RightCHOICE contracted to reimburse Putnam only for services *provided by Putnam*.

86. Putnam agreed to "*provide* Hospital Services to Covered Persons in

- 19 -

accordance with and subject to the terms and conditions of [the Contract]."[7]  (Ex. A at § 2.1 (emphasis added).)

87.     The Contract explicitly prohibited Putnam from billing RightCHOICE for services not performed by Putnam.  The Contract states that Putnam "shall bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]."  (Ex. A at § 4.1(b).)

88.     The Contract also limited the services that Putnam would provide and bill for under the Contract to "inpatient and outpatient services, products, accommodations and care that are customarily provided or available at or available from [Putnam]."  (Ex. A at §§ 1.11 (defining Hospital Services), § 2.1 (defining the treatment Putnam was to provide to the Plaintiffs' members).

89.     Putnam was "responsible for each claim submitted by, or on behalf of, [Putnam]."  (Ex. A at § 4.1(b).)

90.     Other provisions of the Contract relevant to this action include that:

    a.     Putnam is obligated to "participate in, comply with, and provide Hospital Services in accordance with" RightCHOICE policies, programs, and procedures, including its provider manual.  (Ex. A at § 2.6.)

---

[7]   The Contract defined "Hospital Services" as "those inpatient and outpatient services, products, and accommodations and care that are customarily provided or available at or available from [Putnam]."  (Ex. A at § 1.11.)

b.      Putnam, its agents, and employees are required to "comply with and abide by all state, federal and local laws and regulations relating to the provision of Hospital Services to Covered Persons."  (Ex. A at § 2.7.)

c.      Putnam certified that "all claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE] will be and are *accurate, complete, and truthful*."  (Ex. A at § 4.1(d) (emphasis added).)

d.      Putnam agreed to provide "valid and appropriate billing and diagnosis codes."  (Ex. A at § 4.2.)

e.      Putnam agreed not to "pay, receive, or offer any incentive, or participate in any incentive program or arrangement, that provides or would provide [Putnam] or any other physician or provider with a direct or indirect inducement to provide less than Medically Necessary health care services, supplies, accommodations, treatments or care to Covered Persons."  (Ex. A at § 4.4(c).)

f.      Putnam could not "assign, delegate, or transfer [the Contract] or the rights or responsibilities provided for [therein] without the prior written consent of [RightCHOICE]."  (Ex. A at § 6.1(a).)

g.      Putnam agreed that only medically necessary services would be reimbursed by RightCHOICE, and medically necessary was defined as meaning Covered Services that were:

- 21 -

i. appropriate and necessary for the symptoms, diagnosis, or treatment of the medical condition;

ii. provided for the diagnosis, care and treatment of the medical condition;

iii. within standards of good medical practice within the medical community;

iv. not primarily for the convenience of the Covered Person, the attending physician, or another health care provider; and

v. the type, supply or level of service or care which can safely be provided and that is not more than what is necessary or appropriate. (Ex. A at § 1.13 & § 1.18.)

h. The Contract is "governed by, and construed and enforced in accordance with, the laws of the State of Missouri." (Ex. A at § 6.8(a).)

91. The Contract also sets the amount that Putnam receives from RightCHOICE for the provision of Hospital Services.

92. Specifically, the Contract sets the "allowed amount" as the lesser of the Established Charge, which is set in the schedule of reasonable and customary charges

- 22 -

for services and supplies provided by Putnam; or the appropriate amount under the applicable Prospective Payment Schedule, which is Attachment A to the Contract.[8]

93. The Plaintiffs are third-party beneficiaries of the Contract.

94. Specifically, the Contract states that Putnam was to "provide Hospital Services to Covered Persons in accordance with and subject to the terms and conditions of [the Contract]." (Ex. A at § 2.1.)

95. Covered Services was defined to mean, in pertinent part, "those health services, products, accommodations and care for which a Company determines that benefits are available under the applicable Coverage Agreement." (Ex. A at § 1.7.)

96. Coverage Agreement was defined to mean

any agreement, contract, program or certificate entered into, issued or agreed to by a Company, a plan sponsor, or a group, under which a Company furnishes administrative services or other services in support of a health care program, and which may include access to one or more of the Company's provider networks or vendor arrangements, except those excluded by RightCHOICE. *Coverage Agreement also includes any agreement between a Company or any other Blue Cross or Blue Shield plan, or the Blue Cross and Blue Shield Association entitling a Covered Person to receive benefits for Covered Services.*

(Ex. A at § 1.6.)

97. Therefore, the Contract's plain language demonstrates the parties' intent that members of *any* BCBS Plan would be treated by Putnam under the Contract.

---

[8] On March 15, 2017, RightCHOICE sent notice to Putnam that it was amending Putnam's reimbursement rates. The change became effective on June 15, 2017.

- 23 -

## LABORATORY TESTING AND PASS-THROUGH BILLING SCHEMES

98. The vast majority of the claims at issue in this matter are urine-drug tests and blood tests.

### Urine-Drug Testing

99. Drug tests are laboratory analyses used to aid in the detection of prescription, recreational, or illicit substances in human specimens.

100. Although drug tests may be performed on a variety of specimen types, UDT is the most commonly used because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

101. This is consistent with Anthem's Clinical UM Guideline, entitled "Drug Testing or Screening in the Context of Substance Use Disorder and Chronic Pain" (the "Anthem Drug Testing Policy"), which is incorporated by reference into the Contract, and which states that "the use of blood samples as an alternative to urine for drug testing is considered medically necessary when the use of urine is not feasible[.]"

102. UDT typically falls into two categories of testing: presumptive and definitive.

103. Presumptive testing is used, when medically necessary, to determine the presence or absence of one or more drugs or drug classes. Presumptive testing is typically performed via immunoassay, and results are expressed as negative, positive,

- 24 -

or numeric.  Presumptive testing is also referred to as "screening" or "qualitative" testing.

104.    Definitive testing is a follow-up test performed on a separate portion of the original specimen, when medically necessary, to validate the identity and quantity of a specific drug or metabolite.  Definitive testing is typically performed using either gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and results are expressed as a concentration of a particular metabolite or analyte (*e.g.*, nanograms per milliliter (ng/mL)).  Definitive testing is also referred to as "confirmation" or "quantitative" testing.

105.    Definitive testing is typically reasonable and necessary only in certain circumstances (*see*, *e.g.*, the Anthem Drug Testing Policy).

**The Toxicology Laboratory Industry**

106.    In recent years, government enforcement efforts, private lawsuits, and investigative journalism have helped to identify widespread fraud within the toxicology laboratory industry.

107.    For example, in a November 2014 article about increases in the amount of UDT being reimbursed by Medicare, the Wall Street Journal summarized the then-recent history of the industry:

> Spending on the [urine-drug] tests took off after Medicare cracked down on what appeared to be abusive billing for simple urine tests.  Some doctors moved on to high-tech testing methods, for which billing wasn't limited.

- 25 -

> They started testing for a host of different drugs—including illegal ones that few seniors ever use—and billing the federal health program for the elderly and disabled separately for each substance.
>
> Medicare's spending on 22 high-tech tests for drugs of abuse hit $445 million in 2012, up 1,423% in five years.[9]

108. In another example, in October 2015, the former Millennium Laboratories agreed to pay $256 million to the U.S. Department of Justice to resolve allegations that it billed Medicare "many millions of dollars' worth" of UDT claims that were "not reasonable and necessary or that were furnished pursuant to prohibited referrals" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and other statutes.

109. As a result of concerns about the frequency, cost, and manner with which toxicology laboratories were billing government and commercial payors, a number of changes were put into place as to how laboratories test and bill for UDT.

110. For example, the Centers for Medicare and Medicaid Services ("CMS") changed the way that UDT is billed, in part because of a "concern about the potential for overpayment when billing for each individual drug test rather than a single code that pays the same amount regardless of the number of drugs that are being tested."

---

[9] Christopher Weaver and Anna Wilde Mathews, *Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill*, THE WALL STREET JOURNAL, Nov. 10, 2014 (available at: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

- 26 -

111. Because these changes have decreased both the frequency and rate at which toxicology laboratories are reimbursed for UDT, toxicology laboratories looked for other ways to gain access to more favorable reimbursement rates, including—as here—passing their UDT claims through hospitals to take advantage of the hospitals' participating status and favorable reimbursement rates from payors.

112. Indeed, the website of one entity that recruited toxicology laboratories to pass their UDT claims through a network of hospitals makes clear the motives:

## Why Hospital Out-Patient Diagnostic Billing?

The Government is continuing to restrict independent clinical labs due to recurring compliance and quality issues. Payers are strategically making moves to block all but a chosen few clinical labs by restricting in-network access. This forces out-of-network labs to strategically align themselves with health systems in order to have a seat at the table. Additionally, patients, clinics, rehab groups, and MDs prefer working with higher quality lab system than their current choices dictate; That's where you come in...

## Benefits of being a Preferred Partner

  

- 90% adjudication rate
- 50% of claims within 30 days
- Get paid a minimum of $500/specimen

- Work with the top health systems in the country
- Above average reimbursement

- Free state-of-the-art specimen tracking system
- In-Network status for 90+% of claims

113.    In other words, because of "recurring compliance and quality issues," commercial payors restricted laboratories from their networks.  This led some laboratories—including those with compliance and quality issues—to rely on health systems like Putnam to hide the identity of the laboratory performing the tests, and take advantage of the hospitals' favorable reimbursement agreements with payors.

## THE PASS-THROUGH SCHEME

### Overview

114.    After losing access to Campbellton-Graceville Hospital, the Defendants and their co-conspirators needed a new hospital to use as a billing entity. Putnam was struggling financially.

115.    Hospital Partners assumed the management of Putnam to allow the Defendants and their co-conspirators to use the hospital as a pass-through (*i.e.*, to bill claims in a way that represented that Putnam performed the tests, so that Plaintiffs would pay the claims pursuant to Putnam's network contract and rates, which were substantially higher than the Pass-Through Labs would receive if they billed the claims directly).

116.    The Pass-Through Labs or their affiliated entities (*e.g.*, Labmed) employed or contracted with marketers who sought to convince providers to order tests from the Pass-Through Labs.

117.    Providers ordered tests from the Pass-Through Labs.

- 28 -

118. The Pass-Through Labs performed the tests at their laboratories in Colorado, Florida, and Georgia.

119. The Pass-Through Labs provided information about the tests they conducted to Empower.

120. Empower billed Plaintiffs for the tests performed by the Pass-Through Labs as if the tests had been performed at and by Putnam, and as if reimbursable under the Contract.

121. The claims contained numerous material misrepresentations intended to hide the fact that the tests were performed at and by the Pass-Through Labs, that the tests were not performed at or by Putnam, that Putnam-credentialed providers played no role in the tests or patient care, and that the tests were for the Plaintiffs' members in areas well outside of Putnam's service area.

122. Plaintiffs have produced claims data in this action that identifies for each claim at issue: (a) the date the claim was billed by the Defendants; (b) the codes billed by the Defendants; (c) the amounts billed by the Defendants; (d) the amounts paid by Plaintiffs; and (e) the cost-sharing obligations owed by Plaintiffs' members for each claim.

- 29 -

123. But for this pass-through scheme, the tests would have had no connection to Putnam.

124. RightCHOICE reasonably relied on the representations that Defendants and their co-conspirators made or caused to be made on the claims. As a result, it paid many of the claims.

125. When Plaintiffs paid the claims, they paid Putnam.

126. Hospital Partners, Byrns, and Perez had access and control of Putnam's bank accounts. When Plaintiffs paid Putnam, Hospital Partners, Byrns, or Perez wired funds out of Putnam's accounts to the other Defendants and their co-conspirators in accordance with their respective financial arrangements.

127. Upon information and belief, to ensure they received the specimens referred by these providers and laboratories, Defendants or their contracted marketers paid them kickbacks by, for example, promising them a portion of the reimbursement that Putnam received from RightCHOICE.

**The Origin and Structure of the Putnam Pass-Through-Billing Scheme**

128. In mid-2016, Putnam was in extremely poor financial condition. A news article published at the end of 2015 described Putnam as a "house of cards."

129. As a result, the Putnam Board contacted at least three companies to discuss taking over management and/or ownership of Putnam.

130. Only Hospital Partners agreed to meet with the Putnam Board.

- 30 -

131. The Putnam Board felt that, absent an agreement with Hospital Partners, Putnam was "within days of closing."

132. On September 12, 2016, Putnam entered into a management agreement with Hospital Partners, led by David Byrns and Jorge Perez. David Byrns, Hospital Partners' President and Chief Executive Officer, was named Chief Executive Officer of Putnam on September 13, 2016.

133. David Byrns and Jorge Perez directed the acts of Hospital Partners during the period relevant to this action.

134. On September 15, 2016, Putnam contracted with Empower to provide billing and electronic health records software. The contract was signed by David Byrns on behalf of Putnam and by Jorge Perez on behalf of Empower.

135. Jorge Perez directed the acts of Empower during the period relevant to this action.

136. Hospital Partners, Hospital Lab Partners, Byrns, Perez, and Porter engaged a network of Pass-Through Labs.

137. On October 1, 2016, Putnam entered into a Services Agreement with Lucenta Labs.

138. On October 13, 2016, Hospital Lab Partners was created by Jorge Perez and James Porter. Somehow, on September 1, 2016—nearly 45 days before Hospital Lab Partners was formed—it contracted with Pinnacle Labs.

139. Jorge Perez and James Porter directed the acts of Hospital Lab Partners during the period relevant to this action.

140. James Porter directed the acts of Pinnacle Labs during the period relevant to this action.

141. On October 20, 2016, Putnam contracted with Hospital Lab Partners, purportedly to operate a clinical laboratory on behalf of Putnam. The contract was signed by David Byrns on behalf of Putnam and by James Porter on behalf of Hospital Lab Partners. Despite the contract, Hospital Lab Partner's actual role in the scheme was to serve as an intermediary between Putnam on the one hand, and Pinnacle Labs and LifeBrite Labs on the other.

142. Upon information and belief, LifeBrite Labs signed a similar contract with either Putnam or Hospital Lab Partners. Christian Fletcher directed the acts of LifeBrite Labs during the period relevant to this action.

143. On November 1, 2016, Putnam entered into a contract with Serodynamics.

144. Beau Gertz and Mark Blake directed the acts of Serodynamics during the period relevant to this action.

145. On November 4, 2016, Putnam entered into a contract with Labmed.

146. Beau Gertz and Mark Blake directed the acts of Labmed during the period relevant to this action.

147. Pinnacle Labs, LifeBrite Labs, Serodynamics, and Lucenta Labs were Pass-

- 32 -

Through Labs.

148.    In 2018, after his relationship with Putnam ended, Beau Gertz was recorded making public comments in connection with his efforts to purchase another small hospital.  During that meeting, he described his involvement with Jorge Perez, including at Putnam.  Gertz stated:

a.    Gertz worked with Jorge Perez for one-and-a-half years.

b.    Gertz was "one of Jorge Perez's reference laboratories" (*i.e.*, Serodynamics) and "his sales and marketing arm" (*i.e.*, Labmed).

c.    "The way we did it with Empower, we had . . . let's call it 'Lab A.' Let's say Lab A is me.  Lab A would do the processing, reporting, and at the end of the day, it's called 'work.'  I would do all the work.  I would then, through an electronic file—it's called an HL7—but we'll just say 'submission,' would be billed.  It would be billed through one of fourteen hospitals."

d.    The management contracts entered into by the hospitals with Empower "took away basically all the duties, all the taxes, took away all the burdens and it put it all on Empower.  But yet Empower could do whatever they wanted in return.  That's what he has done at all these hospitals.  What you guys saw on CBS was that same exact management contract at a hospital called

- 33 -

Campbellton-Graceville Hospital."[10]

e.      "I followed Jorge.  I thought Jorge was a good guy.  Once I started finding out that this issue was not the way it should be done is when I went to Dentons, which is the largest law firm in the world.  I said, 'Okay, there's obviously a way to do this.  Rural hospitals need a way to survive.'"

f.      "The hospital can't simply take a specimen, have somebody else run it, and then submit it through with nobody in that hospital's ever even seen the patient, heard of the patient, done anything for that patient.  Never handled the patient.  Basically, what was going on is the bills were going through, but there was no work done by the hospital.  All's it was was a billing mechanism at the end of the day.  Jorge owns a billing company and I'm sure he made his decisions for whatever reasons he made his decisions."

g.      "I, myself, am distancing myself.  I've sent demand letters— thirteen total—to the hospitals that utilized my services, and I didn't ask for any

---

[10] In March 2018, shortly before Beau Gertz made his presentation, CBS News aired a sequence of reports regarding pass-through billing schemes of the sort alleged herein: (1) *Some Rural Hospitals Used for Big Insurance Reimbursements – and Profit,* CBS NEWS (March 26, 2018), https://www.cbsnews.com/news/rural-hospitals-big-insurance-reimbursements-chestatee-regional; (2) *How Some Rural Hospitals Were Used to Score Huge Paydays,* CBS NEWS (March 26, 2018), https://www.cbsnews.com/news/how-some-rural-hospitals-were-used-to-score-huge-paydays; (3) *Exploiting Small Hospitals?,* CBS NEWS (March 27, 2018), https://www.youtube.com/watch?v=n5G_ZOylCds; (4) *Auditor "Shocked" by Massive Billing Schemes at Rural Hospitals,* CBS NEWS (MAY 16, 2018), https://www.cbsnews.com/news/questionable-billing-schemes-rural-hospitals-costing-health-insurance-companies-millions/?ftag=CNM-00-10aac3a.

money back. I actually told them, 'Reverse the money, give it back to the insurance carriers.' Because that raises the premiums if it's not done correctly."

      h.     With laboratory outreach programs, you have to do them "100-percent by-the-books or it's considered fraudulent."

      i.     Jorge Perez owed Beau Gertz "$14.4 million in the span of a year. I know it works. But he didn't do it the correct way."

149. In March 2018, Mark Blake sent letters to a number of hospitals affiliated with Jorge Perez and Empower. Upon information and belief, these are the "demand letters" referenced by Beau Gertz during his presentation.

150. In the letters, Mark Blake said that the hospitals "have a very interesting outreach program overseen by Jorge Perez . . . ." The letters also alleged that the hospitals had done little, if any, of the laboratory work that was billed to insurers.

**Claims for Tests Performed Before the Defendants Contracted with Putnam**

151. The Defendants and their co-conspirators saw Putnam as a vehicle through which they could bill *any test*, regardless of whether Putnam had any relationship with the patient or with the performance of the tests.

152. Hospital Partners did not take over the management of Putnam until September 12, 2016. The Pass-Through Labs were engaged even later.

153. This timing did not stop the Defendants or their co-conspirators from billing Plaintiffs more than $7.8 million for tests performed between June 2016 and

September 2016 by Serodynamics, Pinnacle Labs, and LifeBrite Labs. In reliance on these claims, Plaintiffs paid Putnam more than $4.8 million for tests *that were performed before the Defendants or their co-conspirators had any contractual relationship with Putnam.*

154. The Defendants and their co-conspirators likely intended to bill these claims through Campbellton-Graceville Hospital. But in June 2016, a court granted an injunction that closed off their ability to use that hospital as a billing entity. Rather than incur the resulting losses or bill insurers directly, they delayed billing the claims until they gained access to Putnam. Then, they caused them to be billed in a way that represented to Plaintiffs that *Putnam* had performed the tests.

155. Serodynamics, Gertz, and Blake were particularly brazen about this practice. These Defendants and their co-conspirators caused Plaintiffs to be billed more than $5 million for tests performed by Serodynamics between August 2016 and October 2016, and caused Plaintiffs to pay Putnam more than $3.1 million in reliance on the claims.

156. Similarly, Pinnacle Labs' connection to Putnam was through Hospital Lab Partners, which was not created until October 13, 2016. Yet, the Defendants billed Plaintiffs more than $4.8 million for tests performed by Pinnacle Labs between August 2016 and October 12, 2016, causing Plaintiffs to pay them more than $2.9 million.

157. Serodynamics also had a relationship with Southwest Laboratories ("Southwest Labs") whereby it would perform blood tests on specimens referred by

- 36 -

Southwest Labs in exchange for $300 per specimen from Southwest Labs. In late 2016, Southwest owed Serodynamics more than $1 million for tests that Serodynamics had already performed. In exchange for canceling Southwest Labs' debt to Serodynamics, Serodynamics and Southwest Labs agreed that Serodynamics could bill the claims to insurers through Putnam, and that Serodynamics would receive the reimbursements paid by insurers, including Plaintiffs, as a result. The Defendants billed these claims to Plaintiffs even though they had no connection to Putnam and were performed before Serodynamics had a contractual relationship with Putnam.

### Placement of Phlebotomists in Providers' Offices

158. Shortly after Hospital Partners took over management of Putnam, 33 phlebotomists were hired and placed in providers' offices around the country.

159. Upon information and belief, the phlebotomists were placed in the offices of providers who were high-volume customers of Serodynamics and Labmed.

160. The phlebotomists were located in medical practices in Alabama (one), Arizona (one), Arkansas (three), California (two), Georgia (four), Kentucky (three), Louisiana (three), Missouri (two), Oklahoma (two), Tennessee (five), and Texas (seven).

161. The phlebotomists were purportedly employed by Putnam, but were controlled and paid for by Serodynamics and Labmed.

162. Upon information and belief, the phlebotomists were used to make Putnam appear more involved in the tests than it actually was.

- 37 -

## The Scheme's Reliance on Over-Testing and Over-Billing

163. To maximize the revenue that they could extract from the Plaintiffs, the Defendants and their co-conspirators billed the tests using codes that would maximize the amount likely to be paid, without regard to whether those codes reflected appropriate or medically necessary services, and without regard to appropriate billing practices.

164. For the urine-drug tests at issue, a laboratory should have billed one presumptive code and one definitive code per date of service in 2016. Instead, the Defendants and their co-conspirators often unbundled and billed RightCHOICE for 15 or more drug testing codes *in addition to* the codes for both presumptive and definitive testing.

165. For example, Putnam billed RightCHOICE for urine-drug tests purportedly performed for a BCBS Plan member on December 1, 2016. Nevertheless, for that member, Putnam billed RightCHOICE 23 different codes, in spite of the fact that two of them—G0479 and G0480—explicitly covered *all* presumptive *and* definitive testing performed for that member on that date of service. Of the remaining 21 codes billed to RightCHOICE for this member, a substantial percentage were codes for definitive testing that was misrepresented as presumptive testing.

## The Defendants' Efforts to Hide the Scheme

166. In early 2017, Plaintiffs sought to investigate the claims at issue, which

appeared to be for laboratory tests performed by Putnam.

167. In January 2017, Plaintiffs requested that Putnam provide medical records to support the laboratory test claims for ten of Plaintiffs' members. The records were due back to Plaintiffs within 30 days.

168. On March 1, 2017, Plaintiffs wrote to Putnam about the dramatic increase in claims for laboratory tests. The letter requested information about, among other things, Putnam's relationship with Hospital Lab Partners, the role being played by Putnam with the tests, and where the specimens were coming from.

169. On March 13, 2017, David Byrns responded. In his letter, Byrns misrepresented, among other things: (i) Hospital Lab Partners' role vis-à-vis Putnam; (ii) that "Putnam has its own full service clinical laboratory and the equipment to perform all tests it bills with some minor exceptions;" (iii) "Putnam obtains and maintains documentation of physicians' orders for the laboratory services and other relevant diagnostic and/or medical information pertaining to testing and its medical necessity;" and (iv) "Putnam maintains a state-of-the-art, full service laboratory" that "provides routine and emergency clinical services for hospital patients, and to areas where physicians associated and credentialed with Putnam are located."

170. On March 15, 2017, RightCHOICE notified Putnam that it was implementing new laboratory reimbursement rates for Putnam. The new laboratory reimbursement rates would go into effect on June 15, 2017, in accordance with the

Contract's notice requirements.

171. On May 8, 2017, Plaintiffs sent another letter to Putnam, asking for more information on the laboratory tests being billed by Putnam, including the nature of Putnam's relationship with Pinnacle Labs and Cadira Labs (one of Serodynamics' affiliated entities).

172. On May 18, 2017, David Byrns responded. He wrote that Putnam "works diligently to provide the valuable medical services necessary for Anthem-insured patients at Putnam's clinical laboratory[,]" but, "[o]n occasion, Putnam may experience operational issues regarding laboratory capabilities, malfunctioning equipment, or other issues that are common amongst medical providers who perform services with complex instrumentation." In those cases, he continued, Putnam "must work with associates intermittently in order to provide services ordered by physicians."

173. When Byrns made this statement, he knew that it was false, and made it with the intent to further the fraudulent pass-through scheme.

174. Byrns ignored the Plaintiffs' request for more information on Putnam's relationships with Pinnacle Labs and Cadira Labs.

175. In the same letter, Byrns described Hospital Lab Partners' role as "provid[ing] consultation, guidance, and expertise to Putnam in regards to the laboratory services and operations performed at Putnam's laboratory facilities." He otherwise refused to divulge the nature of Hospital Lab Partners' relationship with

Putnam, other than to say that it "assist[ed] Putnam in providing Anthem-insured patients with sound laboratory services." Byrns stated that he could not provide additional information about the nature of Hospital Lab Partners' relationship with Putnam because he did "not want to disclose [Hospital Lab Partners'] trade secrets, confidential information, or other business know-how[.]"

176. When Byrns made these statements, he knew that they were false, and made them with the intent to further the fraudulent pass-through scheme.

177. Specifically, Byrns knew that Hospital Lab Partners was operated by his co-conspirators Jorge Perez and James Porter, and was coordinating with the other Defendants and co-conspirators to bill tests performed by Pinnacle Labs and LifeBrite Labs as if they were performed at and by Putnam. Similarly, Byrns refused to answer Plaintiffs' questions about Putnam's relationships with Pinnacle Labs and Cadira Labs (*a/k/a* Serodynamics) because he knew that Plaintiffs would stop paying the claims if they knew that they were performing tests and causing them to be billed to Plaintiffs in a way that misrepresented that they were performed at and by Putnam.

178. Putnam did not respond to the Plaintiffs' request for medical records until July 3, 2017. On that date, Plaintiffs received a letter from Ricardo J. Perez, the brother of Jorge Perez, on letterhead from Empower, and enclosing records relating to nine of the ten tests that Plaintiffs identified in their medical records request.

179. Upon information and belief, the Defendants delayed providing the

- 41 -

medical records to Plaintiffs as long as possible to prevent Plaintiffs from understanding the pass-through-billing scheme.  Specifically, the Defendants waited to provide the medical records to Plaintiffs until after the new laboratory reimbursement rates went into effect on June 15, 2017, which removed the financial incentive for the Defendants and their co-conspirators to bill the tests to Plaintiffs through Putnam.

### The Amounts Received from Putnam by the Defendants

180. Hospital Partners received approximately $8 million from Putnam.

181. Empower received more than $14 million from Putnam.

182. Hospital Lab Partners received more than $62.5 million from Putnam, the majority of which it then transferred to LifeBrite Labs and Pinnacle Labs.

183. Serodynamics received more than $6 million from Putnam in 2017.

184. LabMed received more than $20 million from Putnam in 2017.

185. LifeBrite Labs received more than $11.5 million directly from Putnam, in addition to the millions it received from Hospital Lab Partners.

186. Pinnacle Labs received millions from Putnam through Hospital Lab Partners.

187. Lucenta Labs received approximately $450,000 from Putnam.

188. Putnam kept a small portion of the funds paid by RightCHOICE.

- 42 -

189.     Empower responded to Plaintiffs' medical records request on behalf of Putnam on July 3, 2017.  In his letter, Ricardo Perez said that he was enclosing "all Medical Records information that we have on file" for the tests requested.

190.     Enclosed with Ricardo Perez's letter were documents relating to nine of the ten sample claims identified by RightCHOICE.

191.     RightCHOICE has identified the following sample claims as illustrative of Defendants' scheme.

192.     At the time that RightCHOICE paid the claims described below, it based its payment determinations on the information provided in the claims from Putnam (*i.e.*, it did not have the test results or other medical records).

*Sample Claim No. 1*

193.     On November 4, 2016, a urine specimen was collected from a BCBS Plan member by a pain management practice in Ohio.

194.     The test results provided by Empower have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the "Account."

195.     None of the tests are identified as being performed at or by Putnam.

- 43 -

196. Instead, under the header, a laboratory report from LifeBrite Labs is reprinted:



197. The test results show that no drugs were detected in the member's specimen, except for Oxycodone, which was prescribed.

198. Because the results of the presumptive test were as expected (*i.e.*, the only positive was for a prescribed medication), definitive testing was not medically necessary under the Anthem Drug Testing Policy.

199. However, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $3,808.

- 44 -

200. In reliance on the misrepresentations contained on the claim form submitted by Putnam, RightCHOICE paid Putnam $2,703.68.

201. This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area. LifeBrite Labs performed the tests, not Putnam.

202. But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid Putnam.

*Sample Claim No. 2*

203. On November 15, 2016, a urine specimen was collected from a BCBS Plan member by a substance abuse treatment facility in Virginia.

204. The test results provided by Empower have "Putnam County Memorial Hospital" at the top of the page, but identify "LIFEBRITE LAB" as the "Account."

205. None of the tests are identified as being completed by Putnam.

- 45 -

206. Instead, underneath the header, a laboratory report from LifeBrite Labs is reprinted:



207. The test results from LifeBrite Labs show that, of the three drugs identified in the member's specimen, two were prescribed (Naloxone and Buprenorphine) and one was not (Gabapentin).

208. Because of the unexpected positive, the Anthem Drug Testing Policy would have permitted definitive testing to confirm the positive for Gabapentin.

209. Instead, Putnam billed RightCHOICE for 20 separate codes, with a total billed charge of $4,138.

- 46 -

210. In reliance on the misrepresentations contained on the claim submitted by Putnam, RightCHOICE paid Putnam $2,937.98

211. This BCBS Plan member was not a Putnam patient, was not treated by a Putnam-credentialed healthcare provider, and was hundreds of miles outside of Putnam's service area. LifeBrite Labs performed the tests, not Putnam.

212. But for this pass-through scheme, Putnam would not have submitted a claim for this testing to RightCHOICE and RightCHOICE would not have paid Putnam.

## CAUSES OF ACTION

### COUNT I
### FRAUD AND FRAUDULENT CONCEALMENT
### (Against all Defendants)

213. The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

214. As alleged herein, each of the Defendants, individually and in furtherance of the fraudulent scheme alleged herein, made, or caused to be made, intentional misrepresentations of material fact relating to the insurance claims that Putnam submitted, or caused to be submitted, to the Plaintiffs for reimbursement.

215. The Defendants and their co-conspirators agreed and conspired with one another to make or cause these intentional misrepresentations to be made.

216. When Defendants made these intentional misrepresentations, or caused them to be made, they did so with the intent to induce the Plaintiffs to rely on those

- 47 -

misrepresentations and pay the insurance claims.

217. Each Defendant's participation in the fraudulent scheme includes, but is not limited to, the following:

a. *Hospital Partners*:  Hospital Partners was responsible for identifying and taking over the management of Putnam, which was essential to the scheme, as Putnam's contract with RightCHOICE was what allowed the Defendants to generate such substantial returns.  Hospital Partners installed David Byrns as Putnam's Chief Executive Officer, who in turn signed many of the contracts that gave the other Defendants access to Putnam.  When RightCHOICE relied on Defendants' material misrepresentations and paid the claims, Hospital Partners withdrew funds from Putnam's accounts to pay itself and the other Defendants for their participation in the scheme.  At the time Hospital Partners took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the relevant period, Hospital Partners was controlled and directed by David Byrns and Jorge Perez.

b. *Hospital Lab Partners*:  Hospital Lab Partners was engaged by Hospital Partners, David Byrns, and Jorge Perez to contract with and manage Pinnacle Labs and LifeBrite Labs, which it did.  When Plaintiffs paid Putnam for

- 48 -

tests performed by Pinnacle Labs or LifeBrite Labs, Byrns would cause Putnam to pay Hospital Lab Partners, which in turn paid Pinnacle Labs and LifeBrite Labs their respective shares of the reimbursements.  At the time Hospital Lab Partners took each of these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Upon information and belief, Hospital Lab Partners was controlled and directed by James Porter and Jorge Perez.

c. *Empower H.I.S.*:  Empower was engaged by Hospital Partners, Jorge Perez, and David Byrns to bill the claims to Plaintiffs.  Specifically, Empower prepared and submitted the thousands of claims at issue.  Empower also delayed Putnam's response to the Plaintiffs' request for medical records.  At the time Empower took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Empower was controlled and directed by Jorge Perez and his family members.

d. *Pinnacle Labs*:  Pinnacle Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, and James Porter.  Pinnacle Labs managed employed or

- 49 -

contracted sales personnel who generated test orders from Pinnacle Labs, performed the tests at its laboratory in Florida, and provided information about the completed tests to Empower so that they could be billed to RightCHOICE as if tested at and by Putnam, and as if reimbursable under the Contract. In exchange for its participation in the pass-through scheme, Pinnacle Labs was paid tens-of-millions of dollars. At the time Pinnacle Labs took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims. Throughout the period relevant hereto, Pinnacle Labs was controlled and directed by James F. Porter, Jr.

e. *Serodynamics*: Serodynamics was engaged to bill its laboratory testing through Putnam by Hospital Partners, David Byrns, Jorge Perez, and James Porter. Serodynamics performed blood tests at its laboratory in Colorado, reported results to ordering providers, and provided information about the completed tests to Empower so that the tests could be billed to RightCHOICE as if tested at and by Putnam, and as if reimbursable under the Contract. Serodynamics and its principals knowingly agreed to participate in this pass-through scheme because of the success they had participating in a similar scheme at Campbellton-Graceville Hospital. In exchange for its participation in the

- 50 -

Putnam scheme, Serodynamics received more than $6 million, and its affiliated entitiy (Labmed) received more than $20 million.  At the time Serodynamics took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the period relevant hereto, Serodynamics was directed by Beau Gertz and Mark Blake.

f.    *Labmed*:  Labmed was engaged by Hospital Partners, David Byrns, Jorge Perez, and James Porter to provide marketing services that would generate orders for blood tests from Serodynamics, which would then be billed to Plaintiffs as if performed at and by Putnam.  In exchange for serving as an intermediary between Serodynamics and the contracted marketers, Labmed received more than $20 million from this scheme.  At the time LabMed took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the period relevant hereto, LabMed was directed Beau Gertz and Mark Blake.

g.    *Jorge Perez*:  Jorge Perez designed and implemented this pass-through scheme, including the creation and structuring of the various entities used to perpetrate the scheme.  Jorge Perez was responsible for convincing the

- 51 -

Putnam Board that Hospital Partners should take over management of the hospital. Jorge Perez created Hospital Partners (with David Byrns), created Hospital Lab Partners (with James F. Porter, Jr.), created and managed Empower (with his family members), and brought together the other Individual Defendants, who he knew from Campbellton-Graceville Hospital. At the time Jorge Perez took these acts, he knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.

h. *David Byrns*: David Byrns conspired with Jorge Perez to design and implement this scheme, including through his dual roles at Hospital Partners (President) and Putnam (CEO). As Putnam's CEO, David Byrns signed the contracts with the other Defendants that were essential to the operation and success of the pass-through scheme. In addition, David Byrns was responsible for the day-to-day management of Putnam throughout the scheme, including but not limited to: (i) interacting with Putnam personnel who raised questions about the laboratory billings; (ii) helping coordinate the setup of the pass-through scheme; (iii) responding to requests for information from Plaintiffs and the Missouri Auditor; and (iv) wiring funds from Putnam's accounts to the other Defendants when Plaintiffs paid the claims. As set forth herein, Byrns made

- 52 -

direct misrepresentations to Plaintiffs in an effort to prevent them from uncovering the pass-through scheme.  In addition, at the time David Byrns took the acts described herein, he knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.

i.      *James F. Porter, Jr.*:  James Porter served in a dual role in furtherance of the pass-through scheme.  First, after agreeing to participate in the conspiracy, James Porter created Hospital Lab Partners, which he used as an intermediary entity to engage Pinnacle Labs and LifeBrite Labs.  Second, he conspired with the other Defendants to bill Plaintiffs for tests performed by Pinnacle Labs as if the tests had been performed at and by Putnam.  James Porter committed Pinnacle Labs to participate in the pass-through scheme in exchange for a percentage of any amounts paid (including RightCHOICE) for tests performed by Pinnacle Labs.  When he agreed to use Pinnacle Labs in furtherance of the pass-through scheme, James F. Porter, Jr. intended that RightCHOICE would reasonably rely on the fraudulent claims and pay Putnam.  When RightCHOICE paid the resulting claims, Pinnacle Labs received a portion of the reimbursement paid for testing that it had performed.

j.      *Beau Gertz*:  Beau Gertz conspired with the other Defendants to bill

- 53 -

Plaintiffs for tests performed by Serodynamics as if the tests had been performed at and by Putnam. In so doing, Gertz knew and intended to cause the submission of fraudulent claims for payment to RightCHOICE. Beau Gertz committed LabMed and Serodynamics to participate in the pass-through scheme and conspired with the other Defendants to do so, in part because of his experience with a similar scheme at Campbellton-Graceville Hospital. When RightCHOICE paid the resulting claims, LabMed and Serodynamics received a portion of the reimbursement paid by RightCHOICE. Beau Gertz directed these acts. Beau Gertz also undertook these acts in his individual capacity.

k. *Mark Blake*: Mark Blake conspired with the other Defendants to bill Plaintiffs for tests performed by Serodynamics as if the tests had been performed at and by Putnam. In so doing, Blake knew and intended to cause the submission of fraudulent claims for payment to RightCHOICE. Blake committed Labmed and Serodynamics to participate in the pass-through scheme and conspired with the other Defendants to do so, in part because of his experience with a similar scheme at Campbellton-Graceville Hospital. When RightCHOICE paid the resulting claims, LabMed and Serodynamics received a portion of the reimbursement paid by RightCHOICE. Mark Blake directed these acts. Mark Blake also undertook these acts in his individual capacity.

218. The co-conspirators' participation in the scheme included, but is not

limited to, the following acts:

a.  *LifeBrite Labs*:  LifeBrite Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, Hospital Lab Partners, David Byrns, Jorge Perez, and James Porter.  LifeBrite Labs managed employed or contracted sales personnel who generated test orders from LifeBrite, performed the tests at its laboratory in Georgia, and provided information about the completed tests to Empower so that they could be billed to RightCHOICE as if tested at and by Putnam, and as if reimbursable under the Contract.  LifeBrite Labs knowingly agreed to participate in this pass-through scheme because of the success it had participating in a similar scheme based at Campbellton-Graceville Hospital.  In exchange for its participation in the scheme, LifeBrite Labs received tens-of-millions of dollars.  At the time LifeBrite Labs took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Throughout the period relevant hereto, LifeBrite Labs was controlled and directed by its sole member and CEO, Christian Fletcher.

b.  *Christian Fletcher*:  Christian Fletcher conspired with the Defendants to bill Plaintiffs for tests performed by LifeBrite Labs as if the tests had been performed at and by Putnam.  Fletcher knew and intended that the Defendants'

- 55 -

conduct would cause the submission of fraudulent claims for payment to RightCHOICE.  Christian Fletcher committed LifeBrite Labs to participate in the pass-through scheme and conspired with the Defendants to do so, in part because of his experience with a similar scheme involving Jorge Perez at Campbellton-Graceville Hospital.  Christian Fletcher committed LifeBrite Labs to participate in the pass-through scheme in exchange for a percentage of any amounts paid (including RightCHOICE) for tests performed by LifeBrite Labs.  When he agreed to use LifeBrite Labs in furtherance of the pass-through scheme, Christian Fletcher intended that RightCHOICE would reasonably rely on the fraudulent claims and pay Putnam.  As the sole member of LifeBrite Labs, Christian Fletcher directed LifeBrite's participation in the scheme in all respects.  Christian Fletcher also undertook these acts in his individual capacity.  Upon information and belief, as the sole member of LifeBrite Labs, when Christian Fletcher received distributions from the company, he necessarily received funds paid by RightCHOICE in reasonable reliance on the fraudulent claims submitted because of the pass-through scheme.

c. *Lucenta Labs*:  Lucenta Labs was engaged to bill its laboratory testing through Putnam by Hospital Partners, David Byrns, and Jorge Perez.  Lucenta Labs generated patients' specimens through its sales personnel, tested the specimens, reported results to its clients, and provided information about the

tests to Empower so that the tests could be billed to RightCHOICE as if tested at and by Putnam, and as if reimbursable under the Contract.  At the time Lucenta Labs took these acts, it knew and intended that they would cause the submission of fraudulent claims for payment to RightCHOICE, and intended that RightCHOICE would reasonably rely on those misrepresentations and pay the claims.  Lucenta Labs received more than $450,000 because of its participation in the scheme alleged herein.

219.     Collectively, the Defendants and their co-conspirators concealed information regarding the structure and role of the entity Defendants in furtherance of the conspiracy, and used the entity Defendants to hide the existence of this scheme from the Plaintiffs.

220.     The claims submitted by Defendants and their co-conspirators, or that Defendants and their co-conspirators caused to be submitted, included the following material misrepresentations:

> a.     Use of a UB-04 claim, rather than a CMS-1500 claim
>
> b.     Provider name and address (misrepresented as Putnam)
>
> c.     Provider Tax ID and NPI (misrepresented as Putnam)
>
> d.     Type of bill (misrepresented as "141," which indicates a specimen submitted for analysis to Putnam);
>
> e.     Admission date and hour (when no admission was made);

f.      Admission type (misrepresented as "3," which indicates an elective admission, when there was no admission);

g.      source of admission (misrepresented as "1," which indicates a physician referral, when there was no admission);

h.      patient discharge status (misrepresented as "01," which indicates a discharge to home or self-care, when there was no admission or discharge);

i.      attending physician's name and NPI (misrepresented as the name and NPI of the referring healthcare provider);

j.      assignment of benefits (misrepresented that Putnam had been assigned the members' benefits);

k.      the medical necessity of the testing performed; and

l.      that the information shown on the face of each claim submitted to RightCHOICE was "true, accurate and complete."

221.    The Defendants and their co-conspirators also failed to disclose, or caused Putnam to fail to disclose, material facts relating to the insurance claims that Defendants and their co-conspirators submitted, or caused to be submitted, including that:

a.      Putnam was participating in a pass-through scheme designed to misuse the Contract;

b.      That the laboratory testing billed for by Putnam was never ordered from Putnam;

- 58 -

c.      Upon information and belief, that participants in the pass-through scheme were paying kickbacks to healthcare providers and laboratories in exchange for referring their patients' specimens to the Pass-Through Labs, which in turn were billed to RightCHOICE under the Contract;

d.      That participants in the pass-through scheme waived BCBS Plan members' copayment and coinsurance obligations, in violation of the Plaintiffs' policy and member contracts, in order to prevent the scheme from being detected by the Plaintiffs.

222.    The Defendants and their co-conspirators understood that, under the circumstances, and given the volume of claims received by RightCHOICE from providers of all types, Putnam had a special relationship of trust and confidence toward RightCHOICE that gave rise to a duty to speak and disclose material information regarding the claims submitted.

223.    The Defendants' scheme relied upon this relationship, and the volume of claims received by RightCHOICE, to hide their fraudulent claims.

224.    The Defendants and their co-conspirators had a duty to disclose to RightCHOICE and the Plaintiffs information material to the claims that Putnam submitted, or caused to be submitted, so as not to mislead RightCHOICE and the Plaintiffs.

225.    The Defendants and their co-conspirators took on this obligation every

- 59 -

time they filed a claim, or caused a claim to be filed, as they certified that each claim was not "knowingly or recklessly disregard[ing] or misrepresent[ing] or conceal[ing] material facts."

226. The Defendants and their co-conspirators also knew that the claims resulting from the pass-through scheme would be submitted to RightCHOICE pursuant to the Contract, which required, among other things, that:

a. "[A]ll claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE] will be and are *accurate, complete, and truthful.*" (Ex. A at § 4.1(d) (emphasis added).)

b. Putnam "shall bill only for Hospital Services performed by, or under the direction and personal supervision of [Putnam]." (Ex. A at § 4.1(b).)

227. At the time that Defendants and their co-conspirators submitted the claims, or caused the claims to be submitted, they knew that the representations described above were false, and that the claims contained the above-described omissions.

228. These misrepresentations and omissions were material to RightCHOICE's determination of whether the claims were payable.

229. The Defendants and their co-conspirators intended for RightCHOICE and the Plaintiffs to rely on their material misrepresentations and omissions, such that RightCHOICE would pay Putnam for the claims arising from this pass-through scheme.

- 60 -

230. The Defendants and their co-conspirators knew, or should have known, that this scheme should have been disclosed to RightCHOICE and the Plaintiffs. Yet, they failed to disclose the scheme.

231. In failing to disclose the aforementioned material information, the Defendants and their co-conspirators acted in bad faith.

232. RightCHOICE and the Plaintiffs reasonably relied on the claims submitted by the Defendants and their co-conspirators, including the misrepresentations and omissions, when determining whether to pay each claim.

233. Had RightCHOICE been aware that the claims contained material misrepresentations, or omitted material information, it would not have paid them.

234. Similarly, had the Defendants or their co-conspirators disclosed the aforementioned material omissions, RightCHOICE would not have paid the claims.

235. The Defendants and their co-conspirators had superior and special knowledge of the pass-through scheme, and took steps to prevent RightCHOICE from identifying it.

236. As a result, when RightCHOICE received the claims, it was unaware of the pass-through scheme, which was not reasonably discoverable by RightCHOICE.

237. In reliance on the misrepresentations and omissions, RightCHOICE paid the claims.

238. The Plaintiffs reconciled some of those payments with RightCHOICE.

- 61 -

239. The Defendants' conduct, and the conduct of the Defendants' co-conspirators, was specifically designed to injure the Plaintiffs, and was done willfully, maliciously, and in disregard of the Plaintiffs' rights.

240. As a direct and proximate result of Defendants' material misrepresentations and omissions, and the material misrepresentations and omissions of the Defendants' co-conspirators, the Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II
## NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

241. The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

242. The claims submitted by Defendants and their co-conspirators, or caused to be submitted by Defendants and their co-conspirators, contained material misrepresentations, including but not limited to those described in paragraphs 236 and 237, above.

243. These representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, made without reasonable care, or made under circumstances in which Defendants and their co-conspirators ought to have known their falsity.

- 62 -

244. The Defendants' misrepresentations were made to RightCHOICE and the Plaintiffs in the course of the Defendants' business and because of a pecuniary interest.

245. The Defendants and their co-conspirators had a duty to disclose to RightCHOICE and the Plaintiffs information material to the claims that the Defendants and their co-conspirators submitted, or caused to be submitted, to RightCHOICE, to avoid misleading RightCHOICE and the Plaintiffs.

246. The Defendants and their co-conspirators took on this obligation every time they filed a claim, or caused a claim to be filed, as they certified that they were not "knowingly or recklessly disregardin[ing] or mispresentin[g] or conceal[ing] material facts."

247. The Defendants and their co-conspirators also took on this obligation because they knowingly caused the misrepresentations to be made pursuant to the Contract, which required "all claims information, encounter data and other information submitted by or on behalf of [Putnam] to [RightCHOICE to be] *accurate, complete, and truthful*." (Ex. A at § 4.1(d) (emphasis added).)

248. The Defendants and their co-conspirators failed to exercise reasonable care when making these representations.

249. It was foreseeable that RightCHOICE and the Plaintiffs would rely on the Defendants' representations, given the nature of the claims payment process, and the fact that they were submitted to RightCHOICE by Putnam.

- 63 -

250. RightCHOICE reasonably relied on Defendants' misrepresentations and paid the claims.

251. If RightCHOICE had been aware of the material misrepresentations, RightCHOICE would not have paid the claims.

252. As a direct and proximate result of Defendants' misrepresentations, the Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III
## RESTITUTION UNDER ERISA § 502(a)(3)
### (Against all Defendants)

253. The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

254. Many of the impacted group health plans are employer-sponsored group health plans covered by ERISA (the "ERISA Plans").

255. The Plaintiffs have been delegated by the plan administrator of each of the ERISA Plans the discretionary authority to review and decide on claims for benefits under the ERISA Plans.

256. The ERISA Plans also delegated to the Plaintiffs the authority to recover overpayments made by the Plaintiffs on the ERISA Plans' behalf.

257. Because of the fraudulent scheme identified herein, the Plaintiffs have paid millions of dollars in benefits to Putnam, and through Putnam, to the Defendants and their co-conspirators.

- 64 -

258. The Plaintiffs have standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

259. As alleged herein, the Defendants and their co-conspirators submitted, or caused to be submitted, misleading and fraudulent claims to RightCHOICE for payment of benefits for charges related to laboratory services that the Defendants and their co-conspirators represented, or caused to be represented, were performed by Putnam.

260. RightCHOICE relied on the claim information supplied by the Defendants and their co-conspirators, or that Defendants and their co-conspirators caused to be supplied, in determining whether to pay the claims.

261. Had RightCHOICE been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

262. Based upon the fraudulent claims that the Defendants and their co-conspirators submitted, or caused to be submitted, the Defendants and their co-conspirators received payments in excess of the amounts that they were actually entitled to receive for those services.

263. Further, even if Defendants and their co-conspirators did not knowingly and intentionally submit misleading and fraudulent claims to RightCHOICE, the

- 65 -

Plaintiffs are entitled to equitable relief to enforce the terms of the ERISA Plans, and recover overpayments made to Defendants.

264. This is particularly true where Defendants and their co-conspirators submitted claims, or caused claims to be submitted, for members of ERISA Plans pursuant to valid contractual assignments (or authorized representation agreements) received from ERISA Plan members. In these instances, the Defendants and their co-conspirators accepted the terms of the ERISA Plans and submitted claims, or caused claims to be submitted, that were subject to those terms.

265. Further, by knowingly accepting payments from the ERISA Plans, the Defendants and their co-conspirators became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

266. The ERISA Plans, by their terms, cover only medically necessary services and require the return of overpayments and amounts that were erroneously paid.

267. Thus, even to the extent that the Defendants and their co-conspirators did not intentionally overcharge the Plaintiffs, the Plaintiffs are entitled to equitable relief to enforce the terms of the ERISA Plans and recover these overpayments.

268. The ERISA Plans state that fraudulent statements on electronic submissions will invalidate any payment or claims for services.

269. The Plaintiffs have paid millions of dollars in benefits to the Defendants and their co-conspirators that were not owed under the terms of the ERISA Plans.

- 66 -

270.   The Plaintiffs seek equitable restitution to cover the assets that Defendants unlawfully obtained because of the conduct described herein.

271.   Specifically, the Plaintiffs seek an Order imposing an equitable lien or constructive trust on the assets that Defendants received in the form of overpayments.

272.   The Plaintiffs also seek an Order restoring to the Plaintiffs—individually and on behalf of the ERISA Plans—the sums held in constructive trust by Defendants.

**COUNT IV**
**DECLARATORY AND INJUNCTIVE RELIEF**
**UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202**
**(Against all Defendants)**

273.   The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

274.   The Plaintiffs act as a claims fiduciary for the ERISA Plans.

275.   Therefore, the Plaintiffs have standing under ERISA § 502(a)(3) to enjoin any acts or practices that violate any provisions of the ERISA Plans, and to obtain other appropriate relief to redress such violations or enforce plan provisions.

276.   The Defendants and their co-conspirators have engaged in a scheme to defraud RightCHOICE into paying amounts to the Defendants and their co-conspirators in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

- 67 -

277. There is an actual case and controversy between the Plaintiffs and Defendants as to the claims the Defendants and their co-conspirators submitted to RightCHOICE, all of which arise from the fraudulent scheme described herein.

278. The Defendants' fraudulent scheme is deceptive, unfair, and unlawful.

279. No payment is due to the Defendants or their co-conspirators on any claims that are pending, or may be submitted in the future, where such claims arise from Defendants' fraudulent scheme.

280. There is a *bona fide*, present, and practical need for a declaration as to the lawfulness of the Defendants' actions, including whether RightCHOICE has the right to deny the claims implicated by Defendants' actions and scheme.

281. The Plaintiffs are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, and that any claims for payment of benefits submitted by Defendants to RightCHOICE because of this scheme are non-payable and void.

282. The Plaintiffs also seek recovery of their reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1).

283. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Plaintiffs are entitled to a judgment declaring that Defendants' actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent

- 68 -

scheme, and that any claims for payment of benefits submitted by Defendants as a result of their fraudulent scheme are non-payable and void.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against all Defendants)

284.    The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

285.    RightCHOICE had a valid and enforceable contract with Putnam (referred to throughout this document as the "Contract").

286.    The Defendants and their co-conspirators were aware of the Contract.

287.    The Defendants and their co-conspirators improperly, wrongfully, willfully, and intentionally engaged in the scheme described in this Complaint.

288.    The Defendants' scheme was predicated upon the repeated breach of the Contract.

289.    By orchestrating and participating in the fraudulent scheme described herein, the Defendants and their co-conspirators caused Putnam to breach its contract with RightCHOICE by, among other things:

c.    Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, for services not performed by, or performed under the direction and personal supervision of, Putnam.  (*See* Ex. A at §§ 1.11, 2.1, and 4.1(b); *see also* Anthem Blue Cross and Blue Shield Provider and Facility Manual

- 69 -

at 32 (requiring that providers of laboratory services bill only for the components of the services that they perform).)

d. Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, for services other than for inpatients or outpatients. (*See* Ex. A at §§ 1.11 & 2.1.)

e. Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not accurate, complete, and truthful, including but not limited to claims containing the following misrepresentations:

i. Provider name;

ii. Provider address

iii. Provider Tax ID and NPI;

iv. Type of bill;

v. Admission type;

vi. Source of admission;

vii. Patient discharge status;

viii. Attending physician's name and NPI;

ix. Medical necessity of the testing performed; and

x. That the information provided on the claim was "true, accurate and complete."

- 70 -

f.     Failing to provide "valid and appropriate billing and diagnosis codes."  (*See* Ex. A at § 4.2.)

g.     Failing to participate in, comply with, and provide hospital services in accordance with Anthem policies, programs, and procedures, including the Anthem Provider Manual and Anthem Drug Testing Policy.  (*See* Ex. A at § 2.6.)  This includes, but is not limited to, billing for components of laboratory testing not performed by Putnam in violation of the Anthem Blue Cross and Blue Shield Provider Manual.

h.     Assigning, delegating, or transferring the Contract or Putnam's rights and responsibilities under the Contract without the prior written consent of RightCHOICE.  (*See* Ex. A at § 6.1(a).)

i.     Submitting claims to RightCHOICE, or causing claims to be submitted to RightCHOICE, that Putnam knew were not reasonable and medically necessary, as defined by the Contract.  (*See* Ex. A at §§ 1.13 & 1.18.)

j.     Paying, receiving, offering an incentive, or participating in an incentive program or arrangement that provides another physician or provider with a direct or indirect inducement to provide less than medically necessary health care services, supplies, accommodations, treatments or care to BCBS Plan members.  (*See* Ex. A at § 4.4(c).)

k.     Failing to refund RightCHOICE for any overpayment or erroneous

- 71 -

payment no later than 30 days after Putnam became aware of the overpayment or erroneous payment. (*See* Ex. A at § 4.4(b).)

290. The Defendants' interference with RightCHOICE's contract with Putnam was without justification.

291. The Plaintiffs have been damaged by Defendants' acts of interference in an amount to be determined in this litigation.

## COUNT VI
## CIVIL CONSPIRACY
### (Against all Defendants)

292. The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

293. The Defendants and their co-conspirators committed torts against the Plaintiffs by fraudulently and negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

294. The Defendants and their co-conspirators formed agreements amongst themselves and the above-named parties, and others unknown, directly or indirectly, to commit the unlawful acts described in this Complaint.

295. The above-named parties committed wrongful acts in furtherance of their common scheme.

296. The Plaintiffs have been injured by the wrongful scheme in a significant amount to be determined in this litigation.

- 72 -

## COUNT VII
## AIDING AND ABETTING A TORT
### (Against all Defendants)

297.    The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

298.    The Defendants and their co-conspirators committed torts against the Plaintiffs by fraudulently and negligently misrepresenting their practices, claims for insurance, and by interfering with the Contract.

299.    Each Defendant knew that the conduct described in this Complaint was occurring and was a breach of duty.

300.    Each Defendant actively participated in various aspects of the scheme described in this Complaint.  Each Defendant also gave substantial assistance or encouragement to other participants in the scheme.

301.    The Plaintiffs have been damaged by the scheme in an amount to be determined in this litigation.

302.    Because each Defendant knew of the scheme and gave substantial assistance to further the scheme, each Defendant is subject to liability for the torts committed in furtherance of the scheme.

- 73 -

## COUNT VIII
## UNJUST ENRICHMENT
### (Against all Defendants)

303. The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

304. The Defendants and their co-conspirators fraudulently submitted or caused the submission of claims to RightCHOICE for services that were not performed at or by Putnam.

305. RightCHOICE, relying on misrepresentations made by the Defendants and their co-conspirators, issued reimbursements to Putnam, which were shared with the other Defendants and their co-conspirators.

306. Each Defendant, therefore, received a benefit from the Plaintiffs in the form of a share of reimbursements that should not have been reimbursed.

307. The Plaintiffs conferred those benefits in reliance on the reasonable belief that the reimbursements were properly owed.

308. Each Defendant appreciated the benefit conferred by the Plaintiffs.

309. Each Defendant has unjustly accepted and retained those benefits.

310. Each Defendant should be required to make restitution for the benefits it received, retained, and appropriated because justice and equity require such restitution.

- 74 -

311.     Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous providers at the expense of insurance companies and patients.

312.     The Plaintiffs are entitled to restitution in an amount to be determined at trial, including but not limited to all amounts Defendants received from RightCHOICE because of Defendants' scheme.

## COUNT IX
## MONEY HAD AND RECEIVED
### (Against All Defendants)

313.     The Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

314.      As set forth herein, each of the Defendants received or obtained possession of the Plaintiffs' money.

315.     Defendants thereby appreciated a benefit.

316.     Defendants' acceptance and retention of the Plaintiffs' money is unjust.

- 75 -

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request judgment in their favor granting the following relief:

a)    Actual and consequential damages in an amount to be determined at trial, plus interest;

b)    An order obligating Defendants to disgorge the proceeds of the scheme;

c)    Equitable relief, as described herein;

d)    An injunction prohibiting Defendants from continuing their scheme;

e)    An award of the Plaintiffs' costs, including reasonable attorney's fees, in accordance with contractual provisions and ERISA § 502(g)(1);

f)    Punitive damages; and

g)    Any other relief deemed just, proper, and/or equitable.

DATED:  September 17, 2019        By:  /s/ Michael L. Jente

**LEWIS RICE LLC**
Neal F. Perryman, MO Bar #43057
Michael L. Jente, MO Bar #62980
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
T: (314) 444-7600
nperryman@lewisrice.com
mjente@lewisrice.com

-and-

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (admitted *pro hac vice*)
Jason W. Pfeiffer, MO Bar #50104
Nathaniel J. Moore (admitted *pro hac vice*)
Amira A. ElShareif (admitted *pro hac vice*)
Jaime J. Wing (admitted *pro hac vice*)
800 LaSalle Avenue
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
jpfeiffer@robinskaplan.com
nmoore@robinskaplan.com
aelshareif@robinskaplan.com
jwing@robinskaplan.com

*Attorneys for Plaintiffs*