UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| RightCHOICE Managed Care, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Hospital Partners, Inc.; Hospital Laboratory Partners, LLC; Empower H.I.S. LLC; RAJ Enterprises of Central Florida, LLC d/b/a Pinnacle Laboratory Services; LabMed Services, LLC; SeroDynamics, LLC; David Byrns; Jorge Perez; Beau Gertz; and Mark Blake, <br><br> Defendants. | Civil Action No. <br> 5:18-CV-06037-DGK |

**PLAINTIFFS' SUGGESTIONS IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF ALL THE EVIDENCE**

Plaintiffs, by and through undersigned counsel, respectfully submit these Suggestions in Support of Plaintiffs' Motion for Judgment as a Matter of Law at the Close of All the Evidence.

## INTRODUCTION

Plaintiffs have introduced undisputed evidence in the forms of both testimony and exhibits satisfying each of the elements required to prove their claims for fraud, tortious interference with contract, civil conspiracy, and money had and received. Judgment as a matter of law, therefore, should be granted in Plaintiffs' favor against each of Defendants Beau Gertz, Mark Blake, SeroDynamics, LLC, and LabMed Services, LLC.

1

# ARGUMENT

**I.   Judgment as a matter of law is appropriate when no reasonable jury could find for the nonmoving party.**

Judgment as a matter of law is warranted when the evidence points all one way, such that a reasonable jury could not conclude otherwise. *Froemming v. Gate City Federal Sav. & Loan Ass'n*, 822 F.2d 723, 727 (8th Cir. 1987); Fed. R. Civ. P. 50(a). In making this determination, courts should consider all evidence in the record without weighing credibility, and should resolve conflicts and make all reasonable inferences in favor of the nonmoving party. *Schooley v. Orkin Extermination Co.*, 502 F.3d 759, 764 (8th Cir. 2007). An inference is reasonable when it may be drawn from the evidence without resort to speculation. *Id.*

A court may direct a verdict in favor of the party bearing the burden of proof. *Froemming*, 822 F. 2d at 727. It may do so, however, only in exceptional circumstances. *Id.* Any such decision must be supported by admitted facts or facts established by the undisputed testimony of one or more disinterested witnesses, with the result being that different minds would be unable to reasonably draw different conclusions from such testimony. *Id.*

**II.   Plaintiffs are entitled to a directed verdict as to their fraud claim.**

Fraud has nine elements: (1) an affirmative representation or, alternatively, a failure to disclose information in the face of an obligation to do so or superior knowledge;[1] (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance as to its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's

---

[1] As to fraudulent concealment, a failure to disclose may substitute for the affirmative representation element of a fraud claim. *Bohac v. Walsh*, 223 S.W.3d 858, 864 (Mo. Ct. App. 2007).

reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). A hearer has the right to rely on distinct and specific misrepresentations "even if the parties stand on equal footing or have equal knowledge or means of information relating to the subject matter." *Iota Mgmt. Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 413 (Mo. Ct. App. 1987). Separately, "one who accepts the fruits of fraud with knowledge of the misrepresentations or concealment by which they were obtained will be held liable therefor, even though he did not personally participate in the fraud." *Pelster v. Ray*, 987 F.2d 514, 523 (8th Cir. 1993) (citing *Walters v. Maloney*, 758 S.W.2d 489, 500 (Mo. Ct. App. 1988)); 37 C.J.S. Fraud § 107 (Feb. 2021) (similar).

### A. Affirmative Representations

Defendant David Byrns, acting as CEO of Putnam Count Memorial Hospital ("Putnam"), entered a contract in late 2016 with Gertz, who acted on SeroDynamics' behalf as its president. (Ex. 7;[2] Stipulated Fact #12, Dkt. 688.) The Sero Defendants have admitted that the Hospital Partners-SeroDynamics contract required that Putnam bill third-party payors for blood lab tests that SeroDynamics performed using Putnam's "provider numbers." (*Id.* § 2.2; Tr. (Gertz) at 323:17-324:25, 614:13-615:3.[3]) The Hospital Partners-SeroDynamics contract made SeroDynamics Putnam's so-called "exclusive" blood reference lab. (*Id.* at 1.) Blake, SeroDynamics' officer and attorney (Stipulated Fact #13, Dkt. 688), admitted that he knew that Defendant Empower H.I.S. LLC ("Empower") would use Putnam's provider numbers to bill the at-issue tests performed by SeroDynamics. (Tr. (Blake) at 614:18-25.) The Sero Defendants have

---

[2] References to "Ex." are to those exhibits received in evidence at trial.

[3] References to "Tr." are to the transcript of trial.

also admitted that all of the at-issue tests were billed to Plaintiffs using Putnam's National Provider Identification ("NPI") number and Taxpayer Identification Number ("TIN"). (Ex. 12; Tr. (Blake) at 614:18-25.)

### B. Falsity

Plaintiffs understand that the provider associated with a given NPI or TIN as identified on a claim form is the provider who performed the services billed. (Tr. (Bobbitt) at 693:1-6.) The Sero Defendants themselves have stipulated that SeroDynamics performed the at issue claims at its laboratory in Denver, CO. (Stipulated Fact #24, Dkt. 688.)

### C. Materiality

Plaintiffs use the NPI and TIN listed on a claim to determine whether to pay the claim and, if the claim is payable, how to price it. (Tr. (Bobbitt) at 625:19-23, 625:22-626:17, 693:10-14.) The TIN and NPI on a claim affect every other step of claims adjudication. (Tr. (Bobbitt) at 626:8-11.)

### D. Knowledge of falsity or ignorance of its truth

The Sero Defendants have stipulated that all tests in this case were performed by SeroDynamics in Colorado. (Stipulated Fact #24, Dkt. 688.) The Sero Defendants have admitted that the SeroDynamics-Putnam contract required that Putnam bill for tests that SeroDynamics performed using Putnam's "provider numbers." (Ex. 7 § 2.2; Tr. (Gertz) at 323:17-324:25, 614:13-615:3.) They have also admitted that SeroDynamics billed Plaintiffs directly before it began its relationship with Putnam. (Tr. (Gertz) at 259:20-260:4.) Unrefuted evidence shows that practice of billing for testing done by another lab under Putnam's provider numbers is not consistent with industry standards. (Tr. (Kongstvedt) at 947:9-13.) As explained above, Plaintiffs look to the submitted TIN and NPI to determine which provider performed a service and, thus, whether a claim is payable and at what price.

### E. Intent

The Hospital Partners-SeroDynamics contract *required* that Putnam's billing company, Empower, bill tests that SeroDynamics performed using Putnam's "provider numbers." (Ex. 7 § 2.2.) Blake admitted that he knew that to get claims paid under contract between Putnam and Plaintiff RightCHOICE Managed Care, Inc. ("RightCHOICE"),[4] the claims would have to be submitted using Putnam's provider numbers. (Tr. (Blake) at 506:14-17.) The Sero Defendants knew of the Florida Blue Cross Blue Shield ("BCBS") plan's prohibition on billing lab tests performed by independent labs through hospitals, including blood tests. (Exs. 86, 90.) Blake and Gertz also knew that under BCBS rules "the blood laboratory can be located within one foot from the hospital and the hospitals can not (sic) bill BCBS for the blood work." (Ex. 94.) The Sero Defendants own counsel warned them what would happen if a hospital "fraudulently bill(ed) by not giving the actual location of the lab work(.)" (Ex. 62.) The Sero Defendants were also advised that BCBS viewed the Sero Defendants' similar conduct at Campbellton-Graceville Hospital as fraudulent. (Ex. 131 at 5.) In preparation for billing certain tests that SeroDynamics had performed before it entered its relationship with Putnam through Hospital Partners, the Sero Defendants altered test requisition forms to bear Putnam's logo. (Exs. 153-54, 172; Tr. (Gertz) at 340:20-341:20, 350:1-12.)

### F. Ignorance of falsity

James Balcom, a member of BCBS' Special Investigations Unit ("SIU") tasked with investigating the billing of the at-issue tests, did not know where the tests at issue were being done in late January 2017. (Ex. 589; Tr. (Balcom) at 841:21-24.) As part of his investigation, on January 24, 2017, he requested medical records to ascertain whether the tests at issue were being

---

[4] RightCHOICE is a subsidiary of Anthem, Inc.

performed at Putnam. (Ex. 230.) By March 1, 2017, Plaintiffs did not know if the tests at issue were being performed at Putnam; they could only speculate. (Ex. 283; Tr. (Huether) at 913:1-8.) If an independent lab could bill for tests that it performed using Putnam's TIN, he would have stopped his investigation; he did not. (Tr. (Balcom) at 839:4-7.) Balcom continued to work on the investigation into Putnam's lab billings until he returned to the DEA in 2018. (Tr. (Balcom) at 807:5-7, 839:8-12.)

In response to an inquiry from Anthem's legal team into Putnam's lab billing, Byrns affirmatively represented on March 13, 2017, that "Putnam has its own full service clinical laboratory and the equipment to perform all tests it bills with some minor exceptions." (Ex. 299 at 1.) On May 18, 2017, Byrns told Anthem's legal team that with "'minor exceptions,' Putnam works diligently to provide the valuable medical services necessary for BCBS-insured patients at Putnam's clinical laboratory." (Ex. 338 at 1.)

### G. Reliance

Plaintiffs process hundreds of millions of claims per year. (Tr. (Bobbitt) at 622:3-7.) The majority of claims that BCBS processes are adjudicated by software, not human beings—they are "auto adjudicated." (Tr. (Bobbitt) at 623:3-22.) BCBS would not be able to process the hundreds of millions of claims it processes every year if the claims were not auto adjudicated. (Tr. (Bobbitt) at 623:23-1.) BCBS' system learns the TIN and NPI on a claim by the provider who submitted the claim. (Tr. (Bobbitt) at 626:3-7.) BCBS relies on providers who bill claims to it being truthful. (Tr. (Bobbitt) at 624:2-8.) Putnam had a contractual duty to bill only for services performed "by, or under the direction and personal supervision of" Putnam. (Ex. 1 § 4.1(b).) The hospital also had a contractual duty to ensure its billed claims were accurate, complete, and truthful. (Ex. 1 § 4.1(d).) If anyone had asked Jamie Huether whether it was appropriate for someone to use Putnam's NPI and TIN to bill BCBS for blood tests being

performed in Colorado, she would have said it was inappropriate under the Putnam-RightCHOICE contract. (Tr. (Huether) at 919:14-25.) The Sero Defendants have produced no evidence to the contrary.

## H. Right to Rely

The Hospital Partners-RightCHOICE contract states: "Hospital hereby certifies that all claims information, encounter data and other information submitted by or on behalf of Hospital to a Company will be and are accurate, complete, and truthful." (Ex. 1 § 4.1(d).) Putnam had a contractual duty to bill only for services performed "by, or under the direction and personal supervision of" Putnam. (Ex. 1 § 4.1(b).) Plaintiffs do not know if the information supplied on a claim form is truthful and accurate—they must rely on providers who submit claims and they presume such information is truthful. (Tr. (Bobbitt) at 624:2-8) Plaintiffs process hundreds of millions of claims per year. (Tr. (Bobbitt) at 622:3-7.) The majority of those are adjudicated by software, not human beings—they are "auto adjudicated." (Tr. (Bobbitt) at 623:3-22.) Plaintiffs would not be able to process the hundreds of millions of claims they process every year if they were not auto adjudicated. (Tr. (Bobbitt) at 623:23-1.) Plaintiffs' system learns the TIN and NPI on a claim by the provider who submitted the claim. (Tr. (Bobbitt) at 626:3-7.) Plaintiffs rely on providers who bill claims to be truthful. (Tr. (Bobbitt) at 624:2-8.)

Balcom understood that Byrns' March 13, 2017, letter meant Putnam was abiding by its contract with RightCHOICE. (Tr. (Balcom) at 854:3-6; PTX 299) Plaintiffs unilaterally reduced Putnam's payment for lab tests in March 2017 to take effect in 90 days, June 15, 2017. (Ex. 6; Tr. (Huether) at 917:12-918:1) The March 2017 amendments to the Putnam contract worked— they reduced the volume of lab claims being submitted through Putnam dramatically. (Tr. (Huether) at 918:10-14.) Plaintiffs were unable to terminate the Putnam contract because they must provide a contracted network on behalf of members, and terminating the Putnam contract

would have eliminated the local rural community's access to its only hospital. (Tr. (Huether) at 918:15-24.)

### I. The Hearer's Consequent and Proximately Caused Injury

Claims adjudication covers every step from the point a claim is submitted to the time that a check is mailed to a provider. (Tr. (Bobbitt) at 620:5-10) The TIN and NPI on a claim affect every other step of claims adjudication. (Tr. (Bobbitt) at 626:8-11, 630:3-7) BCBS paid $18 million on the tests performed by SeroDynamics but billed using Putnam's TIN and NPI. (Ex. 12; Tr. (Fortune) at 1050:23-1052:2, 1053:4-9.) During the time SeroDynamics operated, it received payments totaling more than $6 million from Putnam. (Tr. (Gertz) at 258:9-12) LabMed received over $20 million from Putnam. (Tr. (Gertz) at 259:1-3)

### J. Alternatively, Plaintiffs are entitled to a judgment as a matter of law as to damages pre-dating the Hospital Partners-SeroDynamics contract.

SeroDynamics and LabMed had no relationship with Putnam prior to November 1, 2016. (Exs. 7, 8.) Even so, BCBS paid $3 million for claims with service dates prior to SeroDynamics having a contract with Putnam. (Tr. (Fortune) 1054:20-21.) If Plaintiffs are not entitled to judgement as a matter of law with respect to all of their damages, they are entitled to judgment as a matter of law with respect to damages predating the Hospital Partners-SeroDynamics contract.

### K. Alternatively, Plaintiffs are entitled to judgment as a matter of law as to all proceeds of fraud retained by the Sero Defendants.

During the time SeroDynamics operated, it received payments totaling more than $6 million from Putnam. (Tr. (Gertz) 258:9-12) LabMed received over $20 million from Putnam. (Gertz 259:1-3) The claims billed using Putnam's TIN and NPI but performed by SeroDynamics can be identified by their use of alphanumeric characters in column AG of Exhibit 12; PCCADI denotes SeroDynamics. (Tr. (Oser) 732:2-23; Ex. 12.) BCBS paid $18 million on the tests that

the Sero Defendants performed but were billed using Putnam's "provider numbers." (Ex. 12; Tr. (Fortune) at 1050:23-1052:2, 1053:4-9.)

### L. Alternatively, Plaintiffs are entitled to a directed verdict as to all damages through fraud by omission.

"In nondisclosure cases, a party's silence amounts to a representation where the law imposes a duty to speak." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). Such duty arises when one party has superior knowledge or information that is not reasonably available to the other. *Id.* The Sero Defendants had superior knowledge because the tests were performed in the Denver laboratory. (Stipulated Fact #24, Dkt. 688.) Plaintiffs were not made aware that SeroDynamics performed the tests at its lab in Denver, Colorado. By March 1, 2017, Plaintiffs did not know if the tests at issue were being performed at Putnam; they could only speculate. (Ex. 283; Tr. (Huether) at 913:1-8.)

### III. Plaintiffs are entitled to a directed verdict as to their claim for tortious interference with contract.

Tortious interference with contract has five elements: (1) a contract; (2) a defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from the defendant's conduct. *Rail Switching Servs. v. Marquis-Mo. Terminal, LLC*, 533 S.W.3d 245, 259 (Mo. Ct. App. 2017). A defendant's knowledge of the subject contract may be established by showing it had actual knowledge of the contract or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it. *Id.* The absence of justification means "the absence of any legal right on a defendant's part to take the actions about which plaintiff complains." *Id.* at 115-16.

### A. A Contract

Putnam had a valid contract with RightCHOICE Managed Care. (Stipulated Fact #6—Dkt. 688; Ex. 1)

### B. Defendant's knowledge of the contract or knowledge of facts that would lead a reasonable person to believe in Plaintiffs' interest in it.

It was important to Gertz that Putnam was in-network with BCBS, and he knew that being in-network meant that a provider had a contract with the insurer. (Tr. (Gertz) 316:16-24) Gertz knew that Putnam had a contract with BCBS. (Tr. (Gertz) 316:25-317:3.) Blake knew that Putnam had a contract with BCBS. (Tr. (Blake) 498:18-24.) Gertz told his vice president of sales that they would need to see "MO's" BCBS contract (*i.e.*, Putnam). (Ex. 12.)

Moreover, the Sero Defendants knew Plaintiffs' interest in that contract. Gertz and SeroDynamics' vice president knew that BCBS was relentless about making sure providers use in-network blood labs. (Exs. 51-52.) Gertz knew that payments to CGH were frozen. (Ex. 67.) Gertz received Florida Blue letter which outlined that hospital cannot bill for independent lab's services. (Ex. 86.) Gertz sent the letter to Blake and said he knew that the policy outlined in the Florida Blue letter would be applied to blood. (Ex. 90.) The Sero Defendants would get greater share of proceeds from their arrangement with Putnam if they found an "ethical" way to proceed. (Ex. 120.) Blake explained to Gertz that "[t]he blood laboratory can be located within one foot from the hospital and the hospitals can not [sic] bill BCBS for the blood work." (Ex. 94.) In March of 2017, Gertz told Blake "We can't keep running out of compliance (Texas office sending specimens to Denver then billed out of Missouri—doesn't add up and will blow up every hospital without common ownership)." (Ex. 318.) Gertz wanted to keep Putnam from billing too much so that it was not "sen[t] . . . into audits due to revenue." (Ex. 289.)

### C. Intentional interference by the defendant inducing or causing a breach of the contract;

The Putnam-RightCHOICE contract states: "Hospital shall bill only for Hospital Services performed by, or under the direction and personal supervision of Hospital." (Ex. 1, § 4.1(b).) SeroDynamics' contract with Hospital Partners required use of Putnam's "provider numbers." (Ex. 7.) SeroDynamics performed all of the at-issue tests in Colorado. (Stipulated Fact #24, Dkt. 688.) All of the claims at issue were billed using Putnam's TIN and NPI. (PTX0012) Blake admitted that he knew that in order to get claims paid under BCBS contract, the claims had to be billed with the hospital's provider numbers. (Tr. (Blake) at 506:14-17.) Gertz knew that Empower was billing SeroDynamics claims through Putnam. (Tr. (Gertz) at 388:22-24.) Putnam did not direct and personally supervise the CGH claims. (Tr. (Blake) at 540:16-18.) Putnam did not direct and personally supervise the Southwest Labs claims. (Tr. (Blake) at 563:9-14.) Putnam did not direct and personally supervise *any* of the tests performed by SeroDynamics. (Tr. (Fender) at 788:14-19.)

Section 2.8 of the Putnam-RightCHOICE contract states that "(Putnam) shall refer or transfer (a) Covered Person to another Participating Provider except in cases of emergency or when specific expertise is not available within the provider panel of a Company Program as determined by the Company's medical director in consultation with Hospital and the Company's medical director approves the referral or transfer to a non-Participating Provider." The tests performed by SeroDynamics were not emergencies. (Stipulated Fact #25, Dkt. 688.) Quest served as Putnam's reference lab, and Quest was in-network. (Tr. (Pickens) at 140:14-17, 142:19-23, 143:9-21.) No one at either Putnam or Plaintiffs requested or approved a referral or transfer of any of the specimens that SeroDynamics tested.

11
Case 5:18-cv-06037-DGK   Document 745   Filed 09/26/21   Page 11 of 17

### D. Absence of Justification

The Sero Defendants had no legal right to take the actions that they did because the Putnam-RightCHOICE contract required Putnam to bill only for those services it performed or directed *and* personally supervised. (Ex. 1 § 4.1(b).) As stated above, no one at Putnam directed or personally supervised the work done at SeroDynamics. (Tr. (Fender) at 788:14-19.)

### E. Damages Resulting from Defendants' Conduct

Plaintiffs incorporate by reference Argument Section II.I, *supra*.

## IV. Plaintiffs are entitled to a directed verdict as to their claim for Civil Conspiracy.

Civil conspiracy has five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object; (4) unlawful acts; and (5) damages. *Lyn-Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 700 (Mo. Ct. App. 1999). Conspiracy to breach a contract may serve as the basis for a civil conspiracy claim. *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 587 (Mo. Ct. App. 2008).

### A. Two or More Persons

Byrns, acting on Hospital Partners' behalf and nominally as CEO of Putnam, entered a contract in late 2016 with Gertz, who acted on SeroDynamics' behalf as its president. (Ex. 7.) The Hospital Partners-SeroDynamics contract made SeroDynamics Putnam's so-called "exclusive" blood reference lab. (*Id.* at 1.) Also in late 2016, Byrns, again acting on Hospital Partners' behalf, entered another contract with Gertz, who acted on behalf of LabMed. (Ex. 8.) The Hospital Partners-LabMed contract required Putnam to pay LabMed for "consulting" and "marketing" services. (Ex. 8; Tr. (Gertz) at 258:24-25, 321:2-322:2.) Blake negotiated the LabMed contract with Perez. (Tr. (Blake) 564:1-11.) LabMed entered an agreement obligating it to pay Empower 10% of the compensation LabMed received. (Ex. 339.)

### B. An Object to Be Accomplished

The Sero Defendants, Byrns, Perez, and Byrns' and Perez's companies agreed to bill Plaintiffs for blood lab tests that SeroDynamics performed using Putnam's "provider numbers" and to distribute the proceeds from doing so. (Exs. 7 § 2.2, 105, 134, 218.) Part of this agreement included billing tests through Putnam that SeroDynamics had performed and originally intended to bill through CGH before SeroDynamics lost the ability to do so. (Tr. (Gertz) at 328:18-329:6, 331:23-332:8, 333:6-9; Ex. 7.) The agreement also included billing tests through Putnam that SeroDynamics had performed for Southwest Labs but for which Southwest Labs had not paid SeroDynamics. (Exs. 165, 168; Tr. (Gertz) at 335:6-11, 338:3-5, 339:16-18.)

### C. A Meeting of the Minds on the Object

Gertz told Byrns and Perez that they would "accomplish the mission" after Byrns sent Gertz the executed Hospital Partners-SeroDynamics and -LabMed contracts. (Exs. 7-8, 134.) Perez introduced the Sero Defendants to Putnam; they knew each other previously because Perez introduced the Sero Defendants to CGH. (Tr. (Gertz) at 313:10-13.) Perez told the Sero Defendants to move to Putnam. (Tr. (Blake) at 533:2-17.) Blake negotiated LabMed's contract with Putnam through Perez. (Tr. (Blake) at 564:5-11.) Byrns misrepresented the nature of lab work billed through Putnam in response to direct inquiries from BCBS' legal team. (*See* Exs. 283, 299, 331, 338.) Perez forwarded at least one of those letters to Blake after Perez received it from Byrns. (Ex. 292.) Blake provided comments to Perez on Putnam's response to a report by the Missouri Auditor concerning Putnam's lab billings. (Ex. 350.)

### D. Unlawful Acts

Even though SeroDynamics performed the at-issue tests at its laboratory in Denver, CO (Stipulated Fact #24, Dkt. 688), all of the claims were billed using Putnam's TIN and NPI. (Ex. 12). Blake knew that Empower would use Putnam's provider numbers to bill the tests. (Tr.

(Blake) at 614:23-25.) This constituted fraud and tortious interference with the Putnam-RightCHOICE contract. (*See* Argument Sections II.A-H (elements of fraud except damages) and III.A-D (elements of tortious interference with contract except damages), *supra*.)

### E. Damages

Plaintiffs incorporate by reference Argument Section II.I, *supra*, concerning damages.

## V. Money Had and Received

Money had and received has three elements: (1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust." *O'Shaughnessy v. Cypress Media, L.L.C.*, 208 F. Supp. 3d 1064, 1073 (W.D. Mo. 2016) (Kays, J.). An action for money had and received is a remedy at law that is governed by equitable principles. *N. Farms, Inc. v. Jenkins*, 472 S.W.3d 617, 624 (Mo. Ct. App. 2015).

### A. Receiving or Obtaining a Plaintiffs' Money

Plaintiffs incorporate by reference Argument Section II.I, *supra*. During the time SeroDynamics operated, it received payments totaling more than $6 million from Putnam. (Tr. (Gertz) at 258:9-12.) LabMed received over $20 million from Putnam. (Tr. (Gertz) at 259:1-3.)

### B. Appreciation of a Benefit

The Sero Defendants were aware of and composed "very detailed breakdown(s)" of the proceeds they received from the Putnam billing arrangement, which they sent to Perez. (Ex. 218.)

### C. Unjust Acceptance and Retention of Money

The Sero Defendants' acceptance and retention of Plaintiffs' money was unjust for the reasons stated in Argument Sections II.A-H (elements of fraud except damages) and III.A-D (elements of tortious interference with contract except damages), *supra*.

## CONCLUSION

Plaintiffs have introduced undisputed evidence in the forms of both testimony and exhibits satisfying each of the elements required to prove their claims for fraud, tortious interference with contract, civil conspiracy, and money had and received. Judgment as a matter of law, therefore, should be granted in Plaintiffs' favor.

Dated: September 26, 2021  By:  */s/ Michael L. Jente*

**LEWIS RICE LLC**
Neal F. Perryman, MO Bar #43057
Michael L. Jente, MO Bar #62980
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
T: (314) 444-7600
nperryman@lewisrice.com
mjente@lewisrice.com

-and-

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (admitted PHV)
Munir R. Meghjee (admitted PHV)
Jason W. Pfeiffer, MO Bar # 50104
Nathaniel J. Moore (admitted PHV)
Jaime J. Wing (admitted PHV)
J. Haynes Hansen (admitted PHV)
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
T: (612) 349-8500
F: (612) 339-4181
jgleason@robinskaplan.com
mmeghjee@robinskaplan.com
jpfeiffer@robinskaplan.com
nmoore@robinskaplan.com
jwing@robinskaplan.com
hhansen@robinskaplan.com

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that the foregoing was filed electronically with the United States District Court for the Western District of Missouri, through the Court's CM/ECF system, on the 21st day of September, 2021, with notice of case activity sent to counsel of record.

/s/ Michael L. Jente